UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN CIVIL LIBERTIES UNION, and
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

                Plaintiffs,

      v.

NATIONAL SECURITY AGENCY,
CENTRAL INTELLIGENCE AGENCY,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF JUSTICE, and
DEPARTMENT OF STATE,

            Defendants.

13 Civ. 9198 (AT)


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd floor
New York, New York 10007
Tel.: (212) 637-2739/2679
Fax: (212) 637-2717
E-mail:   David.Jones6@usdoj.gov
         Jean-David Barnea@usdoj.gov

DAVID S. JONES
JEAN-DAVID BARNEA
Assistant United States Attorneys

   – Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ...........................................................................................................2

    A.    Executive Order 12,333 ..............................................................................2

    B.    Procedural History ........................................................................................3

ARGUMENT ..............................................................................................................8

I.    Legal Standards for Summary Judgment in FOIA Actions ...............................8

II.    The Agencies Conducted Reasonable Searches .............................................10

    A.    Central Intelligence Agency ......................................................................11

    B.    Defense Intelligence Agency .....................................................................13

    C.    DOJ—Federal Bureau of Investigation ....................................................14

    D.    DOJ—National Security Division ..............................................................15

    E.    DOJ—Office of Legal Counsel .................................................................17

    F.    National Security Agency ..........................................................................17

    G.    State Department.........................................................................................19

III.    The Withheld Documents and Information Are Exempt from Disclosure Under FOIA ...............................................................................................................23

    A.    The Government Has Properly Withheld Classified Documents and Information Under Exemption 1 ..................................................................23

        1.    Central Intelligence Agency ..........................................................24

        2.    Defense Intelligence Agency .........................................................26

        3.    DOJ—Federal Bureau of Investigation ........................................28

        4.    DOJ—National Security Division .................................................29

        5.    DOJ—Office of Legal Counsel .....................................................34

        6.    National Security Agency ..............................................................37

    B.    The Government Has Properly Withheld Documents and Information Under Exemption 3 ......................................................................................41

        1.    Central Intelligence Agency ..........................................................42

        2.    Defense Intelligence Agency .........................................................43

        3.    DOJ—Federal Bureau of Investigation ........................................44

        4.    DOJ—National Security Division .................................................44

5. DOJ—Office of Legal Counsel ...............................................................46

6. National Security Agency ...................................................................47

C. The Government Has Properly Withheld Documents and Information Under Exemption 5 ...............................................................................................49

1. Deliberative Process Privilege .............................................................49

a. Central Intelligence Agency ......................................................50

b. Defense Intelligence Agency .....................................................51

c. DOJ—National Security Division ..............................................52

d. DOJ—Office of Legal Counsel .................................................53

e. National Security Agency ..........................................................55

2. Attorney-Client Privilege ....................................................................55

a. Central Intelligence Agency ......................................................56

b. DOJ—National Security Division ..............................................57

c. DOJ—Office of Legal Counsel .................................................57

d. National Security Agency ..........................................................58

3. Presidential Communications Privilege ..............................................58

D. The Government Has Properly Withheld Documents and Information Under Exemption 7 ...............................................................................................60

1. Federal Bureau of Investigation .........................................................60

2. DOJ—Office of Legal Counsel ...........................................................62

3. Central Intelligence Agency ...............................................................62

CONCLUSION ................................................................................................63

# TABLE OF AUTHORITIES

**Cases**                                                                                                                      **Page**

*ACLU v. DOJ,*
   681 F.3d 61 (2d Cir. 2012)................................................................................. *passim*

*ACLU v. Office of the Dir. of Nat. Intelligence,*
   No. 10 Civ. 4419 (RJS), 2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011) ......................9

*Allard K. Lowenstein Int'l Human Rights Project v. DHS,*
   626 F.3d 678 (2d Cir. 2010)....................................................................................60, 61

*Amnesty Int'l USA v. CIA,*
   728 F. Supp. 2d 479 (S.D.N.Y. 2010).................................................................. *passim*

*Bishop v. DHS,*
   45 F. Supp. 3d 380 (S.D.N.Y. 2014).............................................................................59

*Brennan Ctr. for Justice v. DOJ,*
   697 F.3d 184 (2d Cir. 2012)....................................................................................53, 55

*CIA v. Sims,*
   471 U.S. 159 (1985)................................................................................................8, 41

*Carney v. DOJ,*
   19 F.3d 807 (2d Cir. 1994)............................................................................................9

*In re Cnty. of Erie,*
   473 F.3d 413 (2d Cir. 2007)..........................................................................................55

*Croskey v. Office of Special Counsel,*
   No. 96-5114, 1997 WL 702364 (D.C. Cir. Oct. 17, 1997) ...........................................36

*Ctr. for Constitutional Rights v. DoD,*
   968 F. Supp. 2d 623 (S.D.N.Y. 2013), *aff'd*, 765 F.3d 161 (2d Cir. 2014)...............8, 9

*Ctr. for Nat'l Sec. Studies v. DOJ,*
   331 F.3d 918 (D.C. Cir. 2003) ......................................................................................9

*Elec. Frontier Found. v. DOJ*,
   739 F.3d 1 (D.C. Cir. 2014) .......................................................................53

*Elec. Privacy Info. Ctr. v. DOJ*,
   Nos. 06-096, 06-214 (RCL), 2014 WL 1279280 (D.D.C. Mar. 31, 2014) .................36

*Ferguson v. FBI*,
   No. 89 Civ 5071 (RPP), 1995 WL 329307 (S.D.N.Y. June 1, 1995),
   *aff'd*, 83 F.3d 41 (2d Cir. 1996) ...................................................................9

*Frugone v. CIA*,
   169 F.3d 772 (D.C. Cir. 1999) ...................................................................10

*Grand Cent. P'ship, Inc. v. Cuomo*,
   166 F.3d 473 (2d Cir. 1999) ............................................................. *passim*

*Halperin v. CIA*,
   629 F.2d 144 (D.C. Cir. 1980) .....................................................................9

*Hamdan v. DOJ*,
   797 F.3d 759 (9th Cir. 2015) .....................................................................43

*Hopkins v. HUD*,
   929 F.2d 81 (2d Cir. 1991) .......................................................................49

*John Doe Agency v. John Doe Corp.*,
   493 U.S. 146 (1989) .................................................................................8

*Krikorian v. Dep't of State*,
   984 F.2d 461 (D.C. Cir. 1993) ...................................................................41

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ........................................................10, 26, 42

*N.Y. Times Co. v. DOJ*,
   756 F.3d 100 (2d Cir. 2014) ...........................................................9, 10, 26

*N.Y. Times Co. v. DOJ*,
   806 F.3d 682 (2d Cir. 2015) .....................................................................53

*N.Y. Times Co. v. DOJ*,
  872 F. Supp. 2d 309 (S.D.N.Y. 2012)............................................................9

*New Hampshire v. Maine*,
  532 U.S. 742 (2001).......................................................................................36

*Nixon v. Adm'r of Gen. Servs.*,
  433 U.S. 425 (1997).......................................................................................58

*Renegotiation Bd. v. Grumman Aircraft Engineering Corp.*,
  421 U.S. 168 (1975).......................................................................................49

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ...............................................................58, 59

*Taylor v. Sturgell*,
  553 U.S. 880 (2008).......................................................................................36

*Tigue v. DOJ*,
  312 F.3d 70 (2d Cir. 2002).............................................................................49

*U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*,
  532 U.S. 1 (2001).............................................................................................8

*Upjohn v. United States*,
  449 U.S. 383 (1981).......................................................................................55

*Weisberg v. DOJ*,
  705 F.2d 1344 (D.C. Cir. 1983) ....................................................................10

*Wilner v. NSA*,
  592 F.3d 60 (2d Cir. 2009).........................................................................9, 41

## FEDERAL STATUTES, EXECUTIVE ORDERS, RULES, AND CONGRESSIONAL MATERIALS

10 U.S.C. § 424.................................................................................43

18 U.S.C. § 798........................................................................45, 47, 48

Central Intelligence Agency Act of 1949
  50 U.S.C. § 3507 ..........................................................................42

Freedom of Information Act,
  5 U.S.C. § 552............................................................................1, 8

  5 U.S.C. § 552(b)(1) .......................................................................23

  5 U.S.C. § 552(b)(3) .......................................................................41

  5 U.S.C. § 552(b)(5) .......................................................................48

  5 U.S.C. § 552(b)(7)(A) ....................................................................61

  5 U.S.C. § 552(b)(7)(D) ....................................................................62

  5 U.S.C. § 552(b)(7)(E) ....................................................................60

National Security Act
  50 U.S.C. § 3024(i)(1) ................................................................ *passim*

NSA Act sec. 6, Pub. L. No. 86-36, 73 Stat. 63, 64,
  50 U.S.C. § 3605...................................................................44, 45, 47, 48

Executive Order 12,333, 46 Fed. Reg. 59,941 (Dec. 4, 1981)................................. *passim*

Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009)..................................... *passim*

Fed. R. Civ. P. 56(a) .........................................................................9

H.R. Rep. No. 1497 (1966) .....................................................................8

# PRELIMINARY STATEMENT

Defendants the National Security Agency ("NSA"), Central Intelligence Agency ("CIA"), Department of Defense ("DoD"), Department of Justice ("DOJ"), and Department of State ("State") (collectively, "Defendants" or "the government"), by their attorney, Preet Bharara, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion for partial summary judgment in this case arising under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

In 2013, Plaintiffs sent sweeping, substantially similar FOIA requests to seven separate agencies or agency components that Plaintiffs believed were responsible for conducting or otherwise working in support of the Nation's overseas intelligence activities, as authorized by Executive Order 12,333. Plaintiffs then commenced this action against those agencies—the Department of Justice in connection with the FOIA responses of its components the Federal Bureau of Investigation ("FBI"), National Security Division ("NSD"), and Office of Legal Counsel ("OLC"), plus CIA, DoD, State, and NSA—seeking to compel broad disclosures of highly sensitive information, much of which goes to the heart of the Nation's foreign intelligence capabilities and activities. Plaintiffs' original requests were narrowed by stipulations approved in 2014 and 2015 to permit more targeted and achievable searches. As described below, each defendant agency carried out careful searches reasonably designed to identify all records that were responsive to Plaintiffs' narrowed requests, and, after processing, each defendant agency released records or portions of records to the greatest extent possible consistent with applicable FOIA exemptions including those applicable to classified, statutorily protected and privileged materials. Plaintiffs reviewed these productions, as well as indexes of withheld materials provided by each defendant agency other than CIA, and identified a subset of withholdings that

they wish to challenge at this stage of the litigation, after which, if necessary, the parties will meet and confer and attempt to consensually resolve any remaining issues in the litigation. *See* Dkt. No. 51 (describing parties' agreement regarding scope of motion and procedures upon the Court's ruling). Plaintiffs also challenge the adequacy of the searches conducted by all agencies other than OLC.

Defendants are entitled to partial summary judgment on all issues raised in this motion. First, as detailed below, each defendant agency satisfied its obligation under FOIA to conduct a search that was reasonably calculated to discover the requested documents. Moreover, the government has meticulously demonstrated, following exacting review and a good-faith effort to be as forthcoming as possible, that each withholding at issue is protected by one or more FOIA exemptions.[1] Indeed, much of the information sought is among the Nation's most sensitive classified information, and its disclosure would cause serious harm to national security in ways that have been explained in the accompanying agency declarations, and in a classified declaration that is being submitted to the Court *in camera* and *ex parte* in support of this motion.

## BACKGROUND

### A.     Executive Order 12,333

Executive Order ("E.O.") 12,333, 46 Fed. Reg. 59,941 (Dec. 4, 1981), as amended, governs and restricts the conduct of certain intelligence activities of the U.S. Government. *See* Declaration of Antoinette B. Shiner ("CIA Decl.") ¶ 6 n.2.[2] Plaintiffs' FOIA requests at issue here pertain to aspects of E.O. 12,333 that concern electronic surveillance and U.S. persons. *Id.* ¶ 6; *see generally* Second Amended Complaint (Dkt. No. 44) (the "Second Amended

---

[1] To assist the Court's review, this memorandum includes an addendum listing each document at issue, and stating which exemption or exemptions apply to each, with reference to the relevant discussion set forth in one or more supporting agency declarations.

[2] For ease of reference, the declarations that accompany and support this memorandum are all abbreviated using the name of the agency with which the declarant is affiliated.

Complaint"); Stipulation and Order Regarding Document Searches, May 9, 2014 (Dkt. No. 30) (the "Stipulation").

Executive Order 12,333 is lengthy and complex, and is not fully described in this memorandum. In brief, however, the Order constitutes formal Presidential recognition that "[a]ccurate and timely information about the capabilities, intentions and activities of foreign powers, organizations, or persons and their agents is essential to informed decisionmaking in the areas of national defense and foreign relations," and identifies the "[c]ollection of such information" as a "priority objective" that "will be pursued in a vigorous, innovative and responsible manner that is consistent with the Constitution and applicable law and respectful of the principles upon which the United States was founded." E.O. 12,333, § 2.1. Toward that end, the Order directs that "[t]he United States intelligence effort shall provide the President and the National Security Council with the necessary information on which to base decisions concerning the conduct and development of foreign, defense and economic policy, and the protection of United States national interests from foreign security threats." Id. § 1.1. The Order further requires that "[a]ll means, consistent with applicable United States law and this Order, and with full consideration of the rights of United States persons, shall be used to develop intelligence information for the President and the National Security Council. A balanced approach between technical collection efforts and other means should be maintained and encouraged." Id. § 1.1(b). The Order includes restrictions on the collection, retention, and dissemination of information pertaining to U.S. persons. E.g., id. §§ 2.3, 2.4.

### B. Procedural History

By letters dated May 13, 2013, Plaintiffs sent substantially identical FOIA requests (the "Initial Requests") to the CIA, NSA, FBI, NSD, OLC, State, and the Defense Intelligence Agency ("DIA"), an agency within DoD. Copies of these requests are annexed as exhibits to the

respective accompanying declarations of each agency, and as exhibits to the now-operative Second Amended Complaint. In relevant part, each of the Initial Requests sought (a) any records construing or interpreting the scope of each agency's authority to act under E.O. 12,333, and any regulations thereunder; (b) any records describing the minimization procedures used by each agency with regard to both intelligence collection and intelligence interception conducted pursuant to Defendants' authority under E.O. 12,333 or any regulations issued thereunder; and (c) any records describing the standards that must be satisfied for the "collection," "acquisition," or "interception" of communications, as each agency defines these terms, pursuant to authority under E.O. 12,333 or any regulations issued thereunder.

Following correspondence with some of the defendant agencies, Plaintiffs filed this action on December 30, 2013, bringing FOIA claims against all five defendant agencies (CIA, DoD in connection with DIA's response, DOJ in connection with the responses of FBI, NSD, and OLC, State, and NSA). *See* Dkt. No. 1 (initial complaint). Plaintiffs amended their complaint on February 28, 2014 (Dkt. No. 17), and Defendants answered on March 3, 2014 (Dkt. No. 18). The parties subsequently submitted, and the Court approved, a Stipulation that set forth agreed-upon procedures for the record searches that Defendants were to perform in response to Plaintiffs' requests. Specifically, OLC was to "continue to search for and process only those documents encompassed by the agreement it reached with Plaintiffs during the administrative processing of the relevant request," Stipulation ¶ 2, NSD was to "search for and process all documents responsive to the original FOIA request submitted to it by Plaintiffs," *id.* ¶ 4, and NSA, CIA, DIA, FBI, and State were to "search for and process only the following categories of documents":

> a. Any formal regulations or policies relating to that Agency's authority under EO 12,333 to undertake "Electronic Surveillance" (as that term is defined in

EO 12,333) that implicates "United States Persons" (as that term is defined in EO 12,333), including regulations or policies relating to that Agency's acquisition, retention, dissemination, or use of information or communications to, from, or about United States Persons under such authority.[FN]

[FN] For purposes of this Stipulation, surveillance that "implicates" United States Persons means surveillance that is reasonably believed to involve the interception, acquisition, scanning, or collection of information or communications to, from, or about a United States Person or Persons even if the target of such surveillance is not a United States Person.

b. Any document that officially authorizes or modifies under EO 12,333 that Agency's use of specific programs, techniques, or types of Electronic Surveillance that implicate United States Persons, or documents that adopt or modify official rules or procedures for the Agency's acquisition, retention, dissemination, or use of information or communications to, from, or about United States Persons under such authority generally or in the context of particular programs, techniques, or types of Electronic Surveillance.

c. Any formal legal opinions addressing that Agency's authority under EO 12,333 to undertake specific programs, techniques, or types of Electronic Surveillance that implicates United States Persons, including formal legal opinions relating to that Agency's acquisition, retention, dissemination, or use of information or communications to, from, or about United States Persons under such authority generally or in the context of particular programs, techniques, or types of Electronic Surveillance.

d. Any formal training materials or reference materials (such as handbooks, presentations, or manuals) that expound on or explain how that Agency implements its authority under EO 12,333 to undertake Electronic Surveillance that implicates United States Persons, including its acquisition, retention, dissemination, or use of information or communications to, from, or about United States Persons under such authority.

e. Any formal reports relating to Electronic Surveillance under EO 12,333 implicating United States Persons, one of whose sections or subsections is devoted to (1) the Agency's compliance, in undertaking such surveillance, with EO 12,333, its implementing regulations, the Foreign Intelligence Surveillance Act, or the Fourth Amendment; or (2) the Agency's interception, acquisition, scanning, or collection of the communications of United States Persons, whether "incidental" or otherwise, in undertaking such surveillance; and that are or were:

    i. Authored by the Agency's inspector general or the functional equivalent thereof;

ii. Submitted by the Agency to Congress, the Office of the Director of National Intelligence, the Attorney General, or the Deputy Attorney General; or

iii. Maintained by the office of the Agency's director or head.

*Id.* ¶ 3.

After NSD informed Plaintiffs that their original request called for records that, by virtue of NSD's mandate and scope of activities, would not be in NSD's possession, *see* Declaration of John Bradford Wiegmann ("NSD Decl.") ¶¶ 3-5, Plaintiffs submitted a new FOIA request to NSD by letter dated July 29, 2014, seeking:

(1) Formal regulations or policies relating to any agency's authority under EO 12,333 to undertake "Electronic Surveillance" (as that term is defined in EO 12,333) that implicates "United States Persons" (as that term is defined in EO 12,333), including regulations or policies relating to the acquisition, retention, dissemination, or use of information or communications to, from, or about United States Persons under such authority.

(2) Records that officially authorize or modify under EO 12,333 any agency's use of specific programs, techniques, or types of Electronic Surveillance that implicate United States Persons, including official rules or procedures for the acquisition, retention, dissemination, or use of information or communications to, from, or about United States persons under such authority generally or in the context of particular programs, techniques, or types of Electronic Surveillance.

(3) Formal legal opinions addressing any agency's authority under EO 12,333 to undertake specific programs, techniques, or types of Electronic Surveillance that implicates United States Persons, including formal legal opinions relating to the acquisition, retention, dissemination, or use of information or communications to, from, or about United States Persons under such authority generally or in the context of particular programs, techniques, or types of Electronic Surveillance.

(4) Formal training materials or reference materials (such as handbooks, presentations, or manuals) that expound on or explain how any agency implements its authority under EO 12,333 to undertake Electronic Surveillance that implicates United States Persons, including the acquisition, retention, dissemination, or use of information or communications to, from, or about United States Persons under such authority.

(5) Formal reports relating to Electronic Surveillance under EO 12,333 implicating United States Persons that contain any meaningful discussion of (1) any agency's compliance, in undertaking such surveillance, with EO 12,333, its implementing regulations, the Foreign Intelligence Surveillance Act, or the Fourth Amendment; or (2) any agency's interception, acquisition, scanning, or collection of the communications of United States Persons, whether "incidental" or otherwise, in undertaking such surveillance; and that are or were:

(a) Authored by an inspector general or the functional equivalent thereof;
(b) Submitted to Congress, the Office of the Director of National Intelligence, the Attorney General, or the Deputy Attorney General; or
(c) Maintained by the office of the Assistant Attorney General for National Security.

*Id.* ¶ 6. ACLU's now-operative Second Amended Complaint, dated October 31, 2014, seeks disclosure of additional records responsive to this request.

The Stipulation further provided that CIA would search only specified offices (those of its Director, Deputy Director, and Executive Director, and "directorate level" records as to categories b and e(ii) above, and those of the OGC Division or created or maintained at the directorate level as to category d above). Stipulation ¶ 6. It also specified various date limitations for all agencies' searches, generally limiting documents considered responsive to those created or modified on or after September 11, 2011, and/or those that are "currently in use or effect." *Id.* ¶ 7.

Soon thereafter, the Court so-ordered a letter that had jointly proposed deadlines for the completion of searches as required by the Stipulation. Dkt. No. 31 (May 21, 2014). The Court subsequently granted a series of scheduling modifications for completion of searches. (Dkt. Nos. 32, 35, 37, 40, 49). With Defendants' consent, Plaintiffs obtained leave of the Court (Dkt. No.

43) to file their now-operative Second Amended Complaint, which Defendants answered (Dkt. No. 47).

As detailed below, each Defendant agency completed its search and provided Plaintiffs with all non-exempt responsive documents or portions of documents that their searches identified, and most of the agencies that withheld any responsive records also provided Plaintiffs with an index of wholly or partially withheld records. Following discussions, Plaintiffs identified a subset of withholdings that they wished to challenge, which are listed in the addendum to this memorandum.[3] Plaintiffs submitted a pre-motion letter describing the parties' agreement as to the issues to be addressed in cross-motions for partial summary judgment and their agreement concerning procedures to attempt to resolve any remaining disputes, if necessary, following the Court's ruling on these motions. *See* Dkt. No. 51.

## ARGUMENT

### I. Legal Standards for Summary Judgment in FOIA Actions

The Freedom of Information Act, 5 U.S.C. § 552, represents a balance struck by Congress "'between the right of the public to know and the need of the Government to keep information in confidence.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 1497, at 6 (1966)); *Ctr. for Constitutional Rights v. DoD*, 968 F. Supp. 2d 623, 631 (S.D.N.Y. 2013), *aff'd*, 765 F.3d 161 (2d Cir. 2014). Thus, while FOIA requires disclosure under certain circumstances, the statute recognizes "that public disclosure is not always in the public interest," *CIA v. Sims*, 471 U.S. 159, 166-67 (1985), and mandates that records need not be disclosed if "the documents fall within [the] enumerated exemptions," *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001) (citations

---

[3] The ACLU does not challenge Defendants' assertion of FOIA Exemptions 6 and 7(C) as to portions of the records at issue in this motion, and thus these exemptions are not discussed herein or listed in the addendum.

omitted); *see also John Doe Agency*, 493 U.S. at 152 (FOIA exemptions are "intended to have meaningful reach and application").

Most FOIA actions are resolved through motions for summary judgment. *See, e.g., Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994); *Ctr. for Constitutional Rights*, 968 F. Supp. 2d at 631. Summary judgment is warranted if a movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a FOIA case, "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden" on summary judgment. *Carney*, 19 F.3d at 812 (footnote omitted). The agency's declarations in support of its determinations are "accorded a presumption of good faith." *Id.* (quotation marks omitted).[4]

Moreover, courts must accord "substantial weight" to agencies' affidavits regarding national security. *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009); *accord N.Y. Times Co. v. DOJ*, 756 F.3d 100, 112 (2d Cir. 2014); *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007). In FOIA cases involving matters of national security, "the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency." *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980); *see also ACLU v DOJ*, 681 F.3d 61, 70-71 (2d Cir. 2012) ("Recognizing the relative competencies of the executive and judiciary, we believe that it is bad law and bad policy to second-guess the predictive judgments made by the government's

---

[4] The Court has authorized the parties not to submit a Local Rule 56.1 statement, *see* Dkt. No. 53, in keeping with "the general rule in this Circuit . . . that in FOIA actions, agency affidavits alone will support a grant of summary judgment" and a Local Rule 56.1 statement "would be meaningless." *Ferguson v. FBI*, No. 89 Civ. 5071 (RPP), 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995), *aff 'd*, 83 F.3d 41 (2d Cir. 1996); *see also, e.g., N.Y. Times Co. v. DOJ*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012); *ACLU v. Office of the Dir. of Nat. Intelligence*, No. 10 Civ. 4419 (RJS), 2011 WL 5563520, at *1 n.1 (S.D.N.Y. Nov. 15, 2011).

intelligence agencies regarding whether disclosure of [the withheld information] would pose a threat to national security." (quoting *Wilner*, 592 F.3d at 76) (internal quotation marks omitted))); *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003) (courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review"); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) ("courts have little expertise in either international diplomacy or counterintelligence operations").  Rather, "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."  *Wilner*, 592 F.3d at 73 (internal quotation marks omitted; quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)); *accord ACLU*, 681 F.3d at 69; *Wolf*, 473 F.3d at 374-75.

The government is entitled to summary judgment as to the withheld documents and information at issue here, especially applying this deferential standard to the government's declarations regarding national security matters.  The government's submissions—including both classified and unclassified declarations—amply demonstrate that the defendant agencies and components conducted reasonable searches, and the withheld documents and portions of documents are each exempt from disclosure under one or more of FOIA Exemptions 1, 3, 5, and 7.

## II.     The Agencies Conducted Reasonable Searches

An agency can show that it has conducted an adequate search for records responsive to a FOIA request by demonstrating, through declarations, that it has conducted a search reasonably calculated to uncover all relevant documents.  *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  "The adequacy of a search is not measured by its results, but rather by its method."  *N.Y. Times*, 756 F.3d at 124; *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999) (adequacy of search turns on "whether the search was reasonably calculated to discover the

requested documents, not whether it actually uncovered every document extant" (internal quotation marks omitted)). The agency is not required to search every record system, only those systems in which it believes responsive records are likely to be located. *See Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 497 (S.D.N.Y. 2010). Here, the classified and unclassified declarations submitted by the defendant agencies and components establish that their searches were reasonable.

### A.    Central Intelligence Agency

The Central Intelligence Agency's search for responsive records is described in the accompanying CIA declaration. After performing searches pursuant to the parties' Stipulation, the CIA produced to Plaintiffs two documents in full and 46 documents in part, while advising Plaintiffs that it was withholding an additional 110 documents in full pursuant to FOIA exemptions 1, 3, 5, and 6. *See* CIA Decl. ¶ 8. In preparing for this motion, the CIA has determined that the correct number of responsive CIA documents withheld in full actually is 82, not 110. *Id.*

Paragraphs 9-11 of the CIA's declaration describe the agency's searches in detail. To perform the searches required by the controlling Stipulation, CIA personnel consulted with agency officials knowledgeable about each specified subject matter to ascertain the universe of responsive records and to identify CIA databases and repositories to search. *Id.* ¶ 9. For the first specified search request, for formal regulations or policies relating to E.O. 12,333, CIA personnel determined that the agency's Regulation 2-2 and its appendices and annexes were responsive because that regulation implements the provisions of E.O. 12,333; CIA then released portions of Regulation 2-2 to Plaintiffs. *Id.* The second specified category of documents consisted of documents that officially authorize or modify the CIA's use of electronic surveillance or documents that modify official rules or procedures for acquisition, retention and

dissemination concerning electronic surveillance of U.S. persons. *Id.* For this category, CIA information management professionals conducted searches of the offices of the CIA Director, Deputy Director, and Executive Director (collectively, the "Director's Area"), and the front offices of Agency directorates, for any such records, using broad electronic search terms such as 12333, 2-2, and 7-1 (a prior reference number for Regulation 2-2) in the databases that CIA personnel determined were used to maintain this type of documents. *Id.* ¶ 10. No other databases or repositories were deemed likely to contain additional responsive records. *Id.*

The third category of documents constituted formal legal opinions addressing specified topics relating to the CIA's authority under E.O. 12,333. *Id.* ¶ 9. CIA searched for these documents by using the same search terms to query the database maintained by the CIA Office of General Counsel Division that is responsible for providing legal advice on complex or novel questions for responsive legal opinions (the "OGC Division"). *Id.* ¶ 10. The parties agreed that the search would be limited to this database, *see* Stipulation ¶ 6, and at any rate the database that was searched is the sole repository for the requested legal opinions, CIA Decl. ¶ 10.

The fourth category of documents for which CIA searched consisted of training or reference materials regarding CIA's authority under E.O. 12,333 to undertake electronic surveillance that implicates U.S. persons. *Id.* ¶ 9. As to this topic, CIA searched its OGC Division and its Directorate front offices, and also requested that attorneys staffing those offices provide the formal training and reference materials on E.O. 12,333 that are currently in use. *Id.* ¶ 10. CIA personnel determined that these are the only databases and individuals likely to maintain responsive records. *Id.*

The fifth and final category of records for which CIA searched consisted of certain reports relating to electronic surveillance of U.S. persons. *Id.* ¶ 9. For this category, CIA

information management professionals identified and searched relevant databases in the Office of the Inspector General, the Office of Congressional Affairs, and the Director's Area, using search terms including 12333, 2-2, and 7-1. *Id.* ¶ 10. CIA information management personnel determined that the offices and repositories searched were the only places likely to contain responsive records pertaining to category 5. *Id.*

These searches yielded a large volume of documents that were either duplicative or non-responsive to Plaintiffs' requests, many of which did not relate to electronic surveillance. *Id.* ¶ 11. These non-responsive records and portions of records were not produced to Plaintiffs; in some instances documents containing responsive information were released in part with redactions of non-responsive material noted. *Id.* The person with overall responsibility for CIA's search attests that the agency searched "in all locations in which it is reasonably likely that responsive records would reside and used search terms and methods reasonably calculated to locate those documents." *Id.* These intensive efforts more than satisfy the FOIA search requirements. *See, e.g.*, *Grand Cent. P'ship*, 166 F.3d at 489 (search adequate if "reasonably calculated to discover the requested documents").

### B. Defense Intelligence Agency

DIA's search was relatively simple because DIA's Office of General Counsel ("OGC") determined that all DIA records related to Plaintiffs' request would have originated with the DIA's OGC. *See* Declaration of Alesia Y. Williams ("DIA Decl.") ¶ 10. DIA therefore tasked its OGC with conducting a search for responsive records, with responsibility for coordinating the search assigned to the Deputy General Counsel for Mission Services. *Id.* The DIA OGC tasked each member of the OGC office, including all administrative staff, to search for any records construing or interpreting DIA's authority under E.O. 12,333, any records describing the minimization procedures used by DIA pursuant to E.O. 12,333, and any records describing the

standards that must be satisfied for the collection, acquisition, or interception of communications pursuant to E.O. 12,333. *Id.* The Deputy General Counsel for Mission Services collected each response from the individual members of the DIA OGC. *Id.* Through this process, DIA identified ten documents responsive to Plaintiffs' FOIA request. *Id.* Each document was forwarded to the DIA FOIA Office for review. *Id.* All ten responsive records were released—four in full and six in part—to Plaintiffs. *Id.* ¶ 11. This simple and methodical search amply meets the applicable requirements. *See, e.g.*, *Grand Cent. P'ship*, 166 F.3d at 489.

### C. DOJ—Federal Bureau of Investigation

The FBI's search was conducted by personnel from its Record/Information Dissemination Section, which is responsible for processing all FOIA requests received by the FBI. *See* Declaration of David M. Hardy ("FBI Decl") ¶¶ 1-2. The FBI explained that its usual FOIA practice is to search its Central Records Service ("CRS") database, which captures and facilitates retrieval of large amounts of the widely varied types of information that FBI possesses. *Id.* ¶ 19. Here, however, Plaintiffs' requests sought policy guides, manuals, procedures, regulations, directives, and other similar records that are not of an investigative nature and did not readily or naturally permit a search of the CRS. *Id.* For this reason, FBI personnel did not attempt a search of the CRS. *Id.*

Instead, they conducted a targeted search of the specific FBI Headquarters Divisions/Units likely to possess responsive records relating to E.O. 12,333, subject to the restrictions set forth in the Stipulation. *Id.* ¶ 20. Specifically, FBI FOIA personnel identified the specific FBI components that were likely to contain responsive records not found elsewhere, and sent them what the FBI calls an "Electronic Communication" requesting that the following FBI components search their databases and paper and manual files: (1) the Corporate Policy Office, now known as the Information Policy Office, which centrally manages the coordination, review

approval, publication, and promulgation of FBI policy; (2) the Counterintelligence Division, which is a component of the National Security Branch charged with preventing and investigating foreign intelligence activities within the United States, targeting both traditional and emerging nontraditional threats and espionage activities; (3) the Counterterrorism Division, which is a component of the National Security Branch that works with intelligence and law enforcement partners to provide a centralized, comprehensive, and intelligence-driven approach to address international and domestic terrorism-related matters; (4) the Training Division, which provides direction and support to FBI headquarters and field divisions in the planning and execution of career development training to include curriculum, funding, instruction, evaluation, tracking, reporting, and implementation for the FBI workforce and partnering agencies; and (5) the Office of the General Counsel – Discovery Processing Units, which are charged with identifying relevant information subject to disclosure during the civil discovery process. *Id.* ¶¶ 21-22. Each of these agencies completed the requested searches. *Id.* As a result of the searches, FBI identified 65 pages of responsive records, which were processed and released in part with redactions. *Id.* ¶ 24 & n.14.

The FBI searched all locations where responsive records could reasonably be expected to be found, *id.* ¶ 21, and its searches afforded "no factual basis" to "conclude a search elsewhere could reasonably be expected to locate responsive material." *Id.* ¶ 23. Accordingly, the FBI's search was "reasonably calculated to discover the requested documents." *Grand Cent. P'ship*, 166 F.3d at 489.

### D. DOJ—National Security Division

NSD is a DOJ division that works to combat terrorism and other threats to national security. The NSD's organizational structure is designed to ensure greater coordination and unity of purpose between prosecutors and law enforcement agencies, on the one hand, and

intelligence attorneys and the Intelligence Community, on the other, thus strengthening the effectiveness of the federal government's national security efforts. *See* NSD Decl. ¶ 2; U.S. Dep't of Justice, Nat'l Security Division, *About the Division*, http://www.justice.gov/nsd/about-division (last visited Feb. 26, 2016).

There is no central NSD repository or searchable database that would contain records responsive to Plaintiffs' requests to NSD, so, in order to locate and retrieve responsive records, NSD identified individuals whose work involved the use of E.O. 12,333. *See* NSD Decl. ¶ 8. Specifically, NSD attorneys who are familiar with NSD operations, personnel, and areas of responsibility, and who obtained input from additional relevant NSD personnel, identified six attorneys in NSD's Office of Intelligence[5] and one attorney in NSD's Office of Law and Policy[6] who have worked on issues concerning electronic surveillance under E.O. 12,333 described in the request. *Id.* Due to the nature of their duties, no other NSD personnel were likely to have responsive records that these seven attorneys did not also have. *Id.*

Each of these seven attorneys searched for responsive records by searching their email files, any other electronic files, and paper files, as well as anywhere else they thought responsive records might have been stored. *Id.* ¶ 9. In addition, NSD FOIA staff conducted searches of the policy files of one of NSD's predecessor DOJ components, the Office of Intelligence Policy and Review. *Id.* These searches captured all the systems and types of files that were likely to contain responsive records possessed by each attorney. *Id.* The attorneys who performed these searches were unaware of other locations or personnel that would be likely to yield additional

---

[5] NSD's Office of Intelligence ensures that the Intelligence Community agencies have the legal authorities necessary to conduct intelligence operations, particularly operations involving the Foreign Intelligence Surveillance Act (FISA); that the office exercises meaningful oversight over various national security activities of Intelligence Community agencies; and that it can play an effective role in FISA-related litigation. *See id.* ¶ 8 n.1.

[6] NSD's Law and Policy Office develops and implements DOJ policies with regard to intelligence, counterterrorism, and other national security matters and provides legal assistance and advice on matters of national security law. *See id.* ¶ 8 n.2.

responsive information, and NSD believes there are no additional locations that are likely to contain additional records beyond those located through the searches that NSD personnel performed.  *Id.*

NSD's search located 68 responsive records, of which eight were released in full to Plaintiffs, nine were released in part, and 51 were withheld in full.  *Id.* ¶ 10.[7]  NSD's search was carefully designed and conducted, and more than meets FOIA's requirements of a search "reasonably calculated to discover the requested documents."  *Grand Cent. P'ship*, 166 F.3d at 489.

### E.    DOJ—Office of Legal Counsel

The sufficiency of OLC's search is not in dispute and therefore is not described here. *See* Dkt. No. 52.

### F.    National Security Agency

NSA designed its search in light of the parties' Stipulation.  *See* Declaration of David Sherman ("NSA Decl.") ¶ 17.  NSA's search located over 1200 pages of responsive material, of which over 850 pages were released in whole or in part to Plaintiffs.  *Id.* ¶ 18.

To seek responsive records, NSA conducted searches in those of its directorates and organizations that NSA determined were most likely to have responsive records if such responsive records existed.  *Id.* ¶ 19.  NSA relied upon its FOIA Office, which is staffed with a cadre of intelligence professionals, including former intelligence analysts, to direct and assist in the search for responsive records.  *Id.*  Additionally, NSA assigned the following personnel to assist with the searches within their respective organizations: the Signals Intelligence Directorate ("SID") assigned three senior employees who are well-versed in the SID's missions, functions,

---

[7] Of these 68 documents, Plaintiffs are challenging the withholding in full of 19 documents specified in paragraph 10 of the NSD Declaration, and the partial withholding of two additional NSD documents, Bates numbered NSD 94-125 and NSD 202-07.  *Id.*

and activities, particularly those undertaken pursuant to E.O. 12,333; the Office of General Counsel ("OGC") assigned a re-employed annuitant, who was a former senior attorney in the OGC's Intelligence Law practice group with extensive experience in drafting legal opinions concerning E.O. 12,333; and the Office of the Inspector General ("OIG") assigned its counsel to the IG (collectively, "Senior Staff"). *Id.*

This experienced Senior Staff reviewed NSA activities and programs, including the sources and methods undertaken in E.O. 12,333 activities and programs, for NSA records that were responsive to Plaintiffs' request. *Id.* ¶ 20. The Senior Staff also searched SID and relevant mission organizations within that directorate; OGC; OIG; the Legislative Affairs Office ("LAO"); the Associate Directorate for Education and Training ("ADET"); and the Office of the Director (to the extent that responsive records would not be located in other organizations). *Id.* This Senior Staff conducted its searches using a combination of electronic terms and manual methods. *Id.* The Senior Staff conducted its electronic searches using search terms including "EO 12333" and terms unique to the directorate/organizations being searched. *Id.* The Senior Staff also conducted manual searches based on the filing systems of each organization likely to have responsive documents, in an effort to identify and locate responsive records. *Id.* Among other things, the Senior Staff manually searched for policies responsive to Plaintiffs' requests on the NSA intranet page of the SID Policy organization, which maintains a repository of NSA and Intelligence Community policies governing the conduct of SIGINT. *Id.*

NSA has explained that any materials responsive to the five categories of requested records would reside in the organizations whose records it searched, and that the assigned Senior Staff would have located these records within those NSA components, even if additional copies could have also been found in other NSA organizations' holdings. *Id.* ¶ 21. This is so because

the NSA organizations that were searched are the NSA organizations responsible for conducting SIGINT activities under E.O. 12,333, managing and overseeing E.O. 12,333 activities, communicating with entities that oversee NSA SIGINT activities (such as the Intelligence Oversight Board), or training NSA personnel. *Id.* For example, OGC and SID were the organizations that would have documents in Category 1 (formal regulations and policies relating to Agency authority under E.O. 12,333) and Category 2 (any document that officially authorizes or modifies Agency policies or procedures that implicate U.S. persons); OGC was the organization that would have documents responsive to Category 3 (formal legal opinions); ADET and SID were the organizations that would have documents responsive to Category 4 (formal training and reference materials); and OGC, SID, LAO, and OIG, collectively, were the organizations that would have documents responsive to Category 5. *Id.* NSA FOIA Office professionals determined, based on their familiarity with NSA's organization and operations, that no other components of NSA were likely to possess additional responsive materials. *Id.* ¶ 19.

Once again, this search was carefully designed and conducted, and easily satisfies FOIA's requirement of a search "reasonably calculated to discover the requested documents." *Grand Cent. P'ship*, 166 F.3d at 489.

### G. State Department

By letter dated June 30, 2013, the State Department informed the Plaintiffs that it had conducted thorough searches of its only two components that were likely to possess responsive materials, if any, namely the State Department's Bureau of Intelligence and Research, and the Office of the Legal Adviser. *See* Declaration of John F. Hackett ("State Decl.") ¶ 9. IPS further informed Plaintiffs that those searches located no records responsive to the subject request. *Id.*

State's declaration thoroughly describes the meticulous and well-conceived search that led to this outcome. It explains that when the agency receives a FOIA request, its Office of

Information Programs and Services ("IPS") evaluates the request to determine which offices, overseas posts, or other records systems within the Department may reasonably be expected to contain the records requested. *Id.* ¶ 10. This determination is based on the description of the records requested and requires a familiarity with the holdings of the agency' records systems, applicable records disposition schedules, and the substantive and functional mandates of numerous State Department offices and Foreign Service posts and missions. *Id.*

After reviewing Plaintiffs' request, IPS determined that the only agency offices or records systems, if any, reasonably likely to have documents responsive to Plaintiff's request were the Bureau of Intelligence and Research ("INR") and the Office of the Legal Adviser ("L"). *Id.* ¶ 12. INR's primary mission is to harness intelligence to serve U.S. diplomacy. *Id.* ¶ 14. Drawing on all-source intelligence, INR provides value-added independent analysis of events to State Department policymakers; ensures that intelligence activities support foreign policy and national security purposes; and serves as the focal point in the Department for ensuring policy review of sensitive counterintelligence and law enforcement activities around the world. *Id.* The bureau also analyzes geographical and international boundary issues. *Id.* A State employee who was knowledgeable about both the FOIA request at issue and INR's records systems determined that the only INR components (if any) reasonably likely to maintain responsive records were the Front Office ("INR/FO") and the Office of Intelligence Operations ("INR/OPS"). *Id.* ¶ 15.

A staff assistant in INR/FO conducted a search of the office's paper and electronic records. *Id.* ¶ 16. The staff assistant manually searched all paper files in INR/FO for any records responsive to the subject FOIA request. *Id.* All INR/FO electronic files, classified and unclassified, are text-searchable and were searched using the terms "Executive Order," "12333,"

and "12,333." *Id.* The staff assistant applied the timeframe of April 1, 2007, to the date the search was conducted, June 2, 2014, to the search of both paper and electronic records. *Id.*

INR/OPS coordinates State's review of sensitive civilian and military intelligence operations and programs; it also coordinates Intelligence Community briefings for ambassadors and ambassadorial nominees. *Id.* ¶ 17. This office works with the Office of the Director of National Intelligence on a variety of intelligence issues, including human intelligence collection policies and programs. *Id.* It acts as the Bureau's focal point for liaison with the CIA and the DIA, including Defense Attachés abroad. *Id.* An Intelligence Operations Officer in INR/OPS coordinated a search of the office's paper and electronic records. *Id.* ¶ 18. The officer manually searched all INR/OPS paper files for any records responsive to the subject FOIA request. *Id.* The search of INR/OPS's electronic records included all e-mails and archived e-mails for all employees in INR/OPS and shared databases, for both unclassified and classified systems. *Id.* All electronic files are text-searchable and were searched using the following terms: "E.O. 12333," "electronic surveillance," "E.O. 12333 + [*i.e.*, AND] U.S. persons," "12333," and "12,333." *Id.* The search used as its cut-off date the date the search was conducted, June 2, 2014, for both paper and electronic files. *Id.*

INR located no responsive records as a result of these searches. *Id.* ¶ 19.

The Office of the Legal Adviser ("L") furnishes advice on all legal issues, domestic and international, arising in the course of the State Department's work. *Id.* ¶ 20. This includes assisting agency principals and policy officers in formulating and implementing the foreign policies of the United States and promoting the development of international law and its institutions as a fundamental element of those policies. *Id.* The office is organized to provide direct legal support to State's various bureaus, including both regional and geographic offices

(those which focus on specific areas of the world) and functional offices (those which deal with specific subject matters such as economics and business, international environmental and scientific issues, or internal management). *Id.* An agency employee who was knowledgeable about both the FOIA request at issue and L's records systems determined that the only L components reasonably likely to maintain responsive records (if any existed) were the Office of Law Enforcement and Intelligence ("L/LEI") and the Office of Political-Military Affairs ("L/PM"). *Id.* ¶ 21.

L/LEI coordinates international extradition for the Department, handles a variety of other law enforcement and intelligence matters, and provides legal advice on proposed legislative initiatives, international agreements, and U.S. intelligence activities. *Id.* ¶ 22. An assistant legal adviser in L/LEI conducted a search of the office's paper and electronic records by manually searching paper files in L/LEI for any documents responsive to the subject FOIA request, and searching L/LEI's electronic records, including unclassified and classified office shared drives, Word files, and e-mail records, using search terms that included, but were not limited to, "12333," "electronic surveillance," and "12,333." *Id.* ¶ 23. No date limitations were applied to these searches. *Id.*

L/PM provides legal assistance in matters relating to global military and political-military activity, base rights and status of forces agreements; foreign military claims and suits against U.S. Armed Forces; munitions control; use of force and war powers; and laws of war. *Id.* ¶ 24. Attorneys in L/PM conducted a search of the office's electronic and paper records. *Id.* ¶ 25. The attorneys manually searched and reviewed each individual paper file that pertained to subjects reasonably likely to include information concerning intelligence activities to locate any documents responsive to the subject FOIA request. *Id.* The search of L/PM's electronic records

included current and archived e-mail records on both the unclassified and classified systems.  *Id.*
All electronic files are text-searchable and were searched using terms that included, but were not
limited to, "12333," "E.O. 12333," "Executive Order 12333," and "12,333."  *Id.*  No date
limitations were applied to these searches.  *Id.*

L located no responsive records as a result of these searches.  *Id.* ¶ 26.  State's declarant
attests that these searches covered all offices and bureaus that are reasonably likely to maintain
records responsive to Plaintiffs' request.  *Id.* ¶ 27.  No more is required.  *See, e.g.*, *Grand Cent.
P'ship*, 166 F.3d at 489.

## III.   The Withheld Documents and Information Are Exempt from Disclosure Under FOIA

### A.   The Government Has Properly Withheld Classified Documents and Information Under Exemption 1

Exemption 1 exempts from public disclosure matters that are "(A) specifically authorized
under criteria established by an Executive order to be kept secret in the interest of national
defense or foreign policy and (B) are in fact properly classified pursuant to such Executive
order."  5 U.S.C. § 552(b)(1).  The current standard for classification is set forth in Executive
Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13,526").  Section 1.1 of the Executive
Order lists four requirements for the classification of national security information: (1) an
"original classification authority" must classify the information; (2) the information must be
"owned by, produced by or for, or [] under the control of the United States Government;" (3) the
information must fall within one or more of eight protected categories of information listed in
section 1.4 of the E.O., including *inter alia* (a) military plans, weapons systems or operations,
(b) foreign government information, (c) intelligence activities, sources, or methods, and
(d) foreign relations of the United States; and (4) an original classification authority must
"determine[] that the unauthorized disclosure of the information reasonably could be expected to

result in damage to the national security" and be "able to identify or describe the damage." E.O. 13,526, § 1.1(a)(1)-(4).

The government's submissions amply demonstrate that these standards have been met with regard to the classified records and information withheld by each agency or component. These records and the bases for their classification are described generally below and in declarations submitted by CIA, DIA, FBI, and NSA, along with accompanying *Vaughn* indexes. In addition, NSA is supplying a classified, *ex parte* declaration providing additional information supporting the assertion of Exemption 1 as to some responsive documents; for reasons explained in that declaration, the information it contains cannot be publicly docketed or disclosed.[8]

### 1. Central Intelligence Agency

CIA's *Vaughn* index, annexed as an exhibit to its declaration, lists 82 responsive documents that CIA denied in full and twelve documents that CIA released in part whose redactions were challenged by Plaintiffs (these documents are all listed in the chart annexed as an addendum to this memorandum). CIA asserted Exemption 1 as to each document, for reasons described in each *Vaughn* index entry and in its declaration. *See* CIA *Vaughn* Index; CIA Decl. ¶¶ 12-18.

Each of these CIA documents is properly subject to FOIA Exemption 1, for reasons explained in the CIA's declaration. The declarant, Antoinette Shiner, is an original classification authority who has personally determined that discrete portions of records responsive to Plaintiffs' requests are currently and properly classified. CIA Decl. ¶ 13. Specifically, Ms. Shiner determined that all information withheld by the CIA "falls under classification category

---

[8] While NSD and OLC have asserted that Exemptions 1 and 3 apply to some documents in their possession as to which NSD and OLC also asserted privilege, *see* NSD Decl. ¶ 11; OLC Decl. ¶¶ 29-31, other agencies are providing the information needed to justify those assertions; for ease of reference, these documents are discussed under headings that reference the agency that located the document rather than the agency whose declarant supports the assertion of the relevant exemption. Meanwhile, State located no responsive documents, and is not asserting or substantiating the applicability of any exemptions. *See* State Decl. ¶ 3.

§ 1.4(c) of [E.O. 13,526] because it concerns 'intelligence activities (including covert action), [or] intelligence sources or methods." *Id.* The index annexed to the declaration attempts "to explain the nature of the information withheld pursuant to Exemption 1 to the extent possible on the public record without disclosing the underlying classified information." *Id.* And, if the Court determines that it requires additional detail (which is not legally required to meet the Government's burden, and should be unnecessary to the Court), the CIA is willing to submit an *in camera, ex parte* declaration to further explain the withheld material and the reasons that material is properly classified and therefore subject to FOIA Exemption 1. *Id.*

The CIA's declaration explains in detail why release of the withheld material could reasonably be expected to cause damage to national security. *Id.* ¶¶ 14-18. Specifically, while Plaintiffs seek information about the important question of how foreign electronic surveillance might impact U.S. persons, the CIA and other agencies have released responsive information to the greatest extent possible, and documents touching on these issues "necessarily contain sensitive intelligence sources, methods and activities of the CIA." *Id.* ¶ 15. Much of this information concerns "intelligence priorities . . . such as intelligence collection related to espionage, terrorism and proliferation." *Id.* ¶ 16. The withheld information "tends to identify the targets of intelligence-gathering efforts [and] reveal the specific collection techniques and methods employed" and "the locations and timing of that collection." *Id.* The internal CIA regulations sought by Plaintiffs "contain details about specific types of intelligence-gathering techniques . . . and limitations on intelligence gathering." *Id.* ¶ 17. Training and reference materials contain similar information including real-world examples and hypotheticals and so "show the actual intelligence techniques and methods used by the CIA." *Id.* Legal opinions and other reports also review similar specific operational activities and information. *Id.* Overall,

disclosure of the withheld information "would provide sensitive details as to how intelligence is acquired, retained and disseminated, thereby revealing strengths, weaknesses, and gaps in intelligence coverage," and would "tend to reveal the resources and capacity of the Agency to collect and share certain types of [information]." *Id.* ¶ 18. Release of this information would enable "adversaries [to] alter their behavior to avoid detection or otherwise undermine U.S. intelligence capabilities and render collection efforts ineffective." *Id.* Thus, "disclosure of the information withheld pursuant to Exemption 1 could reasonably be expected to cause damage to national security." *Id.*

This demonstration easily satisfies the showing required to justify the application of FOIA Exemption 1—especially given the "substantial weight" due to agencies' declarations regarding national security, *Wilner*, 592 F.3d at 73; *N.Y. Times Co.*, 756 F.3d at 112, and the courts' reluctance "to second-guess the predictive judgments made by government's intelligence agencies regarding whether disclosure of the [withheld information] would pose a threat to national security." *ACLU*, 681 F.3d at 70-71 (quoting *Wilner*, 592 F.3d at 76) (internal quotation marks omitted). All that Exemption 1 requires is that "an agency's justification . . . appears logical or plausible." *Wilner*, 592 F.3d at 73 (internal quotation marks omitted; quoting *Larson*, 565 F.3d at 862); *accord ACLU*, 681 F.3d at 69; *Wolf*, 473 F.3d at 374-75. The CIA's explanation and document-by-document *Vaughn* index more than meets this standard.

### 2. Defense Intelligence Agency

The only DIA document at issue in this motion is referred to as "V-4" in the DIA's Vaughn index, which is annexed to the agency's declaration. That document, which was partially released to plaintiffs with privileged and classified material redacted, is titled "Fundamentals of HUMINT Targeting." DIA Decl. ¶ 11. An original classification authority has determined that the withheld information within DIA V-4 is "currently and properly

classified at the SECRET level under E.O. 13,526" and subject to FOIA Exemption 1. *Id.* ¶ 14. DIA V-4 "relates to intelligence sources and methods" and discusses "specifically the means by which DIA legally collects intelligence" and "information relating to intelligence sources." *Id.* ¶ 15.

DIA's declarant describes some of the damage that could reasonably be expected to be caused by the information's disclosure. *See id.* ¶ 16. Release of the withheld information in DIA V-4 could reasonably be expected to cause harms including enabling hostile persons and groups to identify and evade U.S. intelligence activities, methods or sources, *id.* ¶ 17, and knowledge of this information "would be of material assistance to those who would seek to . . . avoid [] or damage" U.S. intelligence operations. *Id.* ¶ 16. "Release of this information would reveal such sources and methods and impair the intelligence collection mission of the intelligence community." *Id.* ¶ 17.

The DIA's declaration establishes all the requirements for withholding under Exemption 1, including the determination (here, following line-by-line review, *id.* ¶ 24) that the withheld information "remains currently and properly classified at the SECRET level under E.O. 13, 526," *id.* ¶ 14, and specifically that the information relates to "intelligence sources and methods" whose disclosure "could reasonably be expected to cause . . . serious damage to national security," *id.* ¶ 15, could render sources unwilling to furnish information or vulnerable to retaliation, *id.* ¶ 16, and would "provide adversaries enough knowledge about specific collection techniques" that they could "develop countermeasures to resist these techniques." *Id.* ¶ 17.

Again, this showing is entitled to "substantial weight" and reflects an Executive Branch "predictive judgment" that should not be "second-guess[ed] by the courts. *Wilner*, 592 F.3d at 73; *ACLU*, 681 F.3d at 70-71.

### 3.        DOJ—Federal Bureau of Investigation

The FBI produced responsive documents to the greatest extent possible, but withheld certain classified information pursuant to FOIA Exemption 1.  Plaintiffs challenge withholdings from three documents identified in the FBI's *Vaughn* index, only two of which entailed withholdings pursuant to Exemption 1: FBI documents Bates-numbered FBI 30-35 and FBI 57-65.  *See* FBI Decl. ¶¶ 30 & n.17, 34-37.  Only six pages in these two documents contained information withheld pursuant to Exemption 1.  *Id.* ¶ 30 n.17.  The first document, which FBI released in part to Plaintiffs, is an "Electronic Communication" from FBI's Office of General Counsel, National Security Law Branch, to all FBI Offices, setting out the policy and procedure for requesting Attorney General authority under E.O. 12,333, § 2.5 to collect intelligence on U.S. persons overseas.  *Id.* ¶ 34, Ex. I (*Vaughn* Index).  The second document contains several sections from FBI's "Domestic Investigations and Operation Guide" that "deal[] with investigative methods in full positive Foreign Intelligence" investigations.  *Id.* ¶ 39, Ex.I (*Vaughn* Index).

As explained in the FBI's Declaration, the agency took all required procedural steps and made all required substantive determinations to justify its assertion of Exemption 1.  Specifically, FBI's declarant David M. Hardy, an original classification authority, determined "that the information withheld pursuant to Exemption (b)(1) is under the control of the United States Government, is classified and requires a classification marking at the "Secret" level since the unauthorized disclosure of the information reasonably could be expected to cause serious damage to national security."  *Id.* ¶ 29 (citing E.O. 13,526 § 1.2(a)(2)).  He also attested that all applicable "procedural and administrative requirements" of E.O. 13,526 were satisfied here.  *Id.*

Mr. Hardy determined that the material withheld from both documents was properly classified under the subsections of section 1.4 of E.O. 13,526, applicable to "intelligence

activities (including covert action), intelligence sources or methods, or cryptology." *Id.* ¶ 30. The information at issue "describes intelligence activities, sources, and methods used by the FBI in gathering intelligence information," and its release would "reveal intelligence activities and methods used by the FBI against targets who are the subject of foreign counterintelligence investigations or operations"; "identify a target of a foreign counterintelligence investigation"; or disclose "intelligence gathering capabilities" directed at targets. *Id.* ¶¶ 35-36. The NSA has augmented this showing by further explaining that the portion of FBI 30-35 withheld at NSA's request "concerns information about an intelligence target that is operationally useful to NSA in effecting communications surveillance," and that the information is classified at the SECRET level. NSA Decl. ¶ 79.

Again, this showing is entitled to "substantial weight" and reflects an Executive Branch "predictive judgment" that should not be "second-guess[ed] by the courts. *Wilner*, 592 F.3d at 73; *ACLU*, 681 F.3d at 70-71.

### 4. DOJ—National Security Division

Plaintiffs challenge withholdings from twenty-one NSD documents identified in the addendum to this memorandum as well as in paragraph 10 of NSD's declaration. Twenty of these documents—all but NSD 2—contain classified material and therefore are properly subject to FOIA Exemption 1.[9] The NSD's assertion Exemption 1 (and 3) is supported primarily by the *NSA*'s declaration, and by the NSA's additional *ex parte* classified submission to the Court. These assertions are amply justified and satisfy all applicable requirements.

Of the twenty NSD documents as to which Exemption 1 was asserted, eighteen—the document Bates-numbered NSD 94-125 and the seventeen identified in paragraph 25 of the NSA

---

[9] This memorandum and the NSD and CIA declarations also discuss one additional responsive document, NSD 49. *See infra* at 34; NSD Decl. ¶ 11 & n.3; CIA Decl. ¶ 7.

Declaration[10]—contain information withheld on behalf of NSA. *See* NSA Decl. ¶ 25. The justification for these withholdings, in part, can only be addressed *in camera, ex parte* because any further description of the information withheld would reveal classified information. *Id.* ¶ 26; *see also* NSA Classified Declaration.

As explained in the NSA's unclassified Declaration, fourteen of these NSD documents (7, 12, 13, 14, 17, 18, 23, 30, 33, 37, 42, 44, 47, and 48) are properly classified because they contain information about particular intelligence sources, and related methods used to collect and process foreign communications. NSA Decl. ¶¶ 38-40. These documents contain "details regarding the types of communication data NSA is able to collect and how that data is collected," the disclosure of which "would reveal core NSA foreign intelligence activities, sources, and methods, including technical tradecraft, to the benefit of our adversaries." *Id.* ¶ 38. Additional details are included in the NSA's *in camera, ex parte* declaration. *Id.*

The NSA has explained that "[d]isclosure of any information about these sources and the methods by which NSA effects collection, as well as the scope of that collection, would demonstrate the capabilities and limitation of the U.S. SIGINT system, and the success (or lack of success) in acquiring certain types of communications." *Id.* ¶ 39. Public disclosure of the NSA's capabilities "would alert targets to the vulnerabilities of their communications (and which of their communications are not vulnerable)," and reports of compliance incidents likewise would "reveal the nature and scope of these intelligence sources." *Id.* Release of this information "would also disclose details regarding NSA's capability to collect certain types of foreign communications, and the gaps or limits of that capability." *Id.* Revealing this information could allow adversaries to develop "countermeasures to thwart collection of their communications," and "may . . . result in a loss of information critical to the national security

_____

[10] NSD 4, 7, 12, 13, 14, 17, 18, 23, 30, 31, 33, 36, 37, 42, 44, 47, and 48.

and defense of the United States." *Id.* NSA's declarant, David Sherman, who is an original classification authority, *id.* ¶ 2, reviewed all withheld information and determined that it is "properly classified at the TOP SECRET level in accordance with E.O. 13526, because the release of this information could reasonably be expected to cause exceptionally grave damage to the national security," *id.* ¶ 40.

One additional NSD document, NSD 31, is properly classified because it "contains details regarding SIGINT sources and methods and legal analysis relating to those sources and methods." *Id.* ¶ 45. NSD 31 "is currently and properly classified in its entirety at the TOP SECRET level in accordance with E.O. 13526," because its release "could reasonably be expected to cause exceptionally grave damage to the national security." *Id.* ¶ 46. As the NSA's declaration describes in some detail, the release of this information would "reveal a wide variety of details that could be used to counter NSA foreign intelligence activities, and cause serious harm to national security." *Id.* ¶ 48.

The release of a seventeenth NSD document at issue, NSD 4, also is barred by Exemption 1 because the withheld information is currently and properly classified as SECRET and "pertains to intelligence activities, intelligence sources or methods, or cryptology, or the vulnerabilities or capabilities" of national security systems or processes, and because "the release of any portion of that document would disclose classified information about functions or activities of the NSA." *Id.* ¶¶ 56-57. The release of this information thus "could reasonably be expected to cause serious damage to the national security," including by revealing "intelligence sources or methods, or cryptology, or the vulnerabilities or capabilities of systems or projects relating to the national security," and "NSA's capabilities and the tradecraft used to carry out" its vital signals intelligence mission. *Id.*

The classified status of NSD 94-125 is explained in paragraphs 71 through 74 of the NSA's declaration. That document, which is an annex to Defense Department procedures pursuant to Executive Order 12,333 from 1988, was withheld in part. *See* NSD *Vaughn* Index. As the NSA's declaration explains, NSA has redacted only limited information from this document and "released all reasonably segregable, non-exempt information" from it. NSA Decl. ¶ 71. The information withheld "pertains to details of how NSA targets certain communications for collection, the types of facilities that NSA may target, and the types of communications that NSA can collect in specific circumstances." *Id.* This information is "currently and properly classified at the CONFIDENTIAL or SECRET levels in accordance with E.O. 13526, . . . because release of this information could reasonably be expected to cause damage, or serious damage, to the national security." *Id.* ¶ 72. The information "pertains to intelligence activities, intelligence sources or methods, or cryptology, or the vulnerabilities or capabilities of systems or projects relating to the national security," as required for classification under Sections 1.4(c) and 1.4(g) of E.O. 13,526. *Id.* The harms that would result from disclosure of this information are summarized in paragraphs 73 and 74 of the NSA's declaration.

NSD 36, which is an OLC memorandum, is also addressed in the NSA's declaration, and "contains some information that is exempt from release pursuant to Exemptions 1 and 3, because the information is currently and properly classified under EO 13526 and because its disclosure would reveal intelligence sources and methods protected by the National Security Act and the NSA Act of 1959." *Id.* ¶ 80. This information is currently and properly classified at the levels ranging from SECRET to TOP SECRET in accordance with E.O. 13,526 because the release of this information "could reasonably be expected to cause either serious or exceptionally grave damage to the national security." *Id.* Information withheld from these documents concerns the

identities of NSA surveillance targets and the scope of NSA collection, including specific types of communications the NSA can and cannot collect under particular surveillance programs. *Id.* This information pertains to intelligence activities, intelligence sources or methods, or cryptology, or the vulnerabilities or capabilities of systems or projects relating to the national security, and therefore meets the criteria for classification set for in Sections 1.4(c) and 1.4(g) of E.O. 13,526. *Id.* Disclosure of the identities of NSA targets and the scope of NSA collection would reveal the capability of NSA and the Intelligence Community to collect information about these targets and alert our adversaries about whether certain past communications are, or are not, likely to have been targeted and captured. *Id.* It therefore meets all requirements for withholding under Exemption 1.[11]

The withheld classified material contained in NSD 9 and NSD 202-07 is addressed in the FBI's declaration. *See* NSD Decl. ¶ 11, FBI Decl. ¶ 32 & n. 20. NSD 202-07, which was released in part, is entitled "Supplemental Guidelines for Collection, Retention, and Dissemination of Foreign Intelligence." FBI Decl. ¶ 34. NSD 9 is an OLC Legal Advice Memorandum to the FBI General Counsel. *Id.* The information withheld from these documents "is protected by Exemption 1 because it describes intelligence activities, sources, and methods utilized by the FBI in gathering intelligence information." *Id.* ¶ 35. Its release "would reveal intelligence activities and methods used by the FBI against targets who are the subject of foreign counterintelligence investigations or operations; identify a target of" such an investigation; or disclose "intelligence gathering capabilities . . . directed at targets." *Id.* ¶ 36. Disclosure of the information withheld pursuant to Exemption 1 "could permit hostile non-U.S. persons . . . to

---

[11] Because OLC has withheld in full documents OLC 2, 3, 4, 6, 8, and NSD 36 pursuant to FOIA Exemption 5, NSA has not attempted to determine whether and to what extent the classified information is reasonably segregable from these documents. *See id.* ¶ 81. In the event the Court determines that these documents were not properly withheld in full under Exemption 5, NSA and other agencies will undertake a line-by-line review to segregate and release any non-exempt information in these documents. *Id.*

appraise the scope, focus, location, target and capabilities of the FBI's intelligence-gathering," and to "devise countermeasures to circumvent" these activities or methods, which "could cause serious damage to our national security. *Id.* ¶ 37.

Finally, NSD 49—which, as explained at paragraph 11 and note 3 of the NSD declaration was not previously described to Plaintiffs but is responsive and therefore is being addressed in this motion, *see* NSD Decl. ¶ 11 & n.3—is a legal memorandum from NSD attorneys to other government attorneys conveying advice with respect to one or more NSA programs or other intelligence activities. *See id.* ¶ 15. The CIA declaration explains that this and other documents and portions of documents are being withheld pursuant to FOIA Exemption 1, among others. *See* CIA Decl. ¶ 8. The information on this basis, including NSD 49, is "properly classified" and "satisfies the procedural and substantive requirements of E.O. 13526. *Id.* ¶ 12. Specifically, the withheld information "concerns 'intelligence activities . . . [or] intelligence sources or methods," and its unauthorized disclosure "could reasonably be expected to result in damage to national security." *Id.* ¶ 13; *see also id.* ¶¶ 16-18 (detailing types of information covered and harms that information's release would be expected to cause). The CIA has determined that, while it has attempted to explain the nature of the withheld information to the extent possible without disclosing the underlying classified information, of required by the Court, the CIA can submit an *in camera*, *ex parte* affidavit to more fully explain this material. *Id.*

The Court therefore should uphold in full the assertions of Exemption 1 as to NSD's responsive documents.

### 5. DOJ—Office of Legal Counsel

Plaintiffs object to the withholding of ten documents written by DOJ's Office of Legal Counsel, identified in the addendum to this memorandum. All but one of these documents was withheld in full pursuant to Exemption 5 on the basis of one or more privilege, as explained in

the Declaration of Paul P. Colborn ("OLC Decl.").  In addition, portions of OLC 2-6 and 8-10 are properly classified and barred from release by one or more statutes, and, accordingly, are subject to Exemptions 1 and 3.  *See* OLC Decl. ¶¶ 30-31 (identifying OLC documents subject to Exemptions 1 and 3); NSA Decl. ¶ 80 (NSA's supporting assertion of Exemptions 1 and 3 as to OLC 2, 3, 4, 6, 8, and 9,[12] as well as NSD 36, which is an OLC memorandum); FBI Decl. ¶ 18 (FBI's assertion of Exemptions 1 and 3 as to OLC 5 and 6, as well as NSD 9, which is an OLC memorandum); CIA Decl. ¶ 8 (CIA's assertion of Exemptions 1 and 3 as to OLC 5).  The withheld portions of OLC 10 were properly withheld pursuant to an interagency classification review completed shortly before the production of the redacted version to ACLU in September 2014.  *See* OLC Decl. ¶¶ 23-24.

As NSA's declaration explains, OLC 2, 3, 4, 6, 8, and 9 all contain information that is currently and properly classified under E.O. 13,526 and therefore subject to withholding under Exemption 1.  NSA Decl. ¶ 80.  All of this information is classified at the SECRET or TOP SECRET level; concerns signals intelligence, the identities of targets, and the capabilities and limitations of NSA surveillance; and would, if disclosed, cause identified harms to the national security and to national intelligence activities.  *Id.*[13]

Certain classified material in two OLC documents—OLC 5 and OLC 6—has also been identified and its withholding is explained in the FBI's declaration.  Both of these documents are legal memoranda that are protected under Exemption 1 because they describe "intelligence

_____

[12] A full classification review of OLC 9 has been completed and the document is being released to Plaintiffs in less-redacted form.  *See id.* ¶ 26.

[13] Because OLC has withheld in full documents OLC 2, 3, 4, 6, 8, and NSD 36 pursuant to FOIA Exemption 5, NSA has not attempted to determine whether and to what extent the classified information in those documents is reasonably segregable. *See id.* ¶ 81.  In the event the Court determines that these documents were not properly withheld in full under Exemption 5, NSA and other agencies will undertake a line-by-line review to segregate and release any non-exempt information in these documents.  *Id.*  NSA has, however, conducted a line-by-line review of OLC 9, and all reasonably segregable, non-exempt portions of that document have been released; the limited information withheld is exempt from release under FOIA Exemptions 1 and 3.  *Id.* ¶ 82.

activities, sources, and methods utilized by the FBI in gathering intelligence information." FBI Decl. ¶ 35. The FBI's declaration describes a variety of significant harms that could result from release of this information. *Id.* ¶¶ 36-37.

The CIA also reviewed OLC 5, CIA Decl. ¶ 7, which is withheld in full pursuant to Exemption 1. *Id.* ¶ 8. OLC 5 is one of several documents that the CIA determined "address questions posed by Agency component personnel requesting guidance regarding the permissibility, limitations and other legal considerations associated with certain contemplated intelligence activities." *Id.* ¶ 17. This information "would provide sensitive details as to how intelligence is acquired, retained and disseminated, thereby revealing strengths, weaknesses, and gaps in intelligence coverage." *Id.* ¶ 18. For these and other reasons detailed in the CIA declaration, "disclosure of the information withheld pursuant to Exemption 1 could reasonably be expected to cause damage to national security." *Id.*

In addition, OLC's withholding of OLC 4, 8, and 10 from ACLU pursuant to Exemptions 1, 3, and 5 was upheld—following *in camera* review—in separate FOIA litigation in Washington, D.C. less than two years ago. *Id.* ¶ 22; *Elec. Privacy Info. Ctr. v. DOJ*, Nos. 06-096, 06-214 (RCL), 2014 WL 1279280 (D.D.C. Mar. 31, 2014) ("*EPIC*"). As ACLU was party to that case and argued and lost a final judgment on the merits on the same cause of action regarding the same documents, it is precluded by the twin doctrines of *res judicata* and collateral estoppel from rearguing here that the documents are not properly withheld under Exemption 1. *See New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001); *cf. Taylor v. Sturgell*, 553 U.S. 880, 893 (2008) (applying preclusion analysis to FOIA case, denying only because second requester was not party to the prior case); *Croskey v. Office of Special Counsel*, No. 96-5114, 1997 WL

702364 (D.C. Cir. Oct. 17, 1997) (applying preclusion analysis and denying only because the documents were not the same).

### 6. National Security Agency

Plaintiffs object to withholdings of or from twenty NSA documents, listed in the addendum to this memorandum and in paragraph 25 of the NSA's declaration, each of which is properly classified and therefore protected by FOIA Exemption 1.[14] As detailed below and in the NSA declaration, each of these documents is properly classified and subject to FOIA Exemption 1.

The NSA's declaration exhaustively explains and supports why the withheld portions of all challenged records are protected by Exemption 1. This memorandum provides an overview of NSA's rationale, and the government respectfully refers the Court to that declaration and the accompanying *ex parte* declaration for a more complete explanation of the bases for the NSA's withholdings.

In brief, four of the 20 challenged NSA documents—NSA 11, 12, 13, and 22—were properly withheld as classified because they contain "myriad details regarding the types of communication data NSA is able to collect and how that data is collected," the disclosure of which "would reveal core NSA foreign intelligence activities, sources, and methods," NSA Decl. ¶ 38, as further elaborated in a classified *in camera, ex parte* declaration submitted by NSA. Disclosure of this information would cause extremely grave damage to national security by revealing the "capabilities and limitations of the U.S. SIGINT system, and the success (or lack of success) in acquiring certain types of communications," which is "central to NSA's

---

[14] Plaintiffs challenge NSA's partial withholdings of NSA 5, 22, 23, 28, and 79, and NSA's determination to withhold NSA 7, 9, and 11-21 in full. In addition to these 18 documents, Plaintiffs challenge NSA's withholding of portions of two other documents, USSID SP0018 (Bates number 4086222) and USSID SP0018 Appendix J (Bates number 4086223), which were released in part to ACLU as part of the administrative processing of the request and were thus not assigned document numbers.

mission" to provide unique and timely insight for U.S. policymakers.  *Id.* ¶ 39.  Release of this information could allow adversaries to "develop additional countermeasures to thwart collection of their communications," potentially resulting in "denial of access to targets' communications and therefore . . . a loss of information critical to the national security and defense of the United States."  *Id.*  All of this withheld information is "currently and properly classified at the TOP SECRET level in accordance with EO 13526," and "no portion of the documents could be reasonably segregated and released."  *Id.* ¶ 40.

An additional 11 withheld NSA documents—NSA 7, 9, 14-21, and 28, as well as NSD 31—are legal analyses prepared by the NSA Office of General Counsel and NSD, all of which contain "details regarding SIGINT sources and methods and legal analysis relating to those sources and methods," specifically including "details regarding the manner in which NSA selects its foreign intelligence targets, the technical means by which NSA collects communications intelligence, as well as the analytical tools and processes employed by NSA analysts to extract useful foreign intelligence from raw data."  *Id.* ¶ 45.  NSA 7, 9, 14, 15, 18, and 21 (and NSD 31) are currently and properly classified at the TOP SECRET level, *id.* ¶ 46, and NSA 16, 17, 19, and 20 are currently and properly classified at the SECRET level.  *Id.* ¶ 47.  Disclosure of this information would reveal "a wide variety of details that could be used to counter NSA foreign intelligence activities, and cause serious harm to national security" in a variety of ways described in the NSA's declaration.  *Id.* ¶ 48.

NSA released in part and properly withheld portions of three other NSA documents at issue—NSA 5 (which is the NSA's Signals Intelligence Directorate Management Directive (SMD) 432), the 2011 version of United States Signals Intelligence Directive (USSID) SP0018, and Appendix J thereto.  *Id.* ¶ 71.  Each of these documents, as well as a 1988 Classified Annex

38

to the DoD Procedures under E.O. 12,333 that is at issue here (NSD 94-125), implements E.O. 12,333 and prescribes policies and procedures for ensuring that SIGINT is conducted in accordance with the E.O. and applicable law. *Id.* Specifically, NSD 94-125 supplements the rules for SIGINT collection, retention, and dissemination established by DoD Directive 5240.01 and DoD 5240.1-R, which govern intelligence activities conducted by DoD components, such as NSA, that affect United States persons. *Id.* USSID SP0018 prescribes policies and procedures and assigns responsibilities to ensure that the missions and functions of the United States SIGINT System (USSS) are conducted in a manner that safeguards the rights of U.S. persons, consistent with the Constitution, federal statutes, and E.O. 12,333. *Id.* Appendix J to USSID SP0018 establishes the procedures for USSS monitoring of radio communications of suspected international narcotics traffickers. *Id.* SMD 432 (NSA 5) is a policy of NSA's SIGINT Directorate that establishes procedural guidelines for collection and dissemination of SIGINT connected to U.S. field exercises. *Id.* NSA redacted only limited information in these four documents and released all reasonably segregable, non-exempt information. *Id.* The information withheld from these documents pertains to details of how NSA targets certain communications for collection, the types of facilities that NSA may target, and the types of communications that NSA can collect in specific circumstances. *Id.*

All withheld material from these three NSA documents and NSD 94-125 has been determined by an original classification authority to be properly and currently classified at the CONFIDENTIAL or SECRET levels in accordance with E.O. 13,526, because the release of this information could reasonably be expected to cause damage, or serious damage, to the national security. *Id.* ¶ 72. Information contained in these documents pertains to intelligence activities, intelligence sources or methods, or cryptology, or the vulnerabilities or capabilities of systems or

projects relating to the national security, and therefore meets the criteria for classification set for

in Sections 1.4(c) and 1.4(g) of E.O. 13,526. *Id.* The NSA's declaration details harms to

national security that release of this information could reasonably be expected to cause. *Id.*

¶¶ 73-74.

NSA 23 is NSA Office of Inspector General Report ST 09-0019, and was withheld in full

pursuant to Exemption 1 because there is no reasonably segregable, non-exempt information in

the report. *Id.* ¶ 58. The document is an 84-page report by the NSA OIG concerning particular

intelligence activities of the NSA, including the dissemination of communications intelligence to

partner agencies. *Id.* The report "contains granular detail regarding the nature of NSA's

intelligence partnerships, the types and amount of communications intelligence it collects and

disseminates, the names of particular NSA targets, the structure of NSA's SIGINT databases,

and suggestions by the OIG on how to improve the dissemination of SIGINT to partner

agencies." *Id.* An original classification authority has reviewed the information withheld and

determined that the information is currently and properly classified at the TOP SECRET level in

accordance with E.O. 13,526, because the release of this information could reasonably be

expected to cause serious damage to the national security. *Id.* ¶ 59. The information withheld

pertains to intelligence activities, intelligence sources or methods, or cryptology, foreign

activities of the United States, or the vulnerabilities or capabilities of systems or projects relating

to the national security, and therefore meets the criteria for classification set forth in Sections

1.4(c), 1.4(d) and 1.4(g) of E.O. 13,526. *Id.* Disclosure of the withheld information would cause

harms including disclosure of United States communications intelligence capabilities and

limitations, which would permit adversaries to more effectively craft their communications

security efforts to frustrate the government's collection of information crucial to the national security. *Id.* ¶ 60.

Finally, NSA 79, an Intelligence Oversight Board quarterly report from 2013, was withheld in part pursuant to Exemption 1. *Id.* ¶ 62. The limited information withheld concerns "technical details regarding the methods by which NSA collects communications intelligence" and other information regarding sensitive NSA activities, all of which "is currently and properly classified . . . in accordance with E.O. 13526." *Id.* ¶¶ 63-65. Release of this information would cause a variety of national security harms. *Id.* ¶¶ 65-66.

Thus, the NSA has met its burden to support its invocation of FOIA Exemption 1 as to all twenty NSA documents at issue in this motion.

## B. The Government Has Properly Withheld Documents and Information Under Exemption 3

Under Exemption 3, matters "specifically exempted from disclosure" by certain statutes need not be disclosed. 5 U.S.C. § 552(b)(3). In examining an Exemption 3 claim, the Court need only examine whether the claimed statute is an exemption statute under FOIA and whether the withheld material satisfies the criteria for the exemption statute. *Sims*, 471 U.S. at 167; *Wilner*, 592 F.3d at 72. As the Second Circuit has explained, "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Wilner*, 592 F.3d at 72 (internal quotation marks omitted); *see also Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993) (court should "not closely scrutinize the contents of a withheld document; instead, [it should] determine only whether there is a relevant statute and whether the document falls within that statute"). To support its claim that information may be withheld pursuant to Exemption 3, the government

need not show that there would be harm to national security from disclosure, only that the withheld information logically or plausibly falls within the purview of the exemption statute. *Wilner*, 592 F.3d at 73; *accord Larson*, 565 F.3d at 868. The government's submissions in this case easily meet this standard.

The principal exemption statute at issue in this case is the National Security Act, as amended, 50 U.S.C. § 3024(i)(1), which provides that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." It is well settled that the National Security Act is an exemption statute under Exemption 3. *See Wilner*, 592 F.3d at 73 (citing *Larson*, 565 F.3d at 865). The government properly withheld documents and information under Exemption 3 and the NSA, among other statutes, because its release would disclose intelligence sources and methods. This memorandum discusses by agency the information withheld pursuant to Exemption 3 and the grounds for each such withholding.

### 1. Central Intelligence Agency

The National Security Act—as noted, an Exemption 3-qualifying statute—bars release of all information that the CIA withheld pursuant to Exemption 1. *See* CIA Decl. ¶¶ 19-20. As discussed above, all classified information that the CIA withheld concerns intelligence sources and methods, as well as "techniques used by the CIA to assess and evaluate intelligence and different sources of intelligence." *Id.* ¶ 20.

Moreover, certain information withheld by the CIA also is protected by Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 3507 (the "CIA Act"). *See* CIA Decl. ¶ 21. That provision protects from disclosure information that would reveal, among other things, the CIA's organization, functions (including protecting intelligence sources and methods), names, titles, salaries, or numbers of personnel. *Id.* Accordingly, the information withheld by CIA—including the "names of CIA employees; official titles; contact information of

CIA personnel; and internal offices that reveal information about the function of the Agency personnel," *id.*—is properly subject to Exemption 3.

This showing amply justifies the CIA's withholding of information as protected by Exemption 3, under the National Security Act and CIA Act.

### 2. Defense Intelligence Agency

The withheld portion of DIA V-4 is also properly subject to Exemption 3 for at least two independent reasons, either of which alone requires nondisclosure. *See* DIA Decl. ¶¶ 18-21. First, the withheld portions of DIA V-4 are protected by the National Security Act, and specifically 50 U.S.C. § 3024(i)(1). DIA carries out its intelligence mission under guidance from the Director of National Intelligence and in accordance with the National Security Act. DIA Decl. ¶ 20. Portions of V-4 have been withheld because their release would reveal intelligence sources and methods. *Id.*; *see also id.* ¶ 21 (further explaining that the withheld material concerns and disclosure would reveal intelligence sources and methods).

Second, portions of V-4 have been withheld under Exemption 3, in conjunction with 10 U.S.C. § 424,[15] because they specifically identify the names, office affiliations, contact information, and titles of DIA personnel, as well as functions of DIA that fall within the meaning of subsection (c)(1) of that provision. *Id.* ¶ 19. Release of this information would identify DIA employees, including the names and official titles of employees working in sensitive positions, and would also reveal part of the Agency's organizational structure, as well as sensitive DIA functions. *Id.* Disclosure of that information is strictly and explicitly prohibited by 10 U.S.C. § 424. *Id.*; *see also Hamdan v. DOJ*, 797 F.3d 759, 776-77 (9th Cir. 2015) (affirming DIA's

---

[15] Section 424 states: "(a) Exemption from disclosure—Except as required by the President or as provided in subsection (c), no provision of law shall be construed to require the disclosure of—(1) the organization or any function of an organization of the Department of Defense named in subsection (b); or (2) the number of persons employed by or assigned or detailed to any such organization or the name, official title, occupational series, grade, or salary of any such person."

assertion that Section 424 is a statutory bar on disclosure that triggers the protection of Exemption 3).

Thus, the withheld portions of DIA V-4 are properly subject to Exemption 3, the National Security Act and Section 424.

### 3.    DOJ—Federal Bureau of Investigation

All information withheld by the FBI pursuant to FOIA Exemption 1 is also protected by, and withheld pursuant to, FOIA Exemption 3. *See* FBI Decl. ¶ 41 n.20; *see also* NSA Decl. ¶ 79. As the FBI's declaration explains, disclosure of this withheld information would reveal intelligence sources and methods, and accordingly is statutorily barred from release pursuant to the National Security Act. *See* FBI Decl. ¶ 41; *Sims*, 471 U.S. at 167-68. This conclusion is reinforced by NSA's separate explanation why classified material contained in FBI 30-35 is statutorily barred from release under three Exemption 3 statutes. *See* NSA Decl. ¶ 79; *see infra* Point III.B.6. This same explanation applies equally to withheld information contained in documents NSD 202-07, NSD 9, OLC 5, and OLC 6. *Id.* ¶ 41 n.20.

### 4.    DOJ—National Security Division

Classified material withheld from the NSD documents is also protected by Exemption 3. As to the NSD documents for which NSA has provided a justification for withholdings under Exemption 1, the NSA's declaration explains that the withheld documents and information are also subject to multiple statutes that satisfy the requirements of Exemption 3, and therefore provide an independent basis for the withholding. *See* NSA Decl. ¶¶ 32-36, 41-44. In brief, the NSA declaration explains that "[t]he challenged information at issue here in this litigation falls squarely within the scope of three statutes," *id.* ¶ 33: (a) section 6 of the NSA Act, Pub. L. No. 86-36, 73 Stat. 63, 64 (codified at 50 U.S.C. § 3605), which provides that "[n]othing in this chapter or any other law . . . shall be construed to require the disclosure of the organization or

44

any function of the National Security Agency, or [of] any information with respect to the activities thereof . . . . ," *id.*; (b) the National Security Act, *id.* ¶ 34; and (c) 18 U.S.C. § 798, which prohibits the unauthorized disclosure of classified information: (i) concerning the communications intelligence activities of the United States, or (ii) obtained by the process of communications intelligence derived from the communications of any foreign government, *id.* ¶ 35. The NSA's declaration explains in greater detail why the requirements of each statute are met as to the withheld NSD information at issue, and that FOIA Exemption 3 applies. *Id.* ¶¶ 32-36, 41-44.

The NSA declaration also explains separately and specifically why Exemption 3 bars release of withheld portions of NSD 94-125. *See id.* ¶¶ 75-78 (explaining applicability of Exemption 3 statutes 50 U.S.C. § 3605, 18 U.S.C. § 798, and 50 U.S.C. § 3024(i)(1)). Specifically, the withheld information relates to a "function of the National Security Agency" and "information with respect to [NSA's] activities"—namely, NSA's "SIGINT" mission—and so is covered by 50 U.S.C. § 3605. *Id.* ¶ 76. Moreover, portions of the withheld information, as indicated by the specific exemption codes included in the released version of the documents, concern "intelligence sources and methods" and so are protected from public release pursuant to the National Security Act. *Id.* ¶¶ 77-78. Finally, some of the withheld information is protected from release under 18 U.S.C. § 798, which protects from disclosure information concerning the communications intelligence activities of the United States, or information obtained by communications intelligence processes. *Id.* ¶ 78.

As to NSD 36, which is an OLC memorandum, the NSA's declaration explains that portions of the document are subject to Exemption 3 in addition to Exemption 1, because the information at issue "relates to NSA communications intelligence activities, including

intelligence sources and methods, is also protected from release by statute and therefore is exempt from release based on the FOIA Exemption 3 statutes: 50 U.S.C. § 3605, 18 U.S.C. § 798, and 50 U.S.C. § 3024(i)(1)." *Id.* ¶ 80.

As also described above, FBI supported the invocation of FOIA Exemption 1 as to the remaining two NSD documents at issue, namely, portions of document NSD 202-07 and NSD 9. The FBI declaration further explains that the same reasons justifying application of Exemption 1 as to the withheld material also qualify those documents for withholding under FOIA Exemption 3, as protected by the National Security Act. *See* FBI Decl. ¶ 41 ("[T]he FBI's intelligence sources and methods would be revealed if any of the information withheld pursuant to Exemption 3 is disclosed to Plaintiffs, and thus, the FBI is prohibited from disclosing the information pursuant to 50 U.S.C. § 3024(i)(1)."). And NSD 49 also is subject to Exemption 3. As the CIA declaration explains, the National Security Act "applies to the same information for which Exemption (b)(1) was asserted," CIA Decl. ¶ 20, which includes NSD 49, *see id.* ¶¶ 8, 12. As such "[d]isclosure of this information is prohibited by statute," as confirmed by the CIA's original classification authority declarant. *Id.* ¶ 20.

Thus, the Court should uphold NSD's assertions of Exemption 3.

### 5. DOJ—Office of Legal Counsel

The classified information contained in OLC 2, 3, 4, 5, 6, 8, 9, and 10 is also protected from disclosure by statute, and therefore subject to Exemption 3. *See* NSA Decl. ¶ 80 (addressing all these documents with the exception of OLC 5, as well as NSD 36, which is an OLC memorandum), FBI Decl. ¶ 34 (addressing OLC 5 and 6); OLC Decl. ¶¶ 23-24 (addressing OLC 10). Specifically, the information that is subject to Exemption 1 and addressed by the NSA declaration "relates to NSA communications intelligence activities, including intelligence sources and methods," and therefore "is also protected from release by statute and therefore is

exempt from release based on the FOIA Exemption 3 statutes: 50 U.S.C. § 3605, 18 U.S.C. § 798, and 50 U.S.C. § 3024(i)(1)." NSA Decl. ¶ 80.[16] Meanwhile, OLC 6 is also subject to Exemption 3, as is OLC 5, based on the FBI's determination that "the FBI's intelligence sources and methods would be revealed if any of the information withheld pursuant to Exemption 3 is disclosed to Plaintiffs, and thus, the FBI is prohibited from disclosing the information pursuant to 50 U.S.C. § 3024(i)(1)." FBI Decl. ¶ 41 & n.20 (identifying OLC 5 and OLC 6 as among the documents as to which FBI is asserting Exemption 3). This conclusion as to OLC 5 is reinforced by the CIA's declaration, which explains that the National Security Act (and therefore Exemption 3) "applies to the same information for which" Exemption 1 was asserted, CIA Decl. ¶ 20, including OLC 5, *id.* ¶ 17. And, as noted above, ACLU is precluded by the decision in *EPIC* from challenging the withholding of OLC 4, 8, and 10 on the basis of Exemption 3.

### 6.    National Security Agency

All classified information withheld by NSA pursuant to FOIA Exemption 1 is also properly protected by FOIA Exemption 3. Specifically, NSA 11, 12, 13, and 22 are protected from disclosure by three Exemption 3 statutes that protect from public release the technical means by which NSA effects its collection operations: 50 U.S.C. § 3605, 50 U.S.C. § 3024(i)(1), and 18 U.S.C. § 798. *See* NSA Decl. ¶ 41; *see also id.* ¶¶ 42-44 (detailing statutory bases of protecting information at issue, including that it pertains to a "one of NSA's primary functions," namely, signals intelligence (National Security Act); the information "concerns NSA's intelligence sources and methods used by NSA to carry out its core foreign intelligence mission" (National Security Act); and it concerns "the communications intelligence activities of the

---

[16] NSA has not completed a line-by-line classification and segregability review of these documents, which, except for OLC 9, are also being withheld in full pursuant to Exemption 5, but it and other agencies will do so to the extent the withholdings in full pursuant to Exemption 5 are not upheld. *Id.* ¶ 81. As noted, a classification review of OLC 9 is complete and a redacted version of that document is being released to Plaintiffs.

United States, or information obtained by communications intelligence processes" (18 U.S.C. § 798)). The withheld information contained in NSA 7, 9, 14-21, and 28 (and NSD 31) similarly is "protected from release by statute and exempt from release based on FOIA Exemption 3, 5 U.S.C. § 552(b)(3), and specifically, the three Exemption 3 statutes discussed above: 50 U.S.C. § 3605, 50 U.S.C. § 3024(i)(1), and 18 U.S.C. § 798." *Id.* ¶ 49; *see also id.* ¶¶ 50-52 (showing that withheld information "relate[s] to a 'function of the National Security Agency'" whose disclosure would reveal "information with respect to" NSA's SIGINT mission, and so is protected by 50 U.S.C. § 3605; is protected from public release pursuant to 50 U.S.C. § 3024(i)(1) because it includes "operational details, such as the technical means of collection and analytic methodology," which "constitute the sources and methods used by NSA to carry out its SIGINT mission"; and is protected from release under 18 U.S.C. § 798 as "information concerning the communications intelligence activities of the United States, or information obtained by communications intelligence processes").

The same analysis also applies to NSA 23, *see* NSA Decl. ¶ 61, and NSA 79, the sample quarterly IOB report also sometimes referred to as NSA Bates No. 4165220. *See id.* Decl. ¶ 67; *see also id.* ¶¶ 68-70 (explaining and documenting the applicability of three separate Exemption 3 statutes, 50 U.S.C. § 3605, 18 U.S.C. § 798, and 50 U.S.C. § 3024(i)(1)). Finally, the withheld information contained in NSA 5 and USSID SP0018 and Appendix J (Bates Nos. 4086222 and 4086223) "is also protected from release by statute and therefore is exempt from release based on the FOIA Exemption 3, 5 U.S.C. § 552(b)(3), statutes: 50 U.S.C. § 3605, 18 U.S.C. § 798, and 50 U.S.C. § 3024(i)(1)." NSA Decl. ¶ 75; *see also id.* ¶¶ 76-78 (detailing and justifying applicability of these statutes).

**C.** **The Government Has Properly Withheld Documents and Information Under Exemption 5**

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). "By this language, Congress intended to incorporate into the FOIA all the normal civil discovery privileges." *Hopkins v. HUD*, 929 F.2d 81, 84 (2d Cir. 1991); *accord Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975). "Stated simply, agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.*, attorney-client, work-product, executive privilege) are protected from disclosure under Exemption 5." *Tigue v. DOJ*, 312 F.3d 70, 76 (2d Cir. 2002) (citation omitted).

### 1. Deliberative Process Privilege

Several agencies properly asserted that the deliberative process privilege protects some or all of various responsive records, as detailed below. In enacting Exemption 5, "[o]ne privilege that Congress specifically had in mind was the 'deliberative process' or 'executive' privilege." *Hopkins*, 929 F.2d at 84. "An agency record must satisfy two criteria to qualify for the deliberative process privilege: it "must be both 'predecisional' and 'deliberative.'" *Id.*; *accord Tigue*, 312 F.3d at 76-77; *Hopkins*, 929 F.2d at 84. A document is "predecisional" when it is "prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Bd.*, 421 U.S. at 184 (*quoted in Tigue*, 312 F.3d at 80; *Grand Cent. P'ship*, 166 F.3d at 482; *Hopkins*, 929 F.2d at 84). While a document is predecisional if it "precedes, in temporal sequence, the 'decision' to which it relates," *Grand Cent. P'ship*, 166 F.3d at 482, the government need not "identify a specific decision" made by the agency to establish the predecisional nature of a particular record, *Sears*, 421 U.S. at 151 n.18; *accord Tigue*, 312 F.3d

at 80.  Rather, so long as the document "was prepared to assist [agency] decisionmaking on a specific issue," it is predecisional.  *Tigue*, 312 F.3d at 80.

"A document is "'deliberative' when it is actually . . . related to the process by which policies are formulated."  *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks omitted; alteration in original).  In determining whether a document is deliberative, courts inquire as to whether it "formed an important, if not essential, link in [the agency's] consultative process," *id.* at 483, whether it reflects the opinions of the author rather than the policy of the agency, *id.*; *Hopkins*, 929 F.2d at 85, and whether it might "reflect inaccurately upon or prematurely disclose the views of [the agency]," *Grand Cent. P'ship*, 166 F.3d at 483.  Predecisional deliberative documents include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *Tigue*, 312 F.3d at 80 (internal quotation marks omitted); *Grand Cent. P'ship*, 166 F.3d at 482; *see also Hopkins*, 929 F.2d at 84-85 (privilege applies to "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated'" (quoting *Sears*, 421 U.S. at 150)).  Legal advice, no less than other types of advisory opinions, "fits exactly within the deliberative process rationale for Exemption 5."  *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980); *accord Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356-57 (2d Cir. 2005).

### a.    Central Intelligence Agency

The deliberative process privilege applies to numerous records located by the CIA, as reflected in the CIA's *Vaughn* index, all of which were also subject to withholding under Exemptions 1 and 3.  *See* CIA Decl. ¶¶ 22-25, CIA *Vaughn* Index.  Specifically, the CIA "invoked the deliberative process privilege in conjunction with the attorney-client privilege . . . to protect legal advice conveyed by attorneys in the CIA's Office of General Counsel to Agency

50

employees and by Department of Justice attorneys to CIA officials." CIA Decl. ¶ 23. As the CIA's declaration explains, these communications concern "specific proposals" and "reflect an interim stage associated with a given deliberation," presenting "a range of options and . . . one consideration for decision-makers when deciding whether to pursue a certain course of action." *Id.* The withheld advice "is one part of that decision-making process and does not constitute the Agency's final decision to undertake a particular operation or action." *Id.*

The CIA also properly invoked the deliberative process privilege and Exemption 5 as to talking points and outlines used by presenters concerning E.O. 12,333's requirements. *See id.* ¶ 24. These documents served as presentation tools only for presenters' use that, although not necessarily linked to specific decisions, "provided guidance on E.O. 12333 intended to inform subsequent Agency decision-making regarding the use of specific authorities." *Id.*

This showing establishes the applicability of the deliberative process privilege and Exemption 5 as asserted by the CIA.

### b. Defense Intelligence Agency

The sole DIA document at issue in this motion—DIA V-4—was released in part, and the redacted material is protected by the deliberative process privilege and Exemption 5. The document is a 25-page, undated DIA OGC legal guidance presentation entitled "Fundamentals of HUMINT Targeting." DIA Decl. ¶ 11. The document "contains recommendations and comments of government employees regarding the . . . rules for collecting on members of sensitive source categories." *Id.* ¶ 23. It is "predecisional" and "deliberative" in that it includes discussions and recommendations concerning "HUMINT operations and intelligence oversight" that served as a "foundational component to subsequent decisions on related activity." *Id.* The DIA's assertion of deliberative process privilege and Exemption 5 therefore should be upheld.

### c.	DOJ—National Security Division

NSD likewise properly withheld NSD 17 and memoranda contained in NSD 4, 12, 13, 14, 23, 33, and 49[17] (as well as NSA 11 and 12) pursuant to the deliberative process privilege and Exemption 5.  *See* NSD Decl. ¶ 16.  NSD 17 and the vast majority of a certain memorandum in NSD 4 are "pre-decisional" because they related to and preceded a final decision regarding one or more NSA programs or other intelligence activities.  *Id.* ¶ 18.  In addition, the vast majority of the memoranda contained in NSD 12, 13, 14, 23, 33, and 49 and NSA 11 and 12 are also "pre-decisional" because they related to and preceded a final decision regarding one or more NSA programs or other intelligence activities.  *Id.*  Further, NSD 17 and the vast majority of the memoranda contained in NSD 4, 12, 13, 14, 23, 33, and 49 and NSA 11 and 12 are "deliberative" because they reflect ongoing deliberations by government attorneys on DOD procedures and one or more NSA programs.  *Id.*  All of these considerations apply equally to NSA 11 and 12.  *Id.* ¶¶ 16-19.  And there is no segregable, non-exempt material in NSD 17 or in the memoranda in NSD 4, 12, 13, 14, 23, 33, and 49 and in NSA 11 and 12.  *See id.* ¶ 19; *see also* NSA Decl. ¶ 45.  Thus, all requirements of the deliberative process privilege have been met as to these documents.

NSD 9 and 36 are also "confidential, pre-decisional, and deliberative" documents provided "in advance of" and "in connection with" Executive Branch decision-making – in this case setting forth legal advice, as explained by OLC.  *See* OLC Decl. ¶ 27; *see also id.* ¶ 21 (NSD 9 and NSD 10 are "classified OLC legal advice memoranda").  These documents too are protected by the deliberative process privilege.

---

[17] More information about these documents is provided in the NSA's classified *in camera, ex parte* declaration in support of this motion.

In addition, pages 2-4 and 30-38 of NSD 18 convey Attorney General advice and recommendations to the President, *see* Declaration of Christina M. Butler of DOJ's Office of Information Policy ("OIP Decl.") ¶ 18, and, as such, they are subject to the deliberative process privilege under Exemption 5. *See id.* ¶¶ 15-17; *see also id.* ¶¶ 11-12 and *infra* Point III.C.3 (explaining application of presidential communications privilege to these records). This material "deliberative in that [it] express[es] advice and recommendations of the Attorney General to the President as part of a presidential deliberative process regarding a matter of presidential decision." *Id.* ¶ 16. It is pre-decisional because it was prepared "for the consideration of the President . . . and expressed prior to a final decision being made by the President." *Id.*

Finally, NSD 2 is a confidential, predecisional, deliberative draft document by which the Department of Homeland Security ("DHS") proposed certain procedures for DOJ consideration. *See* Declaration of Arthur R. Sepeta ("DHS Decl.) ¶¶ 8, 12. The procedures were not adopted by the relevant decision-maker, the Attorney General. *Id.* ¶¶ 12-13. The document thus "reflects one iteration of ongoing deliberations by two executive agencies, *id.* ¶ 13, and as such is protected by Exemption 5 and the deliberative process privilege. *Id.*

### d.      DOJ—Office of Legal Counsel

OLC plays a unique and important governmental role, assisting the Attorney General in her role as legal adviser to the President and to departments and agencies of the Executive Branch. *See* OLC Decl. ¶ 2. OLC "does not purport to make policy decisions" and "lacks authority to make such decisions." *Id.* Moreover, while OLC's "legal advice and analysis may inform" Executive Branch decision-making, "OLC's legal advice is not itself dispositive as to any policy adopted." *Id.* OLC's advice is "generally kept confidential," and often "is part of a larger deliberative process—a process that itself requires confidentiality to be effective." *Id.* ¶ 3. On numerous occasions, the Second Circuit has found OLC legal advice to be protected by the

deliberative process privilege unless the privilege protection has been lost by reason of express adoption or waiver. *See, e.g.*, *N.Y. Times Co. v. DOJ*, 806 F.3d 682, 685-87 (2d Cir. 2015); *Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184, 202-03 (2d Cir. 2012); *accord Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 10 (D.C. Cir. 2014).

In this case, OLC's search revealed ten responsive records, three of which were released in part and seven of which were withheld in full. *Id.* ¶ 12. Nine of the 10 documents (all but OLC 9) were withheld in full or in part pursuant to Exemption 5 based on both the deliberative process privilege and the attorney-client privilege. *See id.* ¶¶ 27-28; OLC *Vaughn* Index. These records "consist primarily of memoranda authored by OLC containing OLC's confidential, pre-decisional legal advice to assist Executive Branch clients in making policy decisions." OLC Decl. ¶ 15. All of the nine documents withheld in full or in part are "predecisional and deliberative, in that they consist of legal advice to Executive Branch decisionmakers." *Id.* ¶ 17.

More specifically, OLC 2-8 and 10, as well as NSD 9 and 36, are classified OLC legal advice memoranda. *Id.* ¶ 21. Each was written in response to confidential requests for OLC legal advice, and each includes "predecisional legal advice from OLC attorneys transmitted to executive branch clients as part of government deliberative processes." *Id.*; *see also id.* ¶ 27. And as noted above, ACLU is precluded by the decision in *EPIC* from challenging the withholding of OLC 4, 8, and 10 on the basis of Exemption 5. Despite certain subsequent discussion of OLC 10 in an inspector general report, *see id.* ¶ 24, there is no reason to disturb the well-reasoned *EPIC* ruling, and that same rationale applies fully to the privilege-based withholdings from OLC 2-8 and 10, and NSD 9 and 36.

OLC 1 is the other OLC document as to which privilege is asserted. It is a cover memorandum transmitting a legal advice memorandum, and contains an unclassified partial

summary of another document, along with a "description of the solicitation of advice and a summary of the memorandum's conclusions." *Id.* ¶ 25. Like the other OLC memoranda withheld on privilege grounds, OLC 1 is protected by the deliberative process privilege because it is "confidential, pre-decisional, and deliberative," prepared "in advance of Executive Branch decisionmaking," and deliberative in that it "consist[s] of advice to Executive Branch officials in connection with" their decisionmaking. *Id.* ¶ 27.

Thus, OLC's assertions of the deliberative process privilege and Exemption 5 should be upheld.

### e.  National Security Agency

NSA 11 and 12 are being withheld pursuant to Exemption 5 on deliberative process privilege grounds, in addition to Exemptions 1 and 3. *See* NSD Decl. ¶¶ 11, 16. As noted above in the discussion of NSD documents subject to the deliberative process privilege, NSA 11 and 12 were pre-decisional in that they "related to and preceded a final agency decision regarding one or more NSA programs other or intelligence activities," and they were "deliberative" because they "reflect ongoing deliberations by government attorneys on one or more NSA programs or other intelligence activities." *Id.* ¶ 18. There is no "segregable, non-exempt material" in these documents. *Id.* ¶ 19. This assertion is further supported as to NSA 12 by the OIP declaration's explanation that, in addition to being subject to the presidential communications privilege, NSA 12 is subject to the deliberative process privilege. *See* OIP Decl. ¶¶ 15-17. Thus, all requirements of the deliberative process privilege have been met as to these documents.

### 2.  Attorney-Client Privilege

Various agencies also properly withheld materials pursuant to the attorney-client privilege, as detailed below. "The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance. Its

purpose is to encourage attorneys and their clients to communicate fully and frankly and thereby to promote 'broader public interests in the observance of law and administration of justice.'" *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (quoting *Upjohn v. United States*, 449 U.S. 383, 389 (1981)) (citation omitted). The privilege operates in the government context as it does between private attorneys and their clients, "protect[ing] most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance." *Id.* To invoke the attorney-client privilege, a party must demonstrate that there was: "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id.* at 419; *see also Brennan Center*, 697 F.3d at 207 (same).

### a.      Central Intelligence Agency

The CIA withheld material from several records (all of which were also subject to Exemptions 1 and 3) on grounds of attorney-client privilege. *See* CIA Decl. ¶ 26; CIA *Vaughn* Index. The communications at issue were "confidential communications between Agency employees and attorneys within the CIA's Office of General Counsel and between CIA officials and Department of Justice lawyers." CIA Decl. ¶ 26. In each instance, "Agency employees requested legal advice related to certain proposed courses of action or operations," through "confidential communications consist[ing] of factual information supplied by clients in connection with their requests for legal advice, discussions between attorneys that reflect those facts, and legal analysis and advice provided to the clients." *Id.* The "confidentiality of these communications was maintained." *Id.* Thus, CIA has established the applicability of the privilege and, as a result, Exemption 5, to the information it withheld on that basis.

### b.     DOJ—National Security Division

NSD also has properly asserted the attorney-client privilege and thus Exemption 5 to

protect NSD 17, one memorandum within NSD 4, and an email message in NSD 31.  *See* NSD

Decl. ¶ 14.  Each of these documents discusses legal issues pertaining to one or more NSA

programs or other intelligence activities, and was "sought by a decision-maker for the

Government to obtain legal advice . . . and indeed reflected such advice." *Id.*[18]  The same is true

of NSD 12, 13, 14, 23, 33, and 49 (as well as NSA 11 and 12), as described at Paragraph 15 of

the NSD Declaration. *Id.* ¶ 15.  The vast majority of these memoranda constitute legal advice

prepared by NSD lawyers to assist other attorneys who represented the government.  As a result,

the vast majority of the memoranda are protected from disclosure under the attorney-client

privilege. *Id.*

NSD 9 and 36 are "classified OLC legal advice memoranda" and are subject to the

attorney-client privilege.  *See* OLC Decl. ¶¶ 21, 28.  They "contain confidential legal advice

provided to OLC's Executive Branch clients," and "reflect confidential communications between

OLC and Executive Branch clients made for the purpose of seeking and providing that legal

advice."  *Id.* ¶ 28.  These documents too therefore are protected by the attorney-client privilege.

### c.     DOJ—Office of Legal Counsel

All material withheld by OLC pursuant to the deliberative process privilege also is

protected by the attorney-client privilege.  All of these documents—OLC 1 through 8 and 10, as

described in more detail above and in OLC's declaration—"consist of legal advice that was

communicated in confidence from OLC to Executive Branch clients" and "disclose confidential

client requests for legal advice."  *Id.* ¶ 19; *see also id.* ¶ 28 (explaining application of attorney-

client privilege to all withheld OLC documents or portions at issue other than OLC 9).  They all

---

[18] More information about these documents is provided in the *ex parte* classified NSA declaration.

"reflect confidential communications between OLC and Executive Branch clients made for the purpose of seeking and providing that legal advice." *Id.* ¶ 28. Thus, they are paradigmatic attorney-client privileged documents, and are properly protected by FOIA Exemption 5.

### d. National Security Agency

NSA 7, 14, 15, 16, 17, 18, 19, 20, 21, and 28 contain correspondence between NSA OGC and its internal clients, such as the Signals Intelligence Directorate, the NSA organization tasked with carrying out NSA's SIGINT mission; Exemption 5 of the FOIA and the attorney-client privilege apply to this correspondence, which constitutes privileged communications between NSA attorneys and NSA clients. *See* NSA Decl. ¶ 53. The communications at issue were made in order to provide legal advice to NSA clients on a variety of operational issues that arose under E.O. 12,333, and the communications were made in confidence. *Id.* The withholdings from NSA 28 were "narrowly tailored to protect operational details regarding the SIGINT activities of NSA and privileged legal analysis," *id.* ¶ 55, such that no additional non-exempt information could reasonably be segregated and released.

NSA 11 and 12 are also subject to the attorney-client privilege and thus Exemption 5. *See* NSD Decl. ¶ 15. These documents discuss legal issues pertaining to an NSA program, and each was "sought by decision-makers for the Government to obtain legal advice . . . and indeed reflected such advice." *Id.*

### 3. Presidential Communications Privilege

Portions of two documents at issue—pages 2-4 and 30-38 of NSA 12, and all of NSD 18—also have been withheld because they are protected by the presidential communications privilege, and, as a result, are subject to FOIA Exemption 5. *See* OIP Decl. ¶¶ 5, 7, 8. The presidential communications privilege is "closely affiliated" with the deliberative process privilege. *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997). However, unlike the

deliberative process privilege, which applies to decisionmaking of executive officials generally, the presidential communications privilege applies specifically to decisionmaking of the President. *Id.* In particular, it applies "to communications in performance of a President's responsibilities, . . . and made in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1997) (citation and internal quotation marks omitted).

Although the presidential communications privilege is limited to documents relating to presidential decisionmaking, the protection afforded by the privilege is broader than the deliberative process privilege. Documents subject to the presidential communications privilege are shielded in their entirety. *See In re Sealed Case*, 121 F.3d at 745 ("Even though the presidential privilege is based on the need to preserve the President's access to candid advice, none of the cases suggest that it encompasses only the deliberative or advice portions of documents."). Moreover, the presidential communications privilege protects not only predecisional advice, but also closely-held presidential directives and decisional documents. *Sealed Case*, 121 F.3d at 745-46; *Amnesty Int'l*, 728 F. Supp. 2d at 522.

Here, in addition to the other grounds asserted, the OIP declaration easily satisfies the requirements to justify the withholding of pages 2-4 and 30-38 of NSA 12, and all of NSD 18, based on the presidential communications privilege and Exemption 5. The privileged presidential communications at issue consist of "Executive Branch communications that reflect advice and recommendations to the President regarding a National Security Agency (NSA) program concerning particular intelligence sources and related methods used to collect and process foreign communications"—specifically, documents reflecting or revealing "advice and recommendations" from the Attorney General to the President. OIP Decl. ¶¶ 7-9. Disclosure of these communications "would inhibit the President's ability to engage in effective

59

communications and decisionmaking by interfering with the ability of the President to obtain

candid information and written advice from Cabinet-level officials such as the Attorney General,

who are expected to and relied upon to give the President their best possible advice." *Id.* ¶ 13.

NSD 18 and pages 2-4 and 30-38 of NSA 12 thus plainly fall within the scope of the

privilege, and are protected from disclosure in their entirety under Exemption 5 for this reason as

well as due to the other applicable Exemption 5-qualifying privileges, and Exemptions 1 and 3.

*See Sealed Case*, 121 F.3d at 745; *Amnesty Int'l*, 728 F. Supp. 2d at 522.

### D. The Government Has Properly Withheld Documents and Information Under Exemption 7

#### 1. Federal Bureau of Investigation

The FBI properly withheld some portions of responsive documents pursuant to FOIA

Exemption 7(E), 5 U.S.C. § 552(b)(7)(E), which protects from disclosure certain sensitive law

enforcement information. Some of this same information is also properly withheld pursuant to

Exemptions 7(A).

First, a "threshold requirement for the application of Exemption 7(E) is that the

documents must be 'compiled for law enforcement purposes.'" *Bishop v. DHS*, 45 F. Supp. 3d

380, 386 (S.D.N.Y. 2014). "Once this threshold requirement is satisfied, a court must determine

if either of Exemption 7(E)'s 'two alternative clauses' applies." *Id.* at 387 (quoting *Allard K.

Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678, 681 (2d Cir. 2010)). "That is,

Exemption 7(E) protects from disclosure "either (1) techniques and procedures for law

enforcement investigations, or (2) guidelines for law enforcement investigations if disclosure of

such guidelines could reasonably be expected to risk circumvention of the law." *Id.* Further,

> The Second Circuit has explained the distinction between "techniques and procedures" and "guidelines" as follows: "The term 'guidelines' — meaning, according to Webster's Third New International Dictionary (1986), 'an indication or outline of future policy or conduct' — generally refers in the context of

Exemption 7(E) to resource allocation. For example, if a law enforcement agency concerned with tax evasion directs its staff to bring charges only against those who evade more than $100,000 in taxes, that direction constitutes a 'guideline.' The phrase 'techniques and procedures,' however, refers to how law enforcement officials go about investigating a crime. *See* Webster's Third New International Dictionary (1986) (defining 'technique' as 'a technical method of accomplishing a desired aim'; and 'procedure' as 'a particular way of doing or of going about the accomplishment of something'). For instance, if the same agency informs tax investigators that cash-based businesses are more likely to commit tax evasion than other businesses, and therefore should be audited with particular care, focusing on such targets constitutes a 'technique or procedure' for investigating tax evasion."

*Id.* (quoting *Lowenstein*, 626 F.3d at 682).

FBI properly withheld portions of 3 responsive documents—FBI 13-15, 30-35, and 57-65 —under Exemption 7(E). As a threshold matter, all responsive documents located by FBI "were compiled for law enforcement purposes" and "squarely fall within the law enforcement duties of the FBI." FBI Decl. ¶ 42. Moreover, the FBI declaration details how release of the information withheld pursuant to Exemption 7(E) "would disclose techniques and/or procedures used in law enforcement and national security investigations or prosecutions, or would disclose guidelines for law enforcement and national security investigations or prosecutions, that could reasonably be expected to risk circumvention of the law." *Id.* ¶ 49. Moreover, although the FBI believed that some responsive documents could be withheld in full on this basis, it nevertheless "endeavored to release as much segregable information as possible to the Plaintiffs." *Id.* The FBI declaration provides extensive additional details concerning how releasing further information would cause a variety of harms to law enforcement capabilities, and would permit circumvention of the law, by disclosing law enforcement techniques, capabilities, and investigations. *Id.* ¶¶ 49-60.

Some of the information that FBI determined was protected by Exemption 7(E) also is protected by Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), which exempts from disclosure "[r]ecords or

information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  *Id.* ¶ 43.  Here, the FBI has asserted Exemption 7(A) in a limited fashion to protect the names, personal identifying information, and activities of third-party subjects of pending FBI investigations.  The release of the names, identifying information, and activities of third parties of on-going FBI investigations could result not only in the acknowledgment of the existence of the investigations, but also expose the identity of suspects, thereby jeopardizing the investigations.  The FBI has applied Exemption (b)(7)(A) to protect the names, personal identifying information, and activities of third parties of these open investigations.

### 2.    DOJ—Office of Legal Counsel

The FBI declaration supports the assertion of Exemption 7(D) as to OLC 6 "to protect identifying information about and information provided by individuals to the FBI and/or law enforcement during the course of an FBI classified counterintelligence investigation of a third-party, under express grants of confidentiality."  *Id.* ¶ 47.  This information is protected by Exemption 7(D), which protects "records or information compiled for law enforcement purposes [which] could reasonably be expected to disclose the identity of a confidential source" and certain types of "information furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).  The information withheld on this basis falls squarely within this exemption, and its release "could have disastrous consequences" and also, more broadly, a "chilling effect on the activities and cooperation of this and other future FBI confidential sources."  FBI Decl. ¶ 47.

### 3.    Central Intelligence Agency

Finally, CIA has asserted Exemption 7(E) with respect to one of its documents that was released in part, a "Memorandum of Understanding Concerning Overseas and Domestic Activities of the Central Intelligence Agency and the Federal Bureau of Investigation"

(document C06235758, CIA *Vaughn* number 4).  *See* CIA Decl. ¶ 28.  This document outlines

the "coordination and cooperation between CIA and FBI in both the overseas and domestic

arenas."  *Id.*  The document, which was compiled for law enforcement purposes, contains law

enforcement procedures protected under Exemption 7(E) as well as guidelines the release of

which would nullify their effectiveness and risk circumvention of the law.  *Id.*

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their

motion for partial summary judgment.

Dated:   New York, New York
         February 26, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York

                            By:      s/David S. Jones
                                     DAVID S. JONES
                                     JEAN-DAVID BARNEA
                                     Assistant United States Attorney
                                     86 Chambers Street, Third Floor
                                     New York, New York 10007
                                     Tel.: (212) 637-2739/2679
                                     Fax: (212) 637-2717
                                     Email:  David.Jones6@usdoj.gov
                                             Jean-David.Barnea@usdoj.gov