UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN CIVIL LIBERTIES UNION, and AMERICAN CIVIL LIBERTIES UNION FOUNDATION,

Plaintiffs,

v.

NATIONAL SECURITY AGENCY, CENTRAL INTELLIGENCE AGENCY, DEPARTMENT OF DEFENSE, DEPARTMENT OF JUSTICE, and DEPARTMENT OF STATE,

Defendants.

No. 13-CV-9198 (AT)

**DECLARATION OF DAVID J. SHERMAN**

I, DAVID J. SHERMAN, hereby declare and state:

1. I am the Associate Director for Policy and Records at the National Security Agency ("NSA" or "Agency"), an intelligence agency within the Department of Defense. I have been employed with NSA since 1985. Prior to my current assignment, I held various senior and supervisory positions at NSA and elsewhere in the Executive Branch, to include serving as the Deputy Chief of Staff in the Agency's Signals Intelligence Directorate, its representative to the Department of Defense, Deputy Associate Director for Foreign Affairs, and Director for Intelligence Programs at the National Security Council. As the Associate Director for Policy and Records, I am responsible for, among other things, the processing of all requests made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for NSA records.

2.     In addition, I am a TOP SECRET original classification authority pursuant to Section 1.3 of Executive Order (EO) 13526, dated 29 December 2009 (75 Fed. Reg. 707).  It is my responsibility to assert FOIA exemptions when warranted over NSA information in the course of litigation.  Through the exercise of my official duties, I have become familiar with the current litigation arising out of a FOIA request for information filed by the Plaintiffs, the American Civil Liberties Union and the American Civil Liberties Union Foundation (collectively, "Plaintiffs" or "ACLU").

3.     Through the exercise of my official duties, I have become familiar with this civil action and the underlying FOIA request.  I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

4.     I submit this declaration in support of the Defendants' Motion for Partial Summary Judgment.  The purpose of this declaration is to explain the search undertaken by NSA in response to Plaintiffs' FOIA request, and to explain and justify, to the extent possible on the public record, the withholdings taken by NSA in responding to Plaintiffs' request for information under the FOIA, 5 U.S.C. § 552, and the withholdings taken by the National Security Division (NSD) of the U.S. Department of Justice on behalf of NSA.  Additionally, I have submitted to the Court an *in camera, ex parte* classified declaration to more fully explain certain withholdings than could be addressed on the public record. To the extent that the Court requires additional information regarding particular withholdings, the Agency will submit a supplemental *in camera, ex parte* classified declaration upon request to provide further explanation of the harm to the national security that could reasonably be expected to occur if certain information were to be released.

## ORIGIN AND MISSION OF NSA

5.      The NSA was established by Presidential Directive in October 1952 as a separately-organized agency within the Department of Defense under the direction, authority, and control of the Secretary of Defense.  NSA's foreign intelligence mission includes the responsibility to collect, process, analyze, produce, and disseminate signals intelligence ("SIGINT") information for foreign intelligence and counterintelligence purposes to support national and departmental missions and for the conduct of military operations. *See* EO 12333, section 1.7(c), as amended.

6.      In performing its SIGINT mission, NSA exploits foreign electromagnetic signals to obtain intelligence information necessary to the national defense, national security, or the conduct of foreign affairs.  NSA has developed a sophisticated worldwide SIGINT collection network that acquires foreign and international electronic communications.  The technological infrastructure that supports NSA's foreign intelligence information collection network has taken years to develop at a cost of billions of dollars and untold human effort.  It relies on sophisticated collection and processing technology.

## IMPORTANCE OF SIGINT TO THE NATIONAL SECURITY

7.      There are two primary reasons for gathering and analyzing intelligence information.  The first, and most important, is to gain the information required to direct U.S. resources as necessary to counter threats to the nation and its allies.  The second reason is to obtain the information necessary to direct the foreign policy of the United States.  Foreign intelligence information provided by the NSA is routinely distributed to a wide variety of senior Government officials, including the President; the President's National Security Advisor; the Director of National Intelligence; the Secretaries of Defense, State, Treasury, and Commerce; U.S. ambassadors serving in posts abroad; the Joint Chiefs of Staff; and the Unified and

Specified Commanders. In addition, SIGINT information is disseminated to numerous agencies and departments, including, among others, the Central Intelligence Agency; the Federal Bureau of Investigation; the Drug Enforcement Administration; the Departments of the Army, Navy, and Air Force; and various intelligence components of the Department of Defense. Information provided by NSA is relevant to a wide range of important issues, including, but not limited to, military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics trafficking. This information is often critical to the formulation of U.S. foreign policy and the support of U.S. military operations around the world. Moreover, intelligence produced by NSA is often unobtainable by other means.

**THE ADMINISTRATIVE PROCESSING OF PLAINTIFFS' FOIA REQUEST**

8. On 13 May 2013, Plaintiffs, via Mr. Abdo, submitted a request for documents under the FOIA to NSA. Plaintiffs specifically requested the following records:

> 1. Any records construing or interpreting the authority of the National Security Agency ("Agency") under Executive Order 12,333 or any regulations issued thereunder;
>
> 2. Any records describing the minimization procedures used by the Agency with regard to both intelligence collection and intelligence interception conducted pursuant to the Agency's authority under EO 12,333 or any regulations issued thereunder; and
>
> 3. Any records describing the standards that must be satisfied for the "collection," acquisition," or "interception" of communications, as the Agency defines these terms, pursuant to the Agency's authority under EO 12,333 or any regulations issued thereunder. **Agency Exhibit (AEX) 1.**

9. On 28 June 2013, NSA's FOIA Office contacted Mr. Abdo for clarification about the records Plaintiffs were seeking and the scope of the records at issue. NSA's FOIA Office and Mr. Abdo agreed to narrow the scope of the request, in an agreement that was formalized by the NSA's FOIA Office in an email to Mr. Abdo sent on this same day, 28 June 2013. **AEX 2.** Mr. Abdo agreed to limit the request to "formally issued guidance . . . such as DoD Directi[ves],

NSA USSID, NSA Policies, various issuances related to FISA, compliance training, and advisories" and "separate legal opinions that interpret the standards or define the terms collection, acquisition, or interception to the extent that opinion/interpretation is not included in the formal guidance." **AEX 2**. On 1 July 2013, NSA provided its initial response to Plaintiffs' FOIA request wherein NSA reiterated the scoping agreement reached on 28 June 2013, and informed Mr. Abdo, among other things, that his request was assigned case number 70809, that the Agency had begun to process this request, and that he was considered an "all other requester" for fee purposes, but there would be no fees as searches for similar records were already being conducted in response to other FOIA requests. **AEX 3.** Further, the NSA's FOIA Office provided Mr. Abdo with two documents that were previously released under the FOIA, totaling 81 pages: United States Signals Intelligence Directive (USSID) 18 and NSA/CSS Policy 1-23. **AEX 3.**

10. On 21 August 2013, NSA's FOIA Office sent Mr. Abdo a follow-up email informing him that the Office of the Director of National Intelligence (ODNI) would be posting documents on its ICpredictRecord website that were related to Sec. 702 of the FISA Amendments Act but which may be responsive to his request for NSA's minimization procedures. **AEX 4.** In this email, the NSA's FOIA Office informed Mr. Abdo that the Agency was continuing to process his FOIA request and that it would provide additional responses when processing of responsive documents was complete. **AEX 4.** Mr. Abdo replied to this email on the same day and informed the Agency's FOIA Office that Plaintiffs had downloaded the documents from the ODNI website. **AEX 4.** Plaintiffs did not specify the documents that they had downloaded from IContheRecord. **AEX 4.**

11. Despite being informed that the Agency was processing his request and receiving NSA documents from both the NSA directly and through the ODNI website, Plaintiffs filed an appeal dated 8 November 2013, which was received by the NSA's Appeal Authority on 18 November 2013. **AEX 5.** In the appeal, Plaintiffs alleged that they had not received a substantive response within twenty days and that the Agency had constructively failed to meet its legal obligations to disclose the requested records. **AEX 5.**

12. By email dated 18 November 2013 and without knowing that Plaintiffs had filed an appeal, the NSA's FOIA Office provided Mr. Abdo with two additional documents, which were more recent versions of USSID 18-USSID SP0018 and Annex J to this USSID. **AEX 6.** In this email, the NSA's FOIA Office informed Mr. Abdo that the ODNI was releasing approximately 2000 pages of information related to Section 501 of the USA PATRIOT Act on that day, which could be found at the ODNI's website as well as the ICOntheRecord Tumblr site. **AEX 6.** In this email, the FOIA Office inquired as to whether the documents released by the ODNI satisfied the FOIA request. **AEX 6.** Plaintiffs did not respond to this inquiry. The NSA's FOIA Office followed up on this email with a formal response that included hard copies of the two recently-processed documents. **AEX 7.** NSA's FOIA Office also informed Plaintiffs of their right to appeal the withholdings in these two documents. **AEX 7.**

13. By letter dated 22 November 2013, NSA's FOIA/PA Appeals Program Manager acknowledged Plaintiffs' appeal dated 8 November 2013, which was received by the Agency on 18 November 2013. **AEX 8.**

14. On December 30, 2013, Plaintiffs filed a civil action under the FOIA against NSA and several other agencies that received requests that were substantially similar to Plaintiffs' FOIA request to NSA.

15.     Despite filing a civil action on 30 December 2013, Plaintiffs, by letter dated 9 January 2014, also filed a second appeal, this time appealing the withholdings in the four initial documents provided by NSA in response to Plaintiffs' FOIA request.  **AEX 9.**  NSA acknowledged this appeal by letter dated 24 January 2014 as it was not yet aware of the Plaintiffs' civil action.  **AEX 10.**

16.     NSA continued to process Plaintiffs' FOIA request based on the stipulation (limiting the request to formally issued guidance) it had reached with Mr. Abdo on 21 June 2013, and determined that all of the documents responsive to the request as stipulated were on the ODNI's IContheRecord website, or were provided by NSA except for one additional document, SID Management Directive 424.  NSA released this document with redactions of information exempt from release based on Exemptions 1 and 3 of the FOIA to Plaintiffs by letter dated 1 May 2014.  **AEX 11.**

17.     Following the filing of Plaintiffs' civil action, Plaintiffs and the various defendants began negotiating a stipulation that, among other things, would define the scope of the records to be searched.  Each of the agencies reached an identical agreement on the scope, with some variations for the Central Intelligence Agency (CIA) and the Office of Legal Counsel (OLC).  As a result of this agreement, Plaintiffs sought substantially different information than that which had been originally agreed upon by the Plaintiffs and NSA on 21 June 2013.  In essence, the agreement on the scope of the agencies' searches was a new request for records as Plaintiffs' FOIA request to NSA sought only three categories of records (records construing or interpreting the authority of NSA under EO 12333; records describing the minimizations procedures used by the agency; and records describing the standards that must be satisfied for collection, acquisition, or interception of communications), all of which were limited by

stipulation to formally issued guidance such as directives, USSIDs, policies, compliance training, etc. In the spirit of transparency, NSA, although it had already completed its processing of Plaintiffs' FOIA request as construed by the agreement of 21 June 2013, agreed to be governed by this stipulation, which as stated previously was essentially a new FOIA request. On 9 May 2014, the parties, including NSA, formally entered into a stipulation with Plaintiffs that would govern the scope of NSA's search for responsive records. The parties agreed that NSA would search for and process records in the following categories:

> 1. Any formal regulations or policies relating to that Agency's authority under EO 12,333 to undertake "Electronic Surveillance" (as that term is defined in EO 12,333) that implicates "United States Persons" (as that term is defined in EO 12,333), including regulations or policies relating to that Agency's acquisition, retention, dissemination or use of information or communications to, from, or about United States persons under such authority.[fn1]
>
> 2. Any document that officially authorizes or modifies under EO 12,333 that Agency's use of specific programs, techniques, or types of Electronic Surveillance that implicate United States Persons, or documents that adopt or modify official rules or procedures for the Agency's acquisition, retention, dissemination, or use of information or communications to, from, or about United States persons under such authority generally or in the context of particular programs, techniques, or types of Electronic Surveillance.
>
> 3. Any formal legal opinions addressing that Agency's authority under EO 12,333 to undertake specific programs, techniques, or types of Electronic Surveillance that implicates United States Persons, including formal legal opinions relating to that Agency's acquisition, retention, dissemination, or use of information or communications to, from, or about United States Persons under such authority generally or in the context of particular programs, techniques, or types of Electronic Surveillance.
>
> 4. Any formal training materials or reference materials (such as handbooks, presentations, or manuals) that expound on or explain how that Agency implements its authority under EO 12,333 to undertake Electronic Surveillance that implicates United States Persons, including acquisition, retention, dissemination, or use of information or communications to, from, or about United States Persons under such authority.
>
> 5. Any formal reports relating to Electronic Surveillance under EO 12,333 implicating United States Persons, one of whose sections or subsections is devoted to (1) the Agency's compliance, in undertaking such surveillance, with

EO 12,333, its implementing regulations, the Foreign Intelligence Surveillance Act, or the Fourth Amendment; or (2) the Agency's interception, acquisition, scanning, or collection of the communications of United States Persons, whether "incidental" or otherwise, in undertaking such surveillance; and that are or were:

a. Authored by the Agency's inspector general or the functional equivalent thereof;

b. Submitted by the Agency to Congress, the Office of the Director of National Intelligence, the Attorney General, or the Deputy Attorney General; or

c. Maintained by the office of the Agency's director or head. **AEX12.**

[Footnote 1: For purposes of this Stipulation, surveillance that "implicates" United States Persons means surveillance that is reasonably believed to involve the interception, acquisition, scanning, or collections of information or communications to, from, or about a United States Person or Persons even if the target of such surveillance is not a United States Person.]

18. The Agency conducted a search for documents responsive to this request, described more fully below, and located over 1200 pages of responsive material, of which over 850 pages were released in whole or in part to the Plaintiffs.

**AGENCY'S SEARCH FOR RESPONSIVE DOCUMENTS**

19. Relying on the specificity of the information sought by Plaintiffs in the stipulation **(AEX 12),** NSA conducted searches in its directorates and organizations that NSA determined were most likely to have responsive records if such responsive records existed. NSA relied upon its FOIA Office, which is staffed with a cadre of intelligence professionals, including intelligence analysts, to direct and assist in the search for responsive records. Additionally, NSA assigned the following personnel to assist with the searches within their respective organizations: the Signals Intelligence Directorate assigned three senior employees who are well-versed in the Directorate's missions, functions, and activities, particularly those undertaken pursuant to EO 12333; the Office of General Counsel assigned a senior attorney with extensive experience in its

Intelligence Law practice group drafting legal opinions concerning EO 12333; and the Office of the Inspector General assigned its counsel (collectively, "Senior Staff"). As explained in Paragraph 21 of this declaration, NSA FOIA Office professionals determined, based on their familiarity with NSA's organization and operations, that no other components of NSA were likely to possess additional responsive materials.

20.     The Senior Staff reviewed NSA activities and programs, to include the sources and methods undertaken in these EO 12333 activities and programs, for records that were responsive to the requested five categories of information about electronic surveillance implicating United States Persons (USPs). The Senior Staff also searched the holdings of the Signals Intelligence Directorate and relevant organizations within that Directorate; the Office of the General Counsel; the Office of the Inspector General; the Legislative Affairs Office; and the Associate Directorate for Education and Training. This Senior Staff was fully aware of the nature of the filing systems of each organization and relied on their experience at NSA to identify the relevant repositories most likely to contain responsive materials. Once these repositories were identified, the Senior Staff conducted searches both electronically and manually. The Senior Staff conducted its electronic searches using the term "EO 12333" and other terms unique to the Directorate/organizations being searched.[1] In the Office of the General Counsel, the Senior Staff searched electronic records of current and former General Counsels, Deputy General Counsels, and Associate General Counsels for Intelligence Law. NSA also searched its repository of serialized legal opinions, which are formal legal guidance issued by individuals occupying those senior legal positions, using the search term "EO 12333" and the

---

[1] ACLU, in its requests and in the stipulation, referred to the Executive Order as EO 12,333 (with a comma). NSA and the U.S. Intelligence Community typically render the Executive Order as EO 12333 (with no comma). NSA's search was reasonably calculated to recover responsive material regardless of the manner in which the number was written.

titles of senior NSA legal officials likely to have created and received responsive documents. The Senior Staff also conducted manual searches based on the filing systems of each organization likely to have responsive documents to identify and locate records responsive to the stipulation. For instance, the Senior Staff searched for documents responsive to Plaintiffs' requests in the electronic repositories of the Signals Intelligence Directorate's policy organization, which contain NSA and IC policies governing the conduct of signals intelligence activities under EO 12333. Likewise, the Senior Staff searched for responsive documents in the electronic repositories of the Associate Directorate for Education and Training, which contain formal training courses and exams. Finally, the Senior Staff manually retrieved from the files of the Office of the Inspector General all quarterly reports filed with the Intelligence Oversight Board for the time period specified in the stipulation, and using the search term "EO 12333"electronically searched the Office of the Inspector General's repositories containing intelligence oversight reports, and then manually reviewed the results for records responsive to the stipulation.

21. NSA's decision to search only the repositories of the five above-listed organizations was reasonable because all originals of materials responsive to the five categories of records requested by the Plaintiff were most likely to reside there. The repositories of other organizations would hold only copies of these original documents. This is because the NSA organizations that were searched are those responsible for (a) conducting signals intelligence activities under EO 12333; (b) ensuring the compliance of these activities with EO 12333 authorities; (c), reporting to higher authorities which oversee NSA signals intelligence activities (such as the Intelligence Oversight Board), and (d) training NSA personnel in the compliant conduct of signals intelligence activities. For example, the Office of the General Counsel and

the Signals Intelligence Directorate were the organizations that could be most reasonably presumed to have documents in Category 1 (formal regulations and policies relating to NSA authorities under EO 12333) and Category 2 (documents that officially authorized or modified NSA policies or procedures that implicate USPs); the Office of the General Counsel was the organization that would have documents responsive to Category 3 (formal legal opinions); the Associate Directorate for Education and Training and the Signals Intelligence Directorate were the organizations that would have documents responsive to Category 4 (formal training and reference materials); and the Office of the General Counsel, the Signals Intelligence Directorate, the Legislative Affairs Office, and the Office of the Inspector General, collectively, were the organizations that would have documents responsive to Category 5 (formal reports to Congress or authored by the NSA IG relating to compliance in undertaking surveillance pursuant to EO 12333).

22. Over 1200 pages of responsive material were located and referred to the NSA FOIA Office for processing. NSA identified and searched all NSA components that were likely to possess records responsive to the FOIA request, and identified and used search methods that were reasonably likely to identify all responsive NSA records.

**APPLICABLE EXEMPTIONS TO THE FOIA**

23. NSA withheld certain information, as set forth below, because it is properly exempt from disclosure under the FOIA based on Exemptions 1, 3 and 5, 5 U.S.C. §§ 552(b)(1), (3), and (5), respectively. This information remains currently and properly classified in accordance with EO 13526 and protected from release by statute, specifically Section 6 of the National Security Agency Act of 1959 (Pub. L. No. 86-36) (codified at 50 U.S.C. § 3605) ("NSA Act"), 18 U.S.C. § 798, and Section 102A(i)(1) of the National Security Act of 1947, as amended (codified at 50 U.S.C. § 3024(i)(1)). Moreover, some of the information withheld

constitutes privileged communications between government attorneys and their clients. All information withheld pursuant to Exemption 5 is also exempt from public release based on Exemptions 1 or 3 of the FOIA.

24. For each document released in part, NSA used "exemption codes" to indicate which FOIA exemption(s) apply to each redacted portion of the document. For instance, if information is exempt under FOIA Exemption 3, NSA redacted it and marked the redaction with "(b)(3)." Additionally, several of the released documents have sections or paragraphs which are "portion marked" to indicate their classification, with the specific level of classification is listed in parentheses. The letters in parentheses – "C," "S," and "TS" – indicate that the information is currently and properly classified CONFIDENTIAL, SECRET, or TOP SECRET, respectively, pursuant to the provisions of EO 13526.

25. ACLU has indicated that it is challenging each defendant agency's withholdings as to a subset of documents that would serve as a narrow "litigation sample" over which the parties could litigate. Specifically, ACLU has indicated that it is challenging (1) NSA's withholdings as to NSA Documents 5, 28, and 79 (Bates Number 4165220, which is a sample selected by ACLU from among 47 quarterly reports and 4 annual reports submitted by NSA to the President's Intelligence Oversight Board (IOB)), which were released in part, and NSA's determination to withhold Documents 7, 9, and 11-23 in full. ACLU has also selected for the litigation sample two NSA documents that were not assigned document numbers: USSID SP0018 (Bates number 4086222) and USSID SP0018 Appendix J (Bates number 4086223), which were both released in part to ACLU as part of the administrative processing of the request.[2] Finally, ACLU has indicated that it is challenging certain withholdings claimed by the

[2] Attached to this declaration is a *Vaughn* Index listing those NSA documents that were selected

Department of Justice National Security Division (NSD), the Federal Bureau of Investigation (FBI), and OLC on behalf of NSA. The documents in this category are NSD Documents 4, 7, 12, 13, 14, 17, 18, 23, 30, 31, 33, 36, 37, 42, 44, 47, and 48, NSD Bates Numbers 094-125, FBI Bates Numbers 30-35, and OLC Documents 2, 3, 4, 6, 8, 9, and 10.[3] With respect to some of these documents from other agencies, this Declaration addresses only certain of the exemptions justifying the withheld or redacted information while the other agency's declaration addresses the remaining exemptions. With respect to the NSA documents at issue, it is my understanding that NSD will justify the applicability of the Attorney-Client and Deliberative Process Privileges under FOIA Exemption 5 to NSA Documents 11 and 12, and that the Department of Justice Office of Information Policy will justify the applicability of the Presidential Communications Privilege under FOIA Exemption 5 to NSA Document 12.

26. The justification for the withholding of some of the challenged information that the Agency withheld under FOIA Exemptions 1 and 3 can only be addressed in an *in camera, ex parte* classified declaration that will accompany this unclassified declaration, addressing NSA Documents 11, 12, 13, and 22, and NSD Documents 4, 7, 12, 13, 14, 17, 18, 23, 30, 33, 36, 37, 42, 44, 47, and 48. This is so because any description of the information withheld beyond that given below would reveal information that is currently and properly classified in accordance with EO 13526 and protected from release by statute as this information would reveal the intelligence sources, methods, activities, and functions of SIGINT collection and exploitation.

---

for the litigation sample in response to ACLU's request, **AEX 13**, as well as copies of the documents listed in that index that were released in part. **AEX 14-18.**

[3] Documents listed in other agencies' *Vaughn* Indexes are referred to by their document numbers or Bates numbers in the respective *Vaughns*.

FOIA Exemption 1

27.     Section 552(b)(1) of the FOIA provides that the FOIA does not require the release of matters that are specifically authorized under criteria established by an Executive Order to be kept secret in the interest of the national defense or foreign policy, and are in fact properly classified pursuant to such Executive Order.  The current Executive Order that establishes such criteria is EO 13526.

28.     Section 1.1 of EO 13526 provides that information may be originally classified if: 1) an original classification authority is classifying the information; 2) the information is owned by, produced by or for, or is under the control of the Government; 3) the information falls within one or more of the categories of information listed in section 1.4 of the Executive Order; and 4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the original classification authority is able to identify or describe the damage.

29.     Section 1.2(a) of EO 13526 provides that information shall be classified at one of three levels.  Information shall be classified at the TOP SECRET level if its unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to the national security.  Information shall be classified at the SECRET level if its unauthorized disclosure reasonably could be expected to cause serious damage to the national security.  Information shall be classified at the CONFIDENTIAL level if its unauthorized disclosure reasonably could be expected to cause damage to the national security.

30.     Section 1.4 of EO 13526 provides that information shall not be considered for classification unless it falls within one (or more) of eight specifically enumerated categories of information.  The categories of classified information in the documents at issue here are those found in Section 1.4(c), which includes intelligence activities (including covert action),

intelligence sources and methods, or cryptology; Section 1.4(d), which includes foreign relations or foreign activities of the United States, including confidential sources; and Section 1.4(g), which includes vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security.

31. In my role as a TOP SECRET original classification authority ("OCA"), I am authorized to make classification determinations at the TOP SECRET, SECRET, and CONFIDENTIAL levels. As set out more fully below, I reviewed the categories of information withheld pursuant to this FOIA request and determined that those categories are currently and properly classified in accordance with EO 13526. Based on that determination, I have further determined that the responsive material at issue was properly withheld, as all of this information is currently and properly classified in accordance with EO 13526. Accordingly, the release of this intelligence information could reasonably be expected to cause damage to the national security. The damage to national security that reasonably could be expected to result from the unauthorized disclosure of this classified information is described below. Finally, in accordance with Section 1.7 of EO 13526, no information was classified or withheld in order to conceal violations of law, or to prevent embarrassment to the Agency.

FOIA Exemption 3

32. Exemption 3, 5 U.S.C. § 552(b)(3), provides that FOIA does not require the production of records that are:

> specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.[4]

[4] The OPEN FOIA Act of 2009 was enacted on October 28, 2009, Pub. L. 111-83, 123 Stat.

33. The challenged information at issue in this litigation falls squarely within the scope of three statutes. The first applicable statute is a statutory privilege unique to NSA. As set forth in section 6 of the NSA Act, Pub. L. No. 86-36 (50 U.S.C. § 3605), "[n]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, [or] of any information with respect to the activities thereof . . . .". Congress, in enacting the language in this statute, decided that disclosure of any information relating to NSA activities is potentially harmful. Federal courts have held that the protection provided by this statute is, by its very terms, absolute. Section 6 states unequivocally that, notwithstanding <u>any</u> other law, including the FOIA, NSA cannot be compelled to disclose <u>any</u> information with respect to its activities. To invoke this privilege, the U.S. Government must demonstrate only that the information it seeks to protect falls within the scope of Section 6. Further, while in this case the harm would be exceptionally grave or serious, the U.S. Government is not required to demonstrate specific harm to national security when invoking this statutory privilege, but only to show that the information relates to its activities. NSA's functions and activities are therefore protected from disclosure regardless of whether or not the information is classified.

34. The second statute is Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1), which provides that "the Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." Like the protection afforded to core NSA activities by section 6 of the NSA Act, the protection afforded to intelligence sources and methods is absolute. Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 3024(i)(1).

---

2142, 2184, 5 U.S.C. § 552(b)(3)(B), after the applicable provisions were enacted, and therefore is not applicable to the analysis in this case.

35. Finally, the third statute is 18 U.S.C. § 798. This statute prohibits the unauthorized disclosure of classified information: (i) concerning the communications intelligence activities of the United States, or (ii) obtained by the process of communications intelligence derived from the communications of any foreign government. The term "communications intelligence," as defined by Section 798, means the "procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients." 18 U.S.C. § 798(b).

36. As described above, these statutes protect the fragile nature of the United States' intelligence sources, methods, and activities, to include but not limited to the existence and depth of signals intelligence-related successes, weaknesses, and exploitation techniques. These statutes recognize the vulnerability of intelligence sources and methods, including to countermeasures, and the significance of the loss of valuable intelligence information to national policymakers and the Intelligence Community ("IC"). Given that Congress specifically prohibited the disclosure of the sources and methods used by the IC, as well as any information related to NSA's functions and activities, I have determined that the information was properly withheld under FOIA Exemption 3.

FOIA Exemption 5

37. Exemption 5 provides that FOIA does not require the release of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than the agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption incorporates multiple privileges, including the traditional attorney-client privilege into the FOIA. As a result, an agency does not have to produce "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Cent., Inc., v. U.S. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977).

## CATEGORIES OF INFORMATION WITHHELD

Documents Related to Classified NSA Intelligence Sources and Methods

38. NSA withheld from disclosure information concerning particular intelligence sources, and related methods used to collect and process foreign communications, including legal analyses, approval documentation, an NSA OIG report, and compliance incident reports. The documents in this category include NSA Documents 11, 12, 13, and 22 and NSD Documents 7, 12, 13, 14, 17, 18, 23, 30, 33, 37, 42, 44, 47, and 48. Other than the documents' dates and number of pages, no information from these documents can be released because the very fact of these intelligence sources and methods is currently and properly classified. Additionally, the documents contain myriad details regarding the types of communication data NSA is able to collect and how that data is collected. Disclosure of this information would reveal core NSA foreign intelligence activities, sources, and methods, including technical tradecraft, to the benefit of our adversaries. NSA has also filed a classified, *ex parte, in camera* declaration more fully explaining the nature of these documents and why no portion of them can be released.[5]

39. Disclosure of any information about these sources and the methods by which NSA effects collection, as well as the scope of that collection, would demonstrate the capabilities and limitations of the U.S. SIGINT system, and the success (or lack of success) in acquiring certain types of communications. The collection of communications intelligence is central to NSA's mission and allows NSA to provide unique and timely insight into the activities

[5] Additionally, it is my understanding that NSD will file a declaration justifying the withholding the Department of Justice, Office of Information Policy, will justify the withholding in full of NSA Document 12 and NSD Document 18 pursuant to the Presidential Communications Privilege incorporated into FOIA Exemption 5, and that NSD will further justify the withholding in full of NSA Documents 11 and 12 pursuant to the Deliberative Process and Attorney-Client Privileges also incorporated into FOIA Exemption 5.

of foreign adversaries for U.S. policymakers. Public disclosure of NSA's capabilities to acquire specific types of communications, and the technical means and methods by which such acquisition is effected, would alert targets to the vulnerabilities of their communications (and which of their communications are not vulnerable). Details regarding compliance incidents reported to the NSA Inspector General and to NSD, including the number of such incidents related to particular collection methodologies, would similarly reveal the nature and scope of these intelligence sources. Release of this information would also disclose details regarding NSA's capability to collect certain types of foreign communications, and the gaps or limits of that capability. Once alerted, adversaries could develop additional countermeasures to thwart collection of their communications. Such a reaction may result in denial of access to targets' communications and therefore result in a loss of information critical to the national security and defense of the United States.

40.    I have reviewed this matter and determined that all information owned by, produced by, or under the control of the U.S. Government regarding this source and the details of the methods used is currently and properly classified at the TOP SECRET level in accordance with EO 13526, because the release of this information could reasonably be expected to cause exceptionally grave damage to the national security. Revealing the existence of these sources themselves would disclose information regarding the technical means by which NSA effects collection of the communications of valid foreign intelligence targets. Therefore, this information meets the criteria for classification set forth in Sections 1.4(c), 1.4(d), and 1.4(g) of EO 13526. *See supra,* ¶ 30. Moreover, because the nature of the sources themselves is currently and properly classified, a release of any portion of the referenced documents would tend to