**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN CIVIL LIBERTIES UNION and
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

                          *Plaintiffs*,

         v.

NATIONAL SECURITY AGENCY,
CENTRAL INTELLIGENCE AGENCY,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF JUSTICE, and
DEPARTMENT OF STATE,

                          *Defendants*.

**Oral Argument Requested**

No. 13-cv-09198 (AT)

ECF Case

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jonathan Manes
David Schulz
Russell Fink (law student intern)
Media Freedom and Information Access Clinic,
    Abrams Institute, Yale Law School
P.O. Box 208215
New Haven, CT 06520
Phone: (212) 850-6103
jonathan.manes@yale.edu

Ashley Gorski
Patrick Toomey
American Civil Liberties Union
    Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
agorski@aclu.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.   The Government Has Improperly Withheld Documents Under Exemption 5 .................. 2

    A.   The Government's "Working Law" Cannot Be Withheld Under
        Exemption 5 ........................................................................................ 2

        1.   The Government Misstates the Scope of the "Working Law" Doctrine ....... 2

        2.   The Withheld Documents Contain Working Law ......................................... 8

            a.   The OLC Memoranda Contain Working Law ..................................... 8

            b.   The NSD and NSA "Approval Packages" Contain
                Working Law ................................................................................ 10

            c.   Other Intra-Agency Memoranda Contain Working Law ................... 11

        3.   The Working-Law Doctrine Overcomes Each of the Privileges the
            Government Asserts ................................................................................... 12

    B.   The Government Has Failed To Justify the Privileges It Asserts ......................... 14

        1.   The Government Has Failed To Justify the
            Deliberative Process Privilege ................................................................. 14

        2.   The Government Has Failed To Justify the
            Attorney-Client Privilege ........................................................................ 19

        3.   The Government Has Failed To Justify the
            Presidential Communications Privilege .................................................... 20

II.   The Government Has Improperly Withheld Information Under
    Exemptions 1 and 3 ................................................................................................ 22

    A.   The Government Must Segregate and Release Legal Analysis That Is Not
        "Inextricably Intertwined" With Exempt Information ...................................... 22

    B.   The Government Must Release Segregable, Non-Exempt Information
        from the Inspector General and Compliance Reports ....................................... 25

    C.   The Government Must Release Segregable, Non-Exempt Information
        from Its Rules and Regulations ...................................................................... 28

III.   The Government Has Improperly Withheld Documents Under Exemption 7 ................ 29

IV.   The Government Should Be Compelled To Disclose Information
    That It Has Officially Acknowledged ........................................................................ 32

i

      A.      The Government's Official Acknowledgments Defeat Exemptions 1 and 3, and They Waive Its Right To Withhold Records Under Exemption 5 ................ 32

      B.      The Court Should Require Reprocessing of STELLAR WIND Documents in Light of Several Government Disclosures ........................................ 35

V.     Alternatively, the Court Should Review a Selection of the Documents *In Camera* ......... 37

VI.   The Government's Searches Were Inadequate Under FOIA ........................................... 38

      A.      The FBI Has Failed To Conduct a Proper Search ................................................ 39

      B.      NSD Has Failed To Conduct a Proper Search ....................................................... 41

      C.      The CIA Has Failed To Conduct a Proper Search ................................................ 42

      D.      The State Department and Defense Intelligence Agency ..................................... 44

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. CIA*,
  710 F.3d 422 (D.C. Cir. 2013) ................................................................. 36

*ACLU v. DOD*,
  No. 15-cv-1954, 2016 WL 889739 (S.D.N.Y. Mar. 4, 2016) ...................... 21

*ACLU v. DOJ*,
  681 F.3d 61 (2d Cir. 2012) ................................................................. 23, 24

*ACLU v. DOJ*,
  No. 15-5217, 2016 WL 1657953 (D.C. Cir. Apr. 21, 2016) ....................... 23

*ACLU v. FBI*,
  No. 11-cv-7562, 2015 WL 1566775 (S.D.N.Y. Mar. 31, 2015) ................. 22

*Adamowicz v. IRS*,
  552 F. Supp. 2d 355 (S.D.N.Y. 2008) ..................................................... 20

*Afshar v. DOS*,
  702 F.2d 1125 (D.C. Cir. 1983) ............................................................. 13

*Allard K. Lowenstein Int'l Human Rts. Proj. v. DHS*,
  626 F.3d 678 (2d Cir. 2010) ................................................................. 31

*Associated Press v. DOJ*,
  549 F.3d 62 (2d Cir. 2008) ................................................................... 37

*Auto. Club of N.Y. v. Port of N.Y. & N.J.*,
  297 F.R.D. 55 (S.D.N.Y. 2013) ........................................................ 15, 18

*Brennan Ctr. for Justice v. DOJ*,
  697 F.3d 184 (2d Cir. 2012) .......................................................... *passim*

*Carney v. DOJ*,
  19 F.3d 807 (2d Cir. 1994) .............................................................. 15, 17

*Church of Scientology v. IRS*,
  792 F.2d 146 (D.C. Cir. 1986) ............................................................... 43

*Citizens for Responsibility & Ethics in Wash. v. DOJ*,
  746 F.3d 1082 (D.C. Cir. 2014) ............................................................. 30

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ................................................................................ 2

*Conally v. Gen. Constr. Co.*,
  269 U.S. 385 (1926) ........................................................................................ 6

*Ctr. for Effective Gov't v. DOS*,
  7 F. Supp. 3d 16 (D.D.C. 2013) ................................................................... 13, 22

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976) ........................................................................................ 35

*Elec. Frontier Found. v. DOJ*,
  739 F.3d 1 (D.C. Cir. 2014) .......................................................................... 3, 4

*Elec. Privacy Info. Ctr. v. Customs & Border Prot.*,
  No. 14-1217, 2016 WL 632179 (D.D.C. Feb. 17, 2016) ............................. 31

*Elkins v. Fed. Aviation Admin.*,
  99 F. Supp. 3d 90 (D.D.C. 2015) ................................................................. 29

*Fed. Open Market Comm. v. Merrill*,
  443 U.S. 340 (1979) ........................................................................................ 13

*Gen. Elec. Co. v. Johnson*,
  No. 00-cv-2855, 2006 WL 2616187 (D.D.C. 2006) ..................................... 34

*Grand Cent. P'ship, Inc. v. Cuomo*,
  166 F.3d 473 (2d Cir. 1999) .......................................................................... 14

*Halpern v. FBI*,
  181 F.3d 279 (2d Cir. 1999) .......................................................................... 37

*In re Cty. of Erie*,
  473 F.3d 413 (2d Cir. 2007) .......................................................................... 19

*In re Fisher*,
  908 F. Supp. 2d 468 (S.D.N.Y. 2012) ......................................................... 20

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ............................................................. 13, 21, 34

*In re Sealed Case*,
  877 F.2d 976 (D.C. Cir. 1989) ..................................................................... 34

*Iturralde v. Comptroller of Currency*,
   315 F.3d 311 (D.C. Cir. 2003) ................................................................... 42, 44

*Jett v. FBI*,
   139 F. Supp. 3d 352 (D.D.C. 2015) ................................................................. 31

*John Doe Corp. v. John Doe Agency*,
   850 F.2d 105 (2d Cir. 1988) ........................................................................... 18

*Judicial Watch, Inc. v. DOJ*,
   365 F.3d 1108 (D.C. Cir. 2004) ...................................................................... 17

*Judicial Watch, Inc. v. FDA*,
   449 F.3d 141 (D.C. Cir. 2006) .................................................................. 15, 18

*Katzman v. CIA*,
   903 F. Supp. 434 (E.D.N.Y. 1995) .................................................................. 40

*Local 3, Int'l Bhd. of Elec. Workers, AFL–CIO v. NLRB*,
   845 F.2d 1177 (2d Cir. 1988) .......................................................................... 37

*Lowenschuss v. W. Pub. Co.*,
   542 F.2d 180 (3d Cir. 1976) .............................................................................. 6

*Mead Data Central, Inc. v. Dep't of the Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) .......................................................... 20, 22, 25

*Morgan v. Covington*,
   648 F.3d 172 (3d Cir. 2011) ........................................................................... 36

*Morley v. CIA*,
   508 F.3d 1108 (D.C. Cir. 2007) ...................................................................... 43

*N.Y. Times Co. v. DOJ*,
   758 F.3d 436 (2d Cir. 2014) ........................................................................... 17

*N.Y. Times Co. v. DOJ*,
   806 F.3d 682 (2d Cir. 2015) ................................................................... *passim*

*N.Y. Times Co. v. DOJ*,
   872 F. Supp. 2d 309 (S.D.N.Y. 2012) ............................................................ 37

*Nat'l Council of La Raza v. DOJ*,
   411 F.3d 350 (2d Cir. 2005) .................................................................. 9, 10, 18

*Nat'l Day Laborer Org. Network v. U.S. Immig. & Customs Enf't Agency,*
    811 F. Supp. 2d 713 (S.D.N.Y. 2011) ........................................................... 15

*Nat'l Day Laborer Org. Network v. U.S. Immig. & Customs Enf't Agency,*
    877 F. Supp. 2d 87 (S.D.N.Y. 2012) ................................................. 40, 42, 44

*NLRB v. Sears, Roebuck & Co.,*
    421 U.S. 132 (1975) ........................................................................... 2, 3, 6

*Oglesby v. U.S. Dep't of Army,*
    920 F.2d 57 (D.C. Cir. 1990) ................................................... 38, 40, 44

*Papachristou v. Jacksonville,*
    405 U.S. 156 (1972) ........................................................................... 6

*Phillippi v. CIA,*
    546 F.2d 1009 (D.C. Cir. 1976) ........................................................... 25

*Quiñon v. FBI,*
    86 F.3d 1222 (D.C. Cir. 1996) ........................................................... 37

*Rabin v. Dep't of State,*
    980 F. Supp. 116 (E.D.N.Y. 1997) ..................................................... 43

*Richmond Newspapers v. Virginia,*
    448 U.S. 555 (1980) ........................................................................... 6

*Schlefer v. United States,*
    702 F.2d 233 (D.C. Cir. 1983) ..................................................... 12, 14

*Senate of the Com. of P.R. v. DOJ,*
    823 F.2d 574 (D.C. Cir. 1987) ........................................................... 15

*Sussman v. U.S. Marshals Serv.,*
    494 F.3d 1106 (D.C. Cir. 2007) ........................................................... 22

*Tax Analysts v. IRS,*
    117 F.3d 607 (D.C. Cir. 1997) ................................................. 2, 3, 5, 11

*Tax Analysts v. IRS,*
    483 F. Supp. 2d 8 (D.D.C. 2007) ........................................................... 12

*United States v. Freitas,*
    800 F.2d 1451 (9th Cir. 1986) ........................................................... 7

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ........................................................................... 20

*Weisberg v. DOJ,*
    705 F.2d 1344 (D.C. Cir. 1983) ............................................................... 38, 43

*Whole Woman's Health v. Hellerstedt,*
    No. 15–274, 2016 WL 3461560 (June 27, 2016) ...................................... 36

**Statutes**

5 U.S.C. § 552 ................................................................................................... *passim*

**Other Sources**

Exec. Order 12333, 46 Fed. Reg. 59,941 (Dec. 4, 1981) ..................................... *passim*

Exec. Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ....................................... 25, 31

Dep't of Justice, Office of the Inspector General, *A Review of the Department of Justice's Involvement with the President's Surveillance Program* (July 2009) ......................................... 8

Privacy & Civil Liberties Oversight Board, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (July 2, 2014) .............. 26

Robert Litt, General Counsel of the Office of the Director of National Intelligence, *The New Intelligence Sharing Procedures Are Not About Law Enforcement*, Just Security (Mar. 30, 2016) ............................................................................................ 30

## INTRODUCTION

The government has refused to disclose the basic rules and legal interpretations that govern its surveillance under Executive Order (EO) 12333—the primary authority under which the NSA gathers foreign intelligence. Plaintiffs filed their FOIA requests to learn how the government construes the broad authority conferred by EO 12333 and its regulations, and whether the government appropriately accommodates the constitutional rights of American citizens and residents. These are matters of tremendous public importance. At bottom, Plaintiffs seek to vindicate one of FOIA's core purposes: exposing the law of the land to public understanding.

In their opposition and reply brief, Defendants have advanced untenable and unsupported legal arguments about the scope of FOIA's exemptions. Under Exemption 5, Defendants cannot withhold documents that comprise or describe the government's "working law." To avoid this conclusion, Defendants misstate the scope of the working-law doctrine, suggesting it applies only to documents that have been publicly or expressly adopted. However, as the Supreme Court and Second Circuit have held, the doctrine is not nearly so limited, but instead requires disclosure of records like those at issue here: legal interpretations that the government has in fact relied upon as a basis for agency action. With respect to Exemptions 1 and 3, Defendants advance a similarly misguided argument, claiming that they may withhold legal analysis that is not inextricably intertwined with classified facts or otherwise exempt material. But pure legal analysis is not an intelligence source or method, and its disclosure cannot result in harm where the government has properly segregated that analysis from classified facts. In these circumstances, legal analysis cannot be withheld under Exemptions 1 or 3.

While several Defendants have submitted supplemental declarations, these merely underscore the persistent gaps and defects in their invocations of Exemptions 1, 3, 5, and 7; their

1

impermissibly conclusory assertions that they have segregated and released non-exempt material; and the deficiencies in their searches for responsive records.

For these reasons, Plaintiffs respectfully request that the Court hold that Defendants have failed to meet their burden to support their withholdings under FOIA. To the extent that the Court requires additional information, Plaintiffs request that the Court review a subset of documents *in camera* to assess whether the government's withholdings are proper, and that it order the government to provide critical information about the documents it is withholding—including how those documents have been used and relied upon by the agencies. Finally, the Court should order the CIA, FBI, and NSD to cure the defects in their searches for responsive records, and impose a series of deadlines for the State Department to review and process the documents contained in 35 newly discovered boxes.

## ARGUMENT

### I.     The Government Has Improperly Withheld Documents Under Exemption 5.

#### A.     The Government's "Working Law" Cannot Be Withheld Under Exemption 5.

##### 1.     The Government Misstates the Scope of the "Working Law" Doctrine.

As Plaintiffs' opening brief explained, courts have unambiguously established that an agency's actual reliance on a document as a basis for its policy or operational decisions transforms that document into working law. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152-53 (1975) ("the reasons which did supply the basis for an agency policy . . . constitute the 'working law' of the agency"); *see also, e.g.*, *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997) (working law includes agency opinions about "what the law is" and "what is not the law and why it is not the law"); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 869 (D.C. Cir. 1980) (working law includes records that are "relied on" or "routinely used" as a basis for agency policy or action).

2

In response to Plaintiffs' detailed explanations about why the documents at issue contain working law, the government—relying almost exclusively on *N.Y. Times Co. v. DOJ* (*N.Y. Times II*), 806 F.3d 682 (2d Cir. 2015) and *Elec. Frontier Found. v. DOJ* (*EFF*), 739 F.3d 1 (D.C. Cir. 2014)—advances a series of arguments that misapprehend and distort the scope of the working-law doctrine.

As an initial matter, the government dramatically misstates the holdings of both *N.Y. Times II* and *EFF*. These cases nowhere "reject" the argument that agency reliance on legal advice as a basis for action transforms that advice into working law. Gov. Opp. 8, 11. To the contrary, legal analysis that is actually relied upon by an agency in carrying out its functions is precisely what must be disclosed as working law under FOIA. *See Sears*, 421 U.S. at 158 (legal advice memoranda that "represent the 'law' of the agency" are not subject to Exemption 5); *Tax Analysts*, 117 F.3d at 618 (legal advice memoranda that are "statements of the agency's legal position" are not subject to Exemption 5).

Nor do *N.Y. Times II* or *EFF* suggest that OLC opinions "generally" are not working law. Gov. Opp. 5, 9. Rather, as the *N.Y. Times II* court explained in a single paragraph of dictum, the OLC documents at issue were not working law because OLC "'did not have the authority to establish the "working law" of the [agency],' and its advice 'is not the law of an agency *unless the agency adopts it*.'" *N.Y. Times II*, 806 F.3d at 687 (quoting *EFF*, 739 F.3d at 10 (emphasis added)). In other words, although OLC memos, standing alone, may not have the force of law, they can become working law if an agency accepts or relies on the memos—*i.e.*, internally "adopts" them—as a basis for agency action.[1]

---

[1] The Second Circuit's brief discussion of working law in *N.Y. Times II* was dictum because the court had already held that, "[w]hether or not 'working law,' the documents are classified and thus protected under Exemption 1." *N.Y. Times II*, 806 F.3d at 687.

Notably, however, neither *EFF* nor *N.Y. Times II* requires that an agency's reliance on or adoption of legal reasoning be "express" or "public" to transform that legal reasoning into working law—and for good reason. As the Second Circuit has explained, the working-law and "express adoption" doctrines are distinct and "separate path[s] towards the loss of Exemption 5's protection." *Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184, 196, 201-02 (2d Cir. 2012). In accordance with this framework, the Second Circuit in *Brennan Center* conducted separate analyses to determine whether certain OLC opinions constituted working law or were expressly adopted. *See id.* at 203-04. In so doing, the court clearly contemplated that legal opinions, including OLC opinions, could constitute working law even if not expressly or publicly adopted. Although *N.Y. Times II* concluded that the OLC opinions at issue were not working law, that court did not—and could not—overrule *Brennan Center*'s doctrinal framework in one paragraph of dictum.

Not only does the government misstate the holdings of *N.Y. Times II* and *EFF*, but the facts of these two cases are also far different from the facts here. In both cases, the plaintiffs argued that OLC memoranda were working law simply because OLC legal advice is precedential and binding on the agencies that receive it. *See EFF*, 739 F.3d at 9; *N.Y. Times II*, 806 F.3d at 687 ("Appellants make the general argument that the legal reasoning in OLC opinions is 'working law'"). In contrast, here, Plaintiffs have explained (and reiterate below) precisely how the OLC memos at issue were subsequently relied on or internally adopted by Defendants. Critically, Plaintiffs have also explained why the withheld *intra*-agency legal memoranda likely

contain working law. *See* Pls. Br. 23-24. Neither *N.Y. Times II* nor *EFF* has any bearing on the disposition of these intra-agency memoranda.[2]

The government misstates the scope of the working-law doctrine in other ways as well. In effect, the government argues that the doctrine applies to only those legal memos that either (i) reflect on their face a final policy decision, or (ii) are "expressly" or "publicly" adopted by an agency. *See, e.g.*, Gov. Opp. 5, 12, 13, 14. But controlling precedent makes clear that the doctrine is not nearly so limited. First, to qualify as working law, it is "not necessary" for a document to "reflect the final programmatic decisions" of agency personnel; it is enough that it represents the agency's "final legal position" on the relevant issue. *Brennan Ctr.*, 697 F.3d at 201. Indeed, the government's claim that legal analysis cannot be working law unless it dictates a specific policy outcome is unsupported by precedent and is entirely divorced from the reality of agency decision-making. It is clear that an agency can rely on legal analysis to set the outer bounds of permissible agency action, while leaving decision-makers with discretion to act within those parameters. When an agency accepts and relies on legal analysis that sets forth what the law does—or does *not*—permit, that analysis is working law. *See Tax Analysts*, 117 F.3d at 617.

Second, the government's argument erroneously conflates the working-law and express adoption doctrines. The government asserts that it can withhold these documents under Exemption 5 simply because it has not publicly or "expressly" adopted them. *See, e.g.*, Gov. Opp. 12 (arguing that NSA 28 is not working law because it has not been used to "publically justify NSA actions" and has not been "expressly adopted" as agency policy (quoting NSA Decl. ¶ 53 (ECF No. 64-1)); *id.* at 14 (arguing same with respect to NSA 11 and NSA 12); *id.* at 5

---

[2] The government contends that Plaintiffs neglected to cite these cases because they cannot "distinguish or overcome" them. Gov. Opp. 9. Quite the opposite: the facts of these two cases are so far removed from the facts before the Court here that Plaintiffs did not believe it necessary to affirmatively distinguish these opinions in their opening brief.

(arguing same with respect to OLC documents). But that is not enough to overcome a working-law claim. Indeed, Defendants have carefully avoided describing how they internally used and relied upon the withheld legal memoranda, including whether they accepted the reasoning in the memoranda as a basis for agency action. Not only is the government's narrow theory unsupported by case law, but if credited, it would eviscerate the working-law doctrine altogether, allowing the government to accept and apply secret legal interpretations while perpetually avoiding disclosure under FOIA. *See Brennan Ctr.*, 697 F.3d at 201-02.

Case law also makes clear that the working-law doctrine, properly construed, does not raise constitutional concerns. The government is wrong to suggest otherwise. *See* Gov. Opp. 11 & n.5. If the government were correct, the Supreme Court in *Sears* would have engaged in a constitutional avoidance analysis before holding that certain of the documents at issue were working law. It did not. *See Sears*, 421 U.S. at 152-55. If anything, the constitutional considerations cut in the opposite direction, and the affirmative disclosure provisions of FOIA—which animate the working-law doctrine—must be read expansively.[3]

---

[3] Several strands of constitutional text and precedent militate against secret law. *See, e.g.*, *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) (Due Process Clause forbids secret law where individual liberty and property interests may be at stake); *Conally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) (Due Process Clause forbids laws that are too vague or ambiguous to provide fair notice of the law's content); U.S. Const. Art. I, sec. 5, cl. 3 (Journal Clause affirms that the lawmaking activities of the Congress must generally be published, and that secrecy is permitted only upon a specific congressional determination that it is necessary). In particular, the constitutional presumption against secret law has roots in the First Amendment, which "has a *structural* role to play in securing and fostering our republican system of self-government." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 585-87 (1980) (Brennan, J., concurring). The First Amendment guarantees a public right of access to certain official records and proceedings, including in particular the decisions of courts interpreting the law. *Id.*; *see also, e.g.*, *Lowenschuss v. W. Pub. Co.*, 542 F.2d 180, 185 (3d Cir. 1976). The self-governance concerns that animate a First Amendment right of public access to judicial interpretations of law apply equally to executive branch interpretations of the law. Finally, secret laws are particularly problematic in the context of government surveillance, raising significant concerns under the Fourth Amendment. The Fourth Amendment requires all searches to be "reasonable" and may

Finally, the government distorts Plaintiffs' arguments about the scope of the working-law doctrine. Plaintiffs do not seek to force government agencies to "prematurely . . . operate in a fishbowl." Gov. Opp. 10 (citation omitted). Contrary to the government's assertions, Plaintiffs do not argue that all legal advice constitutes working law, or even that all legal advice that "coincide[s]" with subsequent agency action is working law. *Id.* at 10, 12. Plaintiffs instead argue that, for the reasons discussed below, the disputed documents here fall squarely within the four corners of the doctrine. Both *N.Y. Times II* and *EFF* make plain that the working-law inquiry is fact-specific, and the facts show that the government has actually relied upon the disputed documents as a basis for policy. Therefore, even if the documents were once privileged, they can no longer be withheld under Exemption 5. The government's protests that it has not "expressly" or "publicly" adopted the documents at issue are insufficient to meet its burden to justify its withholdings.

If this Court were to accept the government's distorted and unduly narrow view of the working-law doctrine, its decision would have far-reaching implications. Not only would it permit the executive branch to shield the key legal interpretations governing the surveillance of Americans under EO 12333, but, more generally, it would close off a crucial avenue that the public relies on to learn about the effective law and policy of the executive branch. Public knowledge of the laws is essential to the functioning of a democratic society—which is precisely why the working-law doctrine exists, and why it forbids the government from withholding the documents at issue here.

---

regard as "unreasonable" any searches undertaken pursuant to legal authorities that have been kept secret from the public. *Cf. United States v. Freitas*, 800 F.2d 1451, 1456 (9th Cir. 1986) (generally requiring notice to individuals in advance of particular searches).

## 2.      The Withheld Documents Contain Working Law.

### a.      The OLC Memoranda Contain Working Law.

As Plaintiffs explained in their opening brief, because the OLC STELLAR WIND memoranda represent the government's controlling legal interpretation of its authority to conduct its warrantless wiretapping program, and because the memoranda were accepted and relied upon by the Department of Justice and President Bush, these documents are working law and cannot be withheld pursuant to Exemption 5. *See* Pls. Br. 18-19 (describing OLC 10, which was released in part, as well as OLC 3, 4, and 8, which appear to be STELLAR WIND memoranda). Official government disclosures explain in extensive detail how OLC memoranda served as the legal basis for the program and played an integral role in the authorization and reauthorization process. *See* OLC 10 at 8-9, 108 (Ex. D to Manes Decl.) (ECF Nos. 71-4, 71-5); Dep't of Justice, Office of the Inspector General, *A Review of the Department of Justice's Involvement with the President's Surveillance Program* (July 2009) ("OIG Report") at 14-15 & n.17, 17 (Ex. E to Manes Decl.) (ECF No. 71-6) (describing procedure whereby OLC submitted a memorandum to the Attorney General as each period of reauthorization came to an end; on the basis of this memorandum, the Attorney General would approve the surveillance "as to form and legality," and the President in turn would issue "Presidential Authorizations" to implement the surveillance).[4]

The government contends that the OLC memoranda are not working law for three reasons: they are not like any of the working-law examples identified in *Brennan Center*; they

---

[4] Similarly, OLC 1 and 2—Theodore Olson's May 1984 memorandum to the Attorney General—appear to have served as the government's working law for decades. *See* Pls. Br. 24-25. As recently as 2007, the Attorney General and NSD accepted and relied on the Olson memorandum in approving new Department of Defense procedures governing EO 12333 surveillance. *See* Pls. Br. 25 (citing the "Wainstein Memo" at 4 n.4 (Ex. G to Manes Decl.) (ECF No. 71-8)).

had "no legal effect on the rights and obligations of private parties"; and, although OLC's legal advice may inform policy decisions, it is "not itself dispositive as to any policy adopted." Gov. Opp. 7. None of these arguments withstands scrutiny. First, the working-law doctrine is not limited to the precise factual contexts identified in a single Second Circuit opinion, and as discussed above, *Brennan Center* contemplated that OLC opinions may be working law. 697 F.3d 201-02. Second, after the STELLAR WIND memoranda were accepted and relied on by executive branch officials, they indisputably had "legal effect" on the rights of private parties— namely, the right to be free from warrantless surveillance. Third, it is irrelevant that OLC's legal advice is not always "dispositive," Gov. Opp. 7, because the facts show that the government actually relied upon the memos at issue, transforming them into working law. In fact, the Attorney General repeatedly reauthorized STELLAR WIND and did so "*[b]ased on*" the analysis in OLC memoranda. *See* OLC 10 at 9 (emphasis added). The fact that STELLAR WIND was repeatedly reauthorized in reliance on OLC's memoranda indisputably shows that these opinions *became* working law, even if they were not initially binding on the Attorney General. *See Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 360 (2d Cir. 2005) (an agency may not adopt a final opinion while "shielding from public view the analysis that yielded that position").

Finally, the government's argument that OLC's declaration is "entitled to a presumption of good faith" is misplaced. Gov. Opp. 9. At no point has the government stated that, as a factual matter, it did not rely on the OLC memoranda as a basis for executive branch action. Nor could it, given the official disclosures establishing the contrary. In any event, the ultimate question

here—whether the documents contain working law—is a legal one for the Court to evaluate de novo.[5]

### b.    The NSD and NSA "Approval Packages" Contain Working Law.

The government has also improperly asserted Exemption 5 over several legal memoranda that were part of "approval packages" for NSA surveillance. Pls. Br. 21-23 (highlighting example approval packages). These approval packages, like the STELLAR WIND memos, are the product of a formal decision-making structure designed to provide legal justifications for specific policy decisions. Within this structure, it is clear that an agency decision-maker who disagreed with the legal justification set forth in an approval package would not *approve* the package. He or she might insist on revisions to the legal rationale, or reject the proposed activity altogether. Conversely, agency approval of the proposed program or action constitutes an acceptance of the legal reasoning supporting the approval package—and, thus, that legal analysis is working law. *See La Raza*, 411 F.3d at 360. Indeed, the very point of an approval package—as the Vaughn indices and declarations show—is to tie a particular policy decision to the agency's legal justification for it.

The government again errs in arguing that these documents are not working law because they were not "publically referred to," "expressly adopted[,] or incorporated by reference." Gov. Opp. 14. Simply put, this is not the relevant legal test. As discussed above, the question is

---

[5] The government also errs in arguing that Plaintiffs have "waived" any argument that the OLC STELLAR WIND memoranda were expressly adopted. Gov. Opp. 8 n.3. Plaintiffs have not waived this argument; rather, as Plaintiffs explained in their opening brief, both the working-law and express adoption doctrines require the disclosure of documents that constitute an agency's effective law or policy. *See* Pls. Br. 17 n.7; *Brennan Ctr.*, 697 F.3d at 195. Plaintiffs have shown that the OLC STELLAR WIND memoranda were in fact relied upon in authorizing the surveillance program *and* expressly cited to justify the Attorney General's and President's decisions. *See* Pls. Br. 18-19. Whether the Court calls this "working law" or "express adoption"—or both—Plaintiffs have established that the memoranda constituted effective law and policy and thus may not be withheld under Exemption 5.

whether Defendants accepted or relied on the legal reasoning contained in these approval packages. To the extent that Defendants ultimately approved the programs described in the packages, this is strong evidence that the legal memos contain Defendants' working law, and they have failed to satisfy their burden to show otherwise.

NSD 4 is a prime example of legal analysis that was relied upon as the basis for agency action. As Plaintiffs explained, this document is very likely the "Wainstein Memo," which supplied the legal foundation for new Department of Defense procedures that expanded the government's ability to review Americans' metadata. *See* Pls. Br. 22-23. Contrary to the government's assertion, if the relevant policy-maker reviewed NSD 4 and, on the basis of the analysis in that document, "elected to take actions that NSD's counsel opined would be lawful," Gov. Opp. 15, the underlying memo would become working law, as it would reflect the agency's view of "what the law is." *Tax Analysts*, 117 F.3d at 617.

Finally, the government misconstrues Plaintiffs' argument when it contends that even if "ACLU were correct that [NSD 4] contains analysis that was *considered* during the process of adopting a final policy or procedure, that would not render pre-decisional legal advice used in deliberations as to whether to adopt certain procedures subject to release as working law." Gov. Br. 14 (emphasis added). Plaintiffs submit that the government did far more than merely "consider" the legal memo in NSD 4; instead, the government *accepted* and *relied* on the memo as a basis for its expanded review of Americans' metadata.

### c.    Other Intra-Agency Memoranda Contain Working Law.

The CIA and NSA are also improperly withholding dozens of internal memoranda from their general counsel's offices. Because this legal advice is almost certainly binding on the agency components that request and receive this advice, the memos very likely reflect the agency's final and binding view of the law. Defendants have also withheld several memoranda

11

by "senior" attorneys, a fact that makes it even more likely that the documents contain working law. *See, e.g.*, *Schlefer v. United States*, 702 F.2d 233, 238 (D.C. Cir. 1983); *Tax Analysts v. IRS*, 483 F. Supp. 2d 8, 14-15 (D.D.C. 2007).

In response, the government advances two arguments, both of which are unavailing. First, it contends that CIA and NSA counsel cannot set *policy* for their respective agencies—essentially the same argument it makes about OLC. *See* Gov. Opp. 15. However, the ability of counsel to set policy is irrelevant; what matters instead is that the Office of General Counsel can and typically does establish the final *legal* position of the agency. Even if an attorney's advice "does not constitute the Agency's final decision to undertake a particular operation or action," CIA Decl. ¶ 23 (ECF No. 60), that advice may still provide the basis for a subsequent course of action. *See, e.g.*, *Schlefer*, 702 F.2d at 238 (rejecting as "superficial" the government's argument that an agency's chief counsel is "wholly without authority to make substantive decisions binding upon the agency"). Second, the government contends that legal memoranda serve as "one consideration, among others," in an agency's policy decision. Gov. Opp. 15 (quoting CIA Supp. Decl. ¶ 3 (ECF No. 76)). This, too, is irrelevant. It is undoubtedly the case that the vast majority of agency decisions are informed by multiple considerations. But where an agency accepts and relies on legal advice as a basis for agency action, it cannot shield that advice from disclosure under Exemption 5. *See Brennan Ctr.*, 697 F.3d at 199-02.

**3.** **The Working-Law Doctrine Overcomes Each of the Privileges the Government Asserts.**

Contrary to the government's arguments, *see* Gov. Opp. 8 n.3, 16-17, the working-law doctrine overcomes each of the privileges the government asserts, including the presidential communications and attorney-client privileges.

The government contends that the working-law analysis is "categorically inapplicable to the presidential communications privilege," Gov. Opp. 16, but neither of the cases it cites stands for this proposition. In both cases, the courts merely recognized in dictum that the privilege extends to "final" presidential communications. *See In re Sealed Case*, 121 F.3d 729, 745-46 (D.C. Cir. 1997); *Loving v. DOD*, 550 F.3d 32, 37 (D.C. Cir. 2008); *see also Ctr. for Effective Gov't v. DOS*, 7 F. Supp. 3d 16, 24 & n.8 (D.D.C. 2013) (discussing both cases). Even assuming that the privilege in fact reaches final and post-decisional presidential communications, it may nevertheless be overcome by the working-law doctrine in certain instances. *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 24 & n.8 (recognizing that the President cannot engage in governance by "secret law"; holding that a final presidential communication that carried the force of law was not exempt under FOIA). In other words, if a presidential communication "create[s] or determine[s] the extent of the substantive rights" of a person, *Afshar v. DOS*, 702 F.2d 1125, 1141 (D.C. Cir. 1983)—for example, by approving the operation of a surveillance program—it is working law and cannot be withheld under Exemption 5.

Insofar as the government contends that the working-law doctrine cannot overcome the attorney-client privilege, *see* Gov. Opp. 8 n.3 (citing *Fed. Open Market Comm. v. Merrill*, 443 U.S. 340, 360 n.23 (1979)), its argument is squarely foreclosed by Second Circuit precedent, *see Brennan Ctr.*, 697 F.3d at 208 (rejecting identical government argument based on *Federal Open Market Committee*; observing that "when a document has been relied upon sufficiently to waive the deliberative-process privilege, that reliance can have the same effect on the attorney-client privilege").

Accordingly, Plaintiffs respectfully request that the Court hold that Defendants have not met their burden to establish that Exemption 5 applies because the withheld documents contain

working law. In the alternative, the Court should review a representative sample of the

memoranda *in camera*—including CIA 65, NSA 16, NSD 4 and 36, and OLC 2 and 5—to assess

whether they contain working law, and it should direct the government to supplement its

declarations with facts describing how each document was used and relied upon by the agencies.

*See* Pls. Br. 26.[6]

**B.    The Government Has Failed To Justify the Privileges It Asserts.**

**1.    The Government Has Failed To Justify the Deliberative Process Privilege.**

The government has failed to justify its invocation of the deliberative process privilege

with respect to all or part of more than 100 documents. Its Vaughn indices and declarations lack

the detail required to demonstrate that the withheld documents are both predecisional and

deliberative, and that they contain no factual, non-deliberative material. *See* Pls. Br. 26-30; *see*

*also, e.g.*, *Schlefer*, 702 F.2d at 237 (explaining that the agency bears the burden of establishing

the application of the deliberative process privilege, and that the privilege should be "construed

narrowly"). Without more detailed accounts of what each document discusses, and the role that it

played in internal deliberations, it is impossible for this Court to determine whether the material

was indeed part of an internal deliberation, and, if so, whether it reflects a decision previously

made, or embodies a position that was ultimately accepted by decision-makers. *See, e.g.*, *Grand*

*Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999). In short, the government has

failed to justify its reliance on the privilege because it has consistently refused to explain: (1) the

roles of the author and recipient of each document; (2) the function and significance of the

document in a decision-making process; (3) the subject-matter of the document and the nature of

the deliberative opinion; and (4) the number of employees among whom the document was

---

[6] Due to a clerical error, Plaintiffs mistakenly referred to NSD 36 as "NSD 10" in their opening
brief. *See* Pls. Br. 7, 15 n.5, 48 n.19. "NSD 10" is not a document at issue on this motion.

circulated. *See Senate of the Com. of P.R. v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987) (finding cursory description of "each document's issue date, its author and intended recipient, and the briefest of references to its subject matter" inadequate to sustain withholding under Exemption 5); *Nat'l Day Laborer Org. Network v. U.S. Immig. & Customs Enf't Agency*, 811 F. Supp. 2d 713, 743 (S.D.N.Y. 2011) (requiring government to describe documents' "function and significance in the agency's decision-making process" to sustain the privilege); *Auto. Club of N.Y. v. Port of N.Y. & N.J.*, 297 F.R.D. 55, 60 (S.D.N.Y. 2013) (observing that a log of documents withheld on the basis of the deliberative process privilege should include, among other information, the number of employees among whom the document was circulated).

Rather than provide this essential information, the government argues that Plaintiffs "overstate[]" the specificity of the showing required to sustain the privilege, Gov. Opp. 18, but its argument is entirely unsupported by case law. The fact that courts "focus on the functions of the *Vaughn* index, not the length of the document descriptions," *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006), does not affect the government's obligation to provide "factual support" for the core elements of the privilege. *Sen. of the Com. of P.R.*, 823 F.2d at 585. The Second Circuit's decision in *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994), is not to the contrary. In *Carney*, the court required that declarations provide "reasonably detailed explanations why any withheld documents fall within an exemption." *Id.* The government's declarations here fail to do precisely that. *See* Pls. Br. 26-30.

The government also misstates the holding of *Tigue v. DOJ* by suggesting that the Second Circuit exempted agencies from identifying any "decision" to which deliberative documents relate. Gov. Opp. 20. (citing *Tigue v. DOJ*, 312 F.3d 70, 80 (2d Cir. 2002)). This is not so. The court in *Tigue* expressly held that, even if the relevant agency decision never

15

ultimately occurred, an agency "must be able to demonstrate that, *ex ante,* the document for which executive privilege is claimed *related to a specific decision facing the agency*." 312 F.3d at 80 (emphasis added).

Here, the government has failed to show that the withheld material is related to a specific decision facing the relevant agency. *See, e.g.*, CIA Vaughn at 5-12, 14-45 (ECF No. 60-1) (stating that documents include "pre-decisional analysis, recommendations and deliberation" without any elaboration); CIA Decl. ¶¶ 23-24 (failing to specify relevant decisions); CIA Supp. Decl. ¶ 12 (describing agency talking points as merely "part of the larger process of providing training on the application of E.O. 12333," and failing to explain how the documents are pre-decisional); NSD Decl. ¶¶ 16-18 (ECF No. 65) (characterizing several NSD and NSA documents as "'pre-decisional' because they related to and preceded a final decision regarding one or more NSA programs or other intelligence activities," without providing any detail as to the nature of the decision to which the specific documents relate).

The government's reliance on boilerplate assertions about the "deliberative" functions of the withheld material is likewise fatal to its claims of privilege. *See, e.g.*, NSD Decl. ¶¶ 16-18 (characterizing documents as "deliberative" because they were "part of a process to assist the Government's decision-making," without specifying the nature of the process or the role the specific documents played); NSD Vaughn at 1-9 (ECF No. 65-1) (failing to describe the subject-matter of the withheld documents in detail or the precise role of the documents in decision-making); OLC Vaughn at 1-2 (ECF No. 67-1) (same); OLC Decl. ¶ 27 (ECF No. 67) (same); *see also Tigue*, 312 F.3d at 80 (for a document to be deliberative, it cannot be "merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment").

In addition to failing to identify the function and significance of the withheld documents in a decision-making process, the government has not provided sufficient information about the roles of the author and recipients of the documents—and, in some cases, it has not provided any information at all about which agency received the documents. Yet even the government acknowledges that specifying "the institutional role of the recipients" of the records is critical to justify the application of the privilege. Gov. Opp. 22 (citing *Carney*, 19 F.3d at 812); *see also N.Y. Times Co. v. DOJ*, 758 F.3d 436, 439 (2d Cir. 2014) (citing as illustrative the Vaughn index in *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1128-36 (D.C. Cir. 2004), which includes far more detailed information about authors and recipients than the Vaughn indices here). Notably, Plaintiffs do not seek the names of government employees or the official titles of NSA and CIA personnel where such information is otherwise exempt from disclosure under the NSA Act, CIA Act, or FOIA Exemption 6. *See* Gov. Opp. 21-22. But Plaintiffs do seek—and are entitled to—basic information about the institutional roles of the author and recipients of each document, as well as the titles of authors and recipients from agencies other than the NSA and CIA. The declarations here simply do not provide that information. *See* Gov. Opp. 20; *see also, e.g.*, NSD Decl. ¶ 15 (stating that several NSD and NSA documents contain memoranda "from NSD attorneys to other Government attorneys," without disclosing the recipient agencies—let alone the roles of the authors and recipient attorneys); *see also* NSA Vaughn at 2 (ECF No. 64-14) (same); NSD Vaughn at 1-9 (providing no information whatsoever about authors or recipients); CIA Decl. ¶ 23 (stating that documents were conveyed to "Agency employees" and "CIA officials"); CIA Vaughn at 5-12, 14-45 (failing to specify the roles of CIA attorney authors and providing no information about recipients). Moreover, none of the agencies have specified the number of employees who ultimately received the documents—information essential "to assess

17

whether the documents were 'related to the process by which policies are formulated.'" *Auto. Club of N.Y.*, 297 F.R.D. at 60 (quoting *La Raza*, 411 F.3d at 356).

The government also contends that, because many of the documents are classified, it need not fully justify its Exemption 5 withholdings in a *public* declaration. *See* Gov. Opp. 19. This is a curious argument: even if Defendants were correct that they could satisfy their burden by supplementing their public Vaughn indices with classified declarations, the only agency that has filed such a declaration is the NSA. Even more puzzlingly, the government cites to the *CIA*'s public declaration in support of this argument. *See id.* (asserting that the CIA's disclosure of the "facts, analysis, and even citations to legal authorities" would tend to reveal classified material (quoting CIA Supp. Decl. ¶ 5)). Setting those curiosities aside, if the CIA is contending that it need not justify its withholdings in any form—not even in a classified submission to the Court— it is plainly mistaken. *See, e.g.*, *John Doe Corp. v. John Doe Agency*, 850 F.2d 105, 110 (2d Cir. 1988), *rev'd on other grounds*, 493 U.S. 146 (1989).[7]

Citing its significantly redacted Vaughn indices in two other FOIA cases, the government further contends that it need not provide detailed justifications to invoke the deliberative process privilege. *See* Gov. Opp. 21-22. But those cases—in which the government asserted near-total secrecy over its targeted-killing program—shed little light on *this* one, in which the government itself has described the surveillance programs at issue in thousands of pages of declassified material. In this case, it is simply not plausible that there is nothing more the government can say

---

[7] In any event, FOIA strongly disfavors reliance upon *in camera*, *ex parte* submissions and permits such reliance only after the government has submitted as detailed a public explanation of its withholdings as possible. *See John Doe Corp.*, 850 F.2d at 110. This requirement serves a crucial purpose: it "enables the adversary system to operate by giving the requester as much information as possible," thereby "enabl[ing] the trial court to fulfill its duty of ruling on the applicability of the exemption." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006).

about the allegedly deliberative process at issue here without compromising legitimately held secrets.

Finally, the government incorrectly asserts that Plaintiffs have "omit[ted]" certain documents from their Index of Contested Documents, and thus "abandoned" claims related to NSD 2, 7, 37, 42, 44, and 47. *See* Gov. Opp. 26-27. Neither contention is accurate. Each of these NSD records was included in Plaintiffs' Index, and Plaintiffs continue to dispute their withholding. *See* Pls. Index at 9 (Ex. A to Manes Decl.) (ECF No. 71-1) (listing NSD 7, 37, 42); *id.* at 10 (listing NSD 44, 47); *id.* at 11 (listing NSD 2).

### 2.     The Government Has Failed To Justify the Attorney-Client Privilege.

As Plaintiffs have explained, the government's vague and incomplete descriptions of the withheld documents are insufficient to meet its burden to invoke the attorney-client privilege. *See* Pls. Br. 29-32. To properly invoke the privilege, the government must show that the document was "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re Cty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). The government's Vaughn indices and declarations fail to establish the essential elements of the privilege.

For example, the CIA, NSA, and NSD have largely failed to provide sufficient information about the authors and recipients of copies of the withheld documents. *See* Pls. Br. 31. However, without this information, the Court cannot assess whether the documents were in fact confidential communications between client and counsel, or whether, for example, they were distributed broadly as official guidance, thus defeating the privilege.

In response, the government highlights the level of detail provided in the NSA's Vaughn index with respect to NSA 7, *see* Gov. Opp. 30—but this example only underscores the glaring deficiencies in the government's descriptions of dozens of other documents. *Compare* NSA

Vaughn at 1 (describing the roles of the author and recipient of NSA 7, and explaining that the document "analyz[ed] a classified NSA SIGINT activity under EO 12333 and USSID 18"), *with, e.g.*, NSA Vaughn at 3 (failing to adequately describe the subject of NSA 14, which "concern[s] classified SIGINT activities"); NSA Decl. ¶ 53 (failing to adequately describe the recipient of NSA 14; noting only that the recipient was an agency client or clients); CIA Vaughn at 10 (failing to adequately describe the author, recipient, and subject of CIA 23, a memorandum "from [a] CIA attorney providing legal advice in response to a request for legal guidance on a particular issue"); CIA Decl. ¶ 26 (stating simply that "Agency employees requested legal advice related to certain proposed courses of action or operations"); NSD Vaughn at 3 (failing to adequately describe the subject of NSD 13 and 14, "NSD Memo[s] on an NSA Program and Accompanying Documentation"); NSD Decl. ¶ 15 (failing to adequately describe the authors and recipients of NSD 13 and 14, memoranda "from NSD attorneys to other Government attorneys"). Under well-established precedent, the government's explanations are plainly insufficient to justify the privilege. *See, e.g.*, *Mead Data Central, Inc. v. Dep't of the Air Force*, 566 F.2d 242, 253-54 (D.C. Cir. 1977); *Adamowicz v. IRS*, 552 F. Supp. 2d 355, 366 (S.D.N.Y. 2008).

### 3.     The Government Has Failed To Justify the Presidential Communications Privilege.

For the first time in its reply brief, the government asserts that the presidential communications privilege applies to CIA 22 and CIA 36. *See* Gov. Opp. 31-32. As a threshold matter, because the CIA did not raise this argument in its Vaughn index or initial declaration, the Court should deem it waived. *See, e.g.*, *In re Fisher*, 908 F. Supp. 2d 468, 472 (S.D.N.Y. 2012); *see also United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003) ("We will not consider an argument raised for the first time in a reply brief."). But regardless, the government has failed to properly invoke the presidential communications privilege over these two documents.

In addition to protecting communications that directly involve the President, the privilege protects "communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). As the D.C. Circuit has explained, the privilege "should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decision making process is adequately protected. Not every person who plays a role in the development of presidential advice, no matter how remote and removed from the President, can qualify for the privilege." *Id.* Specifically, "the privilege should not extend to staff outside the White House in executive branch agencies." *Id. But see ACLU v. DOD*, No. 15-cv-1954, 2016 WL 889739, at *4 (S.D.N.Y. Mar. 4, 2016) (observing in dictum that, in certain circumstances, "the privilege could attach to communications to and from very senior members of the Executive Branch in agencies outside the White House," including "officials at the highest levels in the . . . National Security Council").

Even assuming that the privilege can extend to high-level National Security Council officials (many of whom also serve in other executive-branch agencies), the CIA has failed to justify its invocation of the privilege. First, with respect to CIA 22, the agency has not shown that the memorandum from the Director of the CIA to the National Security Advisor was in fact "solicited" by the President or his close advisers. *See In re Sealed Case*, 121 F.3d at 752. Second, with respect to CIA 36, the agency has failed to specify the roles of the author and recipients of the document. *See* CIA Supp. Decl. ¶ 9 n.3 (cursorily stating that the correspondence was "between the CIA and the National Security Council"). The government has also failed to

specify the number of employees among whom CIA 22 and CIA 36 were circulated. *See id.* ¶ 9; *see also Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26 (the more extensively a privileged communication is distributed, the more attenuated the privilege's purpose). For these reasons, the Court should reject the government's attempt to invoke the presidential communications privilege over CIA 22 and CIA 36.

## II.     The Government Has Improperly Withheld Information Under Exemptions 1 and 3.

Under FOIA, Defendants are required to segregate and disclose non-exempt portions of individual records—*i.e.*, any portion of a record that is not "inextricably intertwined" with properly exempt material. *ACLU v. FBI*, No. 11-cv-7562, 2015 WL 1566775, at *2 (S.D.N.Y. Mar. 31, 2015); 5 U.S.C. § 552(b). To satisfy their burden of establishing that they have released all reasonably segregable material, Defendants must "provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Mead*, 566 F.2d at 261; *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (explaining that courts must make "specific findings of segregability"). For the reasons discussed below, Defendants have failed to establish that they have segregated and released non-exempt portions of legal memoranda, inspector general and compliance reports, and rules and regulations.

### A.     The Government Must Segregate and Release Legal Analysis That Is Not "Inextricably Intertwined" With Exempt Information.

The government's withholding of over 100 legal memoranda in their entirety appears to be predicated on a fundamental misunderstanding of the scope of Exemptions 1 and 3. Contrary to the government's argument, Gov. Opp. 32, "pure legal analysis"—*i.e.*, constitutional and statutory interpretation, discussions of precedent, and legal conclusions that can be segregated from properly classified facts—cannot be withheld under either exemption. *See* Pls. Br. 35-38.

22

Pure legal analysis may not be classified—and, thus, may not be withheld under Exemption 1—for two reasons. First, its disclosure cannot satisfy EO 13526's "damage" requirement. Information may be classified under EO 13526 only if, among other conditions, disclosure "reasonably could be expected to result in damage to the national security," and if the original classification authority is able to "identify or describe the damage." EO 13526 § 1.1(a)(4). It is indisputable that the release of legal analysis that is not inextricably intertwined with properly classified facts cannot reasonably be expected to harm national security. *Cf. N.Y. Times Co. v. DOJ* (*N.Y. Times I*), 756 F.3d 100, 119-20 (2d Cir. 2014).

Second, the Executive Order also limits the kinds of information that can be classified, and pure legal analysis does not fall into one of the eight specified categories. *See* EO 13526 § 1.4. Although the government is correct that EO 13526 permits the classification of material that "pertains to" one of the enumerated categories, its reading of "pertains to" is so broad that it would encompass virtually all of the documents that agencies such as the CIA and NSA produce. *See* Gov. Br. 32-33, 35-36. The more natural and logical construction of that term is that it authorizes classification only if the information in question falls into—that is, *belongs to*—one of the specific categories.[8]

---

[8] *See Pertain*, Merriam-Webster's Dictionary (online ed.), http://www.merriam-webster.com/dictionary/pertain (defining "pertain" as "to belong as a part, member, accessory, or product"). Although an unpublished decision of the D.C. Circuit recently concluded that "pertains is not a very demanding verb," *ACLU v. DOJ*, No. 15-5217, 2016 WL 1657953, at *2 (D.C. Cir. Apr. 21, 2016), the Second Circuit has not opined on whether "pertains to" can encompass pure legal reasoning that is not inextricably intertwined with classified facts. The government's citations to *ACLU v. DOJ*, 681 F.3d 61, 72 (2d Cir. 2012), and *N.Y. Times I*, 756 F.3d 100, 113, 119 (2d Cir. 2014), are misplaced, *see* Gov. Opp. 33, as neither case supports the government's radically expansive interpretation of the phrase. In *ACLU v. DOJ*, the Second Circuit upheld the withholding of portions of OLC memoranda that pertained to an intelligence activity—presumably portions that were inextricably intertwined with classified material. 681 F.3d at 72. Likewise, in *N.Y. Times I*, the Court observed that, "in *some* circumstances the very fact that legal analysis was given concerning a planned operation would risk disclosure of the

Nor can pure legal analysis be withheld under Exemption 3, as none of the withholding statutes cited by Defendants protect it from disclosure. *See* 5 U.S.C. § 552(b)(3) (the government may invoke Exemption 3 only over records that are "*specifically* exempted from disclosure by [a] statute" other than FOIA (emphasis added)); *see also* Pls. Br. 32-33 (discussing case law requiring that withholding statutes be construed narrowly). The government contends that Exemption 3 encompasses any information that "relates to" an intelligence source or method, *see* Gov. Opp. 33-34, but this phrase appears nowhere in the relevant portion of the National Security Act. *See* 50 U.S.C. § 3024(i)(1). The only case that the government cites in support, *ACLU v. DOJ*, 681 F.3d 61 (2d Cir. 2012), does not stand for the proposition that Exemption 3 reaches so broadly. In that case, the Second Circuit affirmed the withholding of a photograph of a detainee taken during the period in which he was interrogated, on the grounds that disclosing it would reveal information important to intelligence gathering. *Id.* at 76. That reasoning simply does not apply to pure legal analysis, the disclosure of which would not reveal intelligence sources or methods. Moreover, if Exemption 3 in fact covered all information that "relates to" subjects identified in the withholding statutes, it would provide the CIA and other agencies with the near-categorical exemption from the FOIA that Congress considered but rejected. *See, e.g.*, Karen A. Winchester & James W. Zirkle, *Freedom of Information and the CIA Information Act*, 21 U. Rich. L. Rev. 231, 256 (1987) (detailing congressional rejection of the CIA's plea to "exclude totally the CIA . . . from the requirements of FOIA").

---

likelihood of that operation." 756 F.3d at 119 (emphasis added). In other words, legal analysis in some circumstances is not segregable from classified operational details—a fact that Plaintiffs readily acknowledge. In any event, the Court need not decide the precise meaning of "pertains to" within the Executive Order, because the disclosure of pure legal analysis cannot reasonably harm national security.

The government suggests that simply because a memorandum "deal[s] with classified topics," disclosure of "even citations to legal authorities" would "tend to reveal . . . the underlying classified material." CIA Supp. Decl. ¶ 5. But it is neither "logical" nor "plausible" that every line of the 108 legal memoranda withheld in full is inextricably intertwined with exempt information. *N.Y. Times I*, 756 F.3d at 119. Instead of providing the "reasons behind their conclusions," *Mead*, 566 F.2d at 261, Defendants continue to rely on impermissibly conclusory assertions that they have satisfied their burden to segregate non-exempt material. Plaintiffs respectfully request that, after reviewing a representative sample of the withheld legal memoranda *in camera*, the Court order the government to conduct a proper segregability analysis and to release all non-exempt portions of the documents.

### B.   The Government Must Release Segregable, Non-Exempt Information from the Inspector General and Compliance Reports.

As Plaintiffs explained in their opening brief, the government has improperly withheld information about the number of compliance incidents in the example Intelligence Oversight Board (IOB) report at issue on this motion, NSA 79 (Ex. J to Manes Decl.) (ECF No. 71-11). *See* Pls. Br. 41. The NSA contends that because the withheld numbers all "relate to" NSA's collection, analysis, and dissemination of signals intelligence, they fall within the scope of the NSA Act and can be withheld pursuant to Exemption 3. *See* Gov. Opp. 37-38. However, as discussed above, this is not the relevant legal test. Exemption 3 applies only to records specifically exempted by statute, and the words "relate to" appear nowhere in the NSA Act. *See* 50 U.S.C. § 3605. Instead, the question is whether the number of incidents of unlawful collection or querying reveal anything about the "function" of the NSA. *See id.*; *cf. Phillippi v. CIA*, 546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976). They do not. *See* Pls. Br. 41.

The government also errs in arguing that these numbers can be withheld under Exemption 1. *See* Gov. Opp. 38. It is neither logical nor plausible that these numbers could permit potential surveillance targets to "assess which NSA capabilities the agency uses most frequently," or to "determine the scope of NSA's collection activities under particular programs," NSA Supp. Decl. ¶ 11 (ECF No. 79), as there is no publicly known statistical relationship between the number of compliance incidents and the scope of a particular program. Moreover, even if disclosure of these numbers would permit adversaries to discern the "NSA's ability and accuracy in determining the 'foreignness' of the selectors targeted for acquisition," *id.*, the NSA has failed to justify its assertion that harm to the national security would result. In fact, the government has already disclosed its error rate in determining the foreignness of selectors—down to the tenths of a percentage point—in the very similar context of Section 702 surveillance under the Foreign Intelligence Surveillance Act. *See, e.g.*, Privacy & Civil Liberties Oversight Board, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* 43-45 (July 2, 2014) (in 2013, DOJ concluded that the NSA had incorrectly tasked selectors as "foreign" in 0.4% of its targeting decisions in the prior year). Finally, given the width of the redactions, the approximate order of magnitude of the compliance incidents is apparent from the face of the document itself.[9] The NSA has simply

---

[9] *See, e.g.*, NSA 79 at ¶¶ I.A.1, I.A.1.b, reproduced in part here for the Court's convenience:

(b) (3)

(U//~~FOUO~~) During the fourth quarter of CY2012, in ☐ instances, signals intelligence (SIGINT) analysts inadvertently targeted communications to, from, or about USPs, while pursuing foreign intelligence tasking or performed mistaken queries that potentially sought or returned information about USPs. Unless otherwise specified, all intercepts, query results, and reports have been deleted or destroyed as required by United States SIGINT Directive SP0018.

- ~~(S//SI//REL TO USA, FVEY)~~ On ☐ occasions during the fourth quarter, NSA analysts performed queries in raw traffic databases without first conducting the necessary research

failed to explain how the release of marginally more precise numbers would result in harm to the national security.

In addition to improperly withholding compliance incident statistics, Defendants have plainly failed to conduct the required segregability review of the reports. *See* Pls. Br. 39-40. This is apparent for three reasons. First, given the length and description of the documents actually or effectively withheld in full, it is implausible that they contain no segregable material whatsoever. For example, NSA 23 is an 84-page Office of Inspector General report on NSA activities. Pls. Br. 39; NSA Vaughn at 5. Yet the NSA's supplemental declaration is silent as to the justification for the complete withholding of NSA 22 and 23. *See* NSA Supp. Decl. ¶¶ 8-13.

Second, the NSA's release of significant portions of its IOB reports shows that segregation of this kind of document is feasible. *See* NSA 79. Although the government seeks to distinguish NSA 79 on the grounds that "the withheld [in full] NSA, CIA, and NSD reports pertain to nonpublic, classified programs or operations," Gov. Opp. 36, NSA 79 apparently "pertains to" nonpublic, classified programs or operations as well. *See* NSA 79 at I.A.2, I.A.3 (redacting information pursuant to Exemptions 1 and 3). The question is not whether the reports withheld in full "pertain to" classified material, but, instead, whether the government has met its burden to segregate material that is non-exempt—including material that would not reveal intelligence sources and methods, and that would not harm national security if disclosed.

Third, the released portions of certain reports suggest that the government has improperly withheld nonexempt information. As an example, Plaintiffs highlighted CIA 10, in which the agency completely withheld sections entitled "Targeting Standards" and "The Department of Justice's Role in EO Compliance." Pls. Br. 40 (describing CIA 10 (Ex. K to Manes Decl.) (ECF No. 71-12)). Although the CIA's supplemental declaration asserts that these sections of the

document "discuss specifics of the Agency's intelligence collection," CIA Supp. Decl. ¶ 8, it is not apparent how general targeting standards and compliance procedures are inextricably intertwined with classified information. Moreover, the agency's supplemental declaration completely fails to address Plaintiffs' concerns about the CIA's withholding of pages of information about "real or perceived legal and policy concerns" associated with targeting U.S. persons abroad for surveillance. Pls. Br. 40 (quoting CIA 10 at 14).

Given the length and importance of the documents withheld in full, as well as the fact that Defendants admit to withholding statistics about compliance incidents, Plaintiffs respectfully request that the Court review a representative sample of these documents *in camera*, including CIA 12, NSA 23, and NSD 44, to assess Defendants' failure to release segregable, non-exempt material. Plaintiffs also request that, after ordering Defendants to release all non-exempt portions of these three documents, the Court order Defendants to conduct a proper segregability review of the remaining reports.

### C.  The Government Must Release Segregable, Non-Exempt Information from Its Rules and Regulations.

The government has also failed to meet its burden of showing that it has segregated and released non-exempt information from its rules and regulations. *See* Pls. Br. 42-43. The government erroneously contends that Plaintiffs challenge "only two" withholdings of rules and regulations. Gov. Opp. 38. In fact, Plaintiffs challenge 17 documents in this category. *See* Pls. Index 10-11; Pls. Br. 42-43. Among these is CIA 4, a memorandum of understanding between the CIA and FBI concerning activities conducted under EO 12333, which Plaintiffs urged the Court to review *in camera*. *See* Pls. Br. 8, 43. The CIA seeks to defend its withholdings on the grounds that the information redacted in this document concerns "foreign intelligence and counterintelligence measures governing operational activities of the CIA and FBI, reporting

requirements, and the passage of information between the two agencies." CIA Supp. Decl. ¶ 11. However, it is not at all apparent how "reporting requirements" or information about "the passage of information between the two agencies" are properly classifiable under EO 13526. Accordingly, Plaintiffs respectfully request that the Court review a representative sample of the withheld rules and regulations *in camera*, including CIA 4 and NSD 202-207, to assess Defendants' failure to release segregable, non-exempt material. Plaintiffs also request that the Court order the NSA to complete its re-review of NSD 94-125 by July 8, 2016. *See* NSA Supp. Decl. ¶ 16 n.3 (in response to Plaintiffs' identification of improperly withheld material, the agency is re-reviewing the document and "hopes to complete its assessment within 30 days").

## III.   The Government Has Improperly Withheld Documents Under Exemption 7.

As Plaintiffs explained in their opening brief, the FBI has failed to satisfy Exemption 7's threshold requirement, because it has failed to explain precisely "*what* law-enforcement purpose" prompted the creation of the documents at issue. *Elkins v. Fed. Aviation Admin.*, 99 F. Supp. 3d 90, 99 (D.D.C. 2015); *see* Pls. Br. 43-48. Contrary to the government's assertion, Gov. Opp. 39, Plaintiffs recognize that a single document *may* have both "law enforcement" and "intelligence" purposes. However, even the government concedes that these two functions merely "overlap," *id.*—and, thus, they are neither identical nor coterminous.

Because law enforcement and intelligence-gathering are distinct activities, and because EO 12333 authorizes such a wide range of foreign-intelligence collection—some of which has no clear nexus to law-enforcement activity—the FBI cannot satisfy its threshold Exemption 7 burden with the general assertion that "[i]ntelligence collected under EO 12333 has a significant law enforcement purpose." FBI Supp. Decl. ¶ 11 (ECF No. 78). While some intelligence-gathering undoubtedly has a law-enforcement purpose, it is neither logical nor plausible that, as a categorical matter, *all* intelligence collected under EO 12333 has a significant law-enforcement

purpose, as evidenced by ODNI General Counsel Robert Litt's recent public remarks on the divide between the FBI's intelligence-gathering and law-enforcement functions under EO 12333. *See* Robert Litt, General Counsel of the Office of the Director of National Intelligence, *The New Intelligence Sharing Procedures Are Not About Law Enforcement*, Just Security (Mar. 30, 2016), http://bit.ly/1WDyMgH; Pls. Br. 44-45.

For example, it is plain that NSD 202-207—a document titled "Supplemental Guidelines for Collection, Retention, and Dissemination of Foreign Intelligence"—primarily concerns foreign-intelligence collection, not "guidelines for law enforcement investigations." 5 U.S.C. § 552(b)(7)(E). The FBI's assertion that NSD 202-207 "spell[s] out specific procedures the FBI, as a law enforcement agency investigating in the United States, must follow when collecting, retaining, and disseminating intelligence information," FBI Supp. Decl. ¶ 16, is not to the contrary, and it fails to satisfy the agency's burden to show that the withheld portions of the document were compiled for a law-enforcement purpose. *See also, e.g.*, *id.* ¶ 15 (omitting any discussion of whether the specific material withheld in FBI 13-15 was in fact compiled for law-enforcement purposes).

Even if the FBI could show that the material it is withholding was compiled for a law-enforcement purpose, it has not justified its withholdings under Exemption 7(E) in particular. With respect to its redactions of "techniques and procedures," the agency must describe with specificity "what procedures are at stake." *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 746 F.3d 1082, 1102 (D.C. Cir. 2014) (rejecting agency assertion of Exemption 7(E)). The FBI's cursory references to intelligence-gathering methods cannot satisfy this requirement. *Compare, e.g.*, FBI Decl. ¶ 18 (ECF No. 63) ("The Counterintelligence Policy Implementation Guide sets forth specific policies, procedures and investigative techniques used by the FBI in its

counterintelligence investigations."), *with Elec. Privacy Info. Ctr. v. Customs & Border Prot.*, No. 14-1217, 2016 WL 632179, at *4 (D.D.C. Feb. 17, 2016) ("The declarant's statements that the withheld materials pertain to the 'use,' 'navigation,' and 'capabilities' of [an intelligence] system . . . are minimally descriptive, and thus do not provide the Court with sufficient detail regarding the law enforcement techniques or procedures the defendant seeks to protect.").

Moreover, with respect to its Exemption 7(E) withholdings of "guidelines," the FBI must further demonstrate that release of the guidelines risks circumvention of the law. *See Allard K. Lowenstein Int'l Human Rts. Proj. v. DHS*, 626 F.3d 678, 681 (2d Cir. 2010).[10] The agency has failed to satisfy this requirement as well. *See* Pls. Br. 46. Its conclusory assertion that disclosure would allow individuals "to develop countermeasures to avoid detection and surveillance," FBI Supp. Decl. ¶ 19, "lacks any case-specific, meaningful explanation as to how any . . . guideline at issue *in this case* would make it easier for individuals to evade the law," *Jett v. FBI*, 139 F. Supp. 3d 352, 363 (D.D.C. 2015).

Thus, because the government has failed to satisfy the basic requirements to invoke Exemption 7, Plaintiffs respectfully request that the Court hold that the government's withholdings pursuant to the exemption are improper.

---

[10] For several of the documents at issue, the extent to which the FBI is withholding material pursuant to the "techniques and procedures" prong or the "guidelines" prong of Exemption 7(E) is unclear. *See, e.g.*, FBI Supp. Decl. ¶ 16 (explaining that NSD 202-207, the Supplemental Guidelines for Collection, Retention, and Dissemination of Foreign Intelligence, "spell out specific procedures," without specifying whether the *withheld* material concerns "guidelines" or "techniques and procedures"). In any event, the government has failed to establish that disclosure of any of the withheld information would risk circumvention of law.

**IV.     The Government Should Be Compelled To Disclose Information That It Has Officially Acknowledged.**

**A.     The Government's Official Acknowledgments Defeat Exemptions 1 and 3, and They Waive Its Right To Withhold Records Under Exemption 5.**

As Plaintiffs explained in their opening brief, the government is improperly withholding information that it has officially acknowledged. *See* Pls. Br. 11-14. Under Exemptions 1 and 3, the government may not withhold information from the public unless it differs materially from information that the government has already revealed. *N.Y. Times I*, 756 F.3d at 114, 119-20. Here, it is clear that the government is withholding material from OLC 3, 4, and 8, as well as other CIA, NSA, NSD, and OLC legal memoranda, that is closely related to disclosures already made in OLC 9, OLC 10, and the multi-agency OIG Report. *See* Pls. Br. 12-14.

Second Circuit precedent is clear that the government's official acknowledgments can overcome Exemption 5 privileges as well. Notably, the government does not meaningfully dispute the fact that it has officially acknowledged information it continues to withhold under Exemptions 1, 3, and 5. *See* Gov. Opp. 42-47. Instead, it attempts to insulate its Exemption 5 withholdings from disclosure by arguing that this Court should engage in a separate "waiver" analysis with respect to this material—and by urging the Court to take an unduly narrow view of the scope of the waiver doctrine. *Id.* But regardless of whether the Court engages in a "waiver" or "official acknowledgment" analysis, the result is the same: because the government has failed to meet its burden to show that it has not waived confidentiality over portions of OLC 3, 4, and 8, these documents—and likely others—are not wholly exempt from disclosure. This conclusion follows directly from the Second Circuit's opinion in *N.Y. Times I*. There, the court concluded that an OLC memorandum on targeted killing could not be withheld under Exemption 5 because a series of official acknowledgments by senior government officials, as well as the government's

release of a DOJ white paper, resulted in the "waiver of secrecy and privilege as to the legal analysis" in the OLC memorandum. 756 F.3d at 114-17.

*N.Y. Times I* squarely forecloses the government's attempts to narrow the applicability of the waiver doctrine and the scope of the waiver itself. Although the government contends that waiver "requires disclosure of a privileged communication; revealing the information communicated is not a waiver," Gov. Opp. 44, *N.Y. Times I* recognized that "the attorney-client and deliberative privileges, in the context of Exemption 5, may be lost by disclosure"—without requiring that the disclosure be of a "privileged communication." 756 F.3d at 114. Notably, the court's analysis of Exemption 5 involved canvassing an array of public statements by senior government officials discussing the lawfulness of targeted killing. *See id.* (describing speeches by, among others, then–Attorney General Eric Holder, on matters closely related to the substance of the OLC memorandum). If the Second Circuit had accepted the narrow rule that the government now seeks to advance, that analysis would have been entirely superfluous, as those public speeches were not "privileged communications." In addition, if the government's rule were correct, then the Second Circuit would have assessed whether the DOJ white paper itself had been a properly privileged communication prior to its disclosure—an inquiry that the court did not undertake. *See id.* Finally, even if it were the case that waiver required the disclosure of a privileged communication, OLC 10 is, on the government's view, precisely such a communication. *See* OLC Vaughn at 2; *see also* Pls. Br. 12-14.

The government also errs in arguing that, in the FOIA context, "[p]ublic disclosures of attorney-client privileged information outside the context of litigation do not waive privilege as to other, undisclosed attorney-client communications." Gov. Opp. 44. Indeed, the court's holding in *N.Y. Times I* was predicated entirely on the fact that the government had waived the *secrecy*

*and confidentiality* of the OLC targeted killing memorandum through its several disclosures outside of litigation. *See* 756 F.3d at 114-17 ("the Government may no longer validly claim that the legal analysis in the [OLC] Memorandum is a secret"); *see also, e.g.*, *N.Y. Times II*, 806 F.3d at 686 (recognizing that "a Government official's public statement made after preparation of a legal opinion" can "result in waiver of protection for that opinion" under Exemption 5).

Moreover, the government disregards entirely the doctrine of subject-matter waiver. It is well established that, in many contexts, the "voluntary disclosure of privileged material subject to the attorney–client privilege . . . 'waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter.'" *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997). The inquiry is context-specific and "depend[s] heavily on the factual context in which the privilege is asserted." *In re Sealed Case*, 877 F.2d 976, 981 (D.C. Cir. 1989); *accord Gen. Elec. Co. v. Johnson*, No. 00-cv-2855, 2006 WL 2616187 at *19 (D.D.C. 2006) ("The scope of subject-matter waiver is a matter that rests within the Court's discretion."). The appropriate inquiry—as with the official acknowledgment of material withheld under Exemptions 1 and 3—is whether disclosure of publicly acknowledged information would expose other, still-privileged information.

In short, regardless of whether a court is evaluating withholdings under Exemptions 1, 3, or 5, the critical question is whether already-disclosed information can be effectively segregated from *other* information that warrants continued secrecy. For example, if a "significant interval of time" passes between the creation of a protected document and an official's "subsequent statement discussing the same or a similar topic," the document's discussion of the relevant topic is more likely to be the product of a wholly distinct context—and is thus more likely to be inextricably intertwined with other privileged information. *N.Y. Times II*, 806 F.3d at 686.

34

Ultimately, however, the government bears the burden of establishing that the privilege has not been waived, *see Brennan Ctr.*, 697 F.3d at 201-02, and here, it has failed to explain why the contexts giving rise to OLC 9, 10, and the OIG Report are so different from the contexts of the withheld material as to preclude waiver.

**B.      The Court Should Require Reprocessing of STELLAR WIND Documents in Light of Several Government Disclosures.**

In addition to seeking the disclosure of any withheld information closely related to the information disclosed in OLC 9 and 10, Plaintiffs respectfully request reprocessing of documents—including OLC 3, 4, 8, and 10—that incorporate material officially acknowledged in the 740-page multi-agency report on STELLAR WIND that the government released in September 2015. *See* Pls. Br. 14.

Although the government contends that this task would "accomplish nothing," and that the "broad public purposes of FOIA would not be furthered by this exercise," Gov. Opp. 45, this is not so. FOIA requires that agencies disclose all reasonably segregable non-exempt material, *see* 5 U.S.C. § 552(b), and the government here has conceded that it is "possible" that material acknowledged in the OIG Report appears in portions of OLC 10 that were redacted. OLC Decl. ¶ 24. Plaintiffs are simply seeking to hold the government to its statutory obligation. While it is true that the information at issue "has already [been] released in another form," Gov. Opp. 45, the release of this information in each document where it appears will provide critical context to already disclosed material, furnish a more complete and accurate historical record, and further "open agency action to the light of public scrutiny"—one of the core purposes of FOIA. *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976).

The government also argues that reprocessing would be "unduly burdensome on limited government resources," and result in an unmanageable parade of horribles, Gov. Opp. 44, 47, but

it fails to consider the alternatives. Plaintiffs, or any other FOIA requester, are legally entitled to file a new FOIA request *at any time* that seeks the release of the same information from the exact same documents. 5 U.S.C. § 552(a). Surely it is more efficient for the government to fulfill its FOIA obligations in the context of the current case than to do so in response to successive FOIA requests. Furthermore, Plaintiffs are not requesting reprocessing of the each of the agencies' complete document productions; rather, Plaintiffs' request is limited to the small subset of documents that pertain to STELLAR WIND. Indeed, what Plaintiffs seek is precisely what the court granted in *N.Y. Times I*: the reprocessing of a limited set of documents in response to official government disclosures post-dating the plaintiffs' FOIA request. 756 F.3d at 110 n.8. Although the government attempts to distinguish that case, *see* Gov. Opp. 44-45, here, just as in *N.Y. Times I*, the material at issue goes "to the heart" of what Plaintiffs sought through their FOIA requests. 756 F.3d at 110 n.8; *see also ACLU v. CIA*, 710 F.3d 422, 431-32 (D.C. Cir. 2013). More generally, the Second Circuit was clear that its decision to take judicial notice of post-FOIA request disclosures was "the most sensible approach to ongoing disclosures by the Government made in the midst of FOIA litigation." *Id.*

The government appears to have abandoned its argument that Plaintiffs are barred from challenging the withholding of OLC 4, 8, and 10 under the doctrines of res judicata and collateral estoppel. *Compare* Gov. Br. 36, 47, 54, *with* Gov. Opp. 44. For the reasons explained in Plaintiffs' opening brief, neither doctrine poses a bar here. *See* Pls. Br. 49-50; *Whole Woman's Health v. Hellerstedt*, __ S. Ct. __, No. 15–274, 2016 WL 3461560, at *11 (June 27, 2016) ("Res judicata does not bar claims that are predicated on events that postdate the filing of the initial complaint." (quoting *Morgan v. Covington*, 648 F.3d 172, 178 (3d Cir. 2011)).

**V.**     **Alternatively, the Court Should Review a Selection of the Documents *In Camera*.**

For the reasons explained above and in Plaintiffs' opening brief, the Court should order the government to disclose the records whose withholding it has not justified. At a minimum, however, the Court should conduct an *in camera* review of a representative sample of the documents at issue to determine whether they may be withheld. *See* Pls. Br. 6-9, 48-49. This sample should include the following:

> Legal Memoranda: CIA 65, NSA 16, NSD 4, NSD 36, OLC 2, and OLC 5;

> Inspector General and Compliance Reports: CIA 12, NSA 23, and NSD 44;

> Rules and Regulations: CIA 4 and NSD 202-207; and

> Training Materials: CIA 46 and DIA V-4.

As the Second Circuit has recognized, *in camera* review allows a district court to make a case-specific determination about the legality of government withholdings. *See Associated Press v. DOJ*, 549 F.3d 62, 67 (2d Cir. 2008); 5 U.S.C. § 552(a)(4)(B). Courts have found such review particularly appropriate where (1) "the government seeks to exempt entire documents but provides only vague or sweeping claims as to why those documents should be withheld," *Associated Press*, 549 F.3d at 67 (citing *Local 3, Int'l Bhd. of Elec. Workers, AFL–CIO v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988)); and (2) the number of documents at issue is manageably small, *see N.Y. Times Co. v. DOJ*, 872 F. Supp. 2d 309, 315 (S.D.N.Y. 2012); *see also Quiñon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996). Both of these conditions are present here. *See supra* Sections I.B, II, III; Pls. Br. 48-49 (requesting *in camera* review of 13 documents).

The government wrongly objects to *in camera* review on the grounds that, "where the [agency] affidavit is sufficiently detailed to place the documents within the claimed exemptions, and where the government's assertions are not challenged by contrary evidence," the Second Circuit has "held that the district court should restrain its discretion to order *in camera* review."

37

Gov. Opp. 58 (quoting *Halpern v. FBI*, 181 F.3d 279, 295 (2d Cir. 1999)). But neither condition is present here. First, for the reasons discussed above, the government's declarations are entirely inadequate. *See supra* Sections I.B, II, III. Second, the record put forward by Plaintiffs contradicts several of the government's key factual claims. *See, e.g.*, Pls. Br. 18-19 (discussing executive branch reliance on STELLAR WIND memoranda); *id.* at 22-23 (discussing executive branch reliance on NSD 4, the "Wainstein Memo" (Ex. G to Manes Decl.) (ECF No. 71-8)). In light of these factual challenges to the government's declarations, *in camera* review is warranted.

## VI.   The Government's Searches Were Inadequate Under FOIA.

Three defendant agencies—FBI, CIA and NSD—have failed to conduct proper searches for records. Although the government has submitted supplemental declarations for each, these simply highlight—rather than cure—the defects in each agency's search.

Much of the government's reply rests on a straw-man argument: that the government is not required to discover "every document extant" when responding to a FOIA request. *See* Gov. Opp. 47. But Plaintiffs do not ask the government to mine its files to locate every last responsive document. Plaintiffs demand only that Defendants comply with FOIA by showing "beyond material doubt" that they have searched each location likely to have records, and that they have used search terms or other reliable methods reasonably calculated to locate all responsive documents. *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); Pls. Br. 51-52.

The FBI, CIA, and NSD have not shown that their searches were adequate. To meet their burden of proof, agencies must submit declarations that, at a minimum, (1) identify which files were searched and by whom; (2) describe the file locations searched and the structure of the agency's file system in order to demonstrate that searching any other system would be unlikely to disclose additional relevant information; and (3) provide a list of the specific search terms used and the combinations thereof. *See* Pls. Br. 51-53 (collecting cases). Without at least this

level of detail, the Court will be unable "to determine if the search was adequate." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

Not only do the FBI's, CIA's, and NSD's declarations fail to meet these standards, but their declarations suggest obvious gaps in the searches that each agency conducted. Plaintiffs respectfully request that the Court order each agency to conduct a proper search that addresses these defects. Plaintiffs also request that the Court impose prompt deadlines for the State Department ("State") to complete its review of newly discovered documents, to produce non-exempt material, and to provide explanations for the withholding of any material that it asserts is exempt.

### A.    The FBI Has Failed To Conduct a Proper Search.

The FBI has failed to conduct an adequate search for two reasons. First, it failed to properly supervise or maintain records of the search conducted by front-line staff. As a result, even the FBI does not know whether all of the relevant employees searched their files and, if so, what process and search terms they used. Second, the FBI improperly limited its search to only certain components of the agency, even though its own publicly released documents provide strong reason to believe that other components have responsive records.

As Plaintiffs explained in their opening brief, the FBI failed to provide adequate detail about which files were searched, by whom, using which search terms. Pls. Br. 57-58. In its reply, the FBI has not adequately addressed any of these faults. In fact, the FBI concedes that after each component reported back with the results of its search, the agency did not bother to ask how the component conducted its search, which file systems were searched, which employees searched their own records, and what search terms or other methodologies were used. FBI Supp. Decl. ¶ 6. Moreover, the FBI effectively concedes that it would be impossible at this point to reconstruct any meaningfully detailed description of the search. *See id.* ("Particularly given the passage of

time and the numerous individuals involved in its search, FBI is not in a position to detail all search steps taken by all of its tasked employees."). Thus, the FBI is simply unable to explain to this Court, with any detail, *why* its search was sufficient. *See id.*

The government is in effect asking this Court to take it on faith that the FBI conducted a reasonable search. But the law does not allow a court to uphold a search in the absence of supporting facts. *See Oglesby*, 920 F.2d at 68. Moreover, this Court should not endorse the slipshod manner in which the FBI apparently superintends its FOIA process. The agency's practice of searching for records without tracking how those searches are conducted makes it impossible for a reviewing court (or plaintiffs) to determine what the agency has actually done to search its files. Here, because the FBI is unable to identify *which* repositories were searched, the Court is left with little choice but to find that the FBI failed to search all file systems containing potentially responsive information. *See Nat'l Day Laborer Org. Network v. U.S. Immig. & Customs Enf't Agency*, 877 F. Supp. 2d 87, 96 (S.D.N.Y. 2012) (citing *Katzman v. CIA*, 903 F. Supp. 434, 438 (E.D.N.Y. 1995)).

Moreover, it was plainly unreasonable for the FBI to limit its search solely to its Training Division, Corporate Policy Office, Office of the General Counsel Discovery Processing Units, and National Security Branch. FBI Decl. ¶ 21; FBI Supp. Decl. ¶ 4. This is because the FBI has other components likely to be involved in the use of EO 12333-derived information about U.S. persons—an issue at the heart of Plaintiffs' FOIA request. For instance, the FBI has a separate "Intelligence Branch" with responsibility to "proactively engag[e] with the Bureau's partners across the intelligence and law enforcement communities" and "oversee[] intelligence policy and guidance." FBI, *About Us: Intelligence Branch*, https://www.fbi.gov/about-us/intelligence/intelligence. It stands to reason that the FBI branch chiefly responsible for

intelligence collection would have records regarding the use of information obtained under EO 12333.

For these reasons, the FBI cannot establish that it conducted an adequate search. Plaintiffs respectfully request that the Court direct the FBI to conduct a proper search for responsive records.

**B.      NSD Has Failed To Conduct a Proper Search.**

NSD limited its search to two subcomponents: the Office of Intelligence and the Office of Law and Policy. Both searches appear to have been fatally underinclusive. This Court should order NSD to expand the scope of its search so as to reasonably encompass all documents requested.

The search of the NSD Office of Intelligence was not reasonably calculated to uncover all relevant documents, particularly documents dating back several years. Plaintiffs' request covered documents spanning a 13-year period, yet NSD concluded that no responsive records were likely to be found anywhere but in the files of six attorneys it selected. NSD Supp. Decl. ¶ 11 (ECF No. 80). In its supplemental declaration, NSD provided an additional description of these attorneys' positions, and it averred that these attorneys are "some of the most senior and knowledgeable attorneys within that office, each having extensive institutional knowledge." *Id.* But NSD has provided no basis to conclude that these six attorneys' files would cover the entire time period of the Court-ordered FOIA search. *See* Pls. Br. at 56-57.

NSD's search of the Office of Law and Policy was even more clearly unreasonable. It searched only one attorney's files within that office to uncover the work of an entire section over 13 years. In its supplemental declaration, NSD asserts that it was reasonable to search only the current Special Counsel's files because "the Special Counsel works more on 12333 related matters than anyone else in the Office of Law and Policy. As a result, it is unlikely that any

additional *significant* records would be located in the files of another employee within the Office of Law and Policy." NSD Supp. Decl. ¶ 11 (emphasis added). But NSD effectively concedes that there were other attorneys within the OLP who also worked on EO 12333 matters, and that they may have responsive documents not also located in the Special Counsel's files. *See id.* More fundamentally, it is not for NSD to assess what records may or may not be "significant"; its obligation is to conduct a search reasonably calculated to locate the records Plaintiffs requested, as specified in this Court's order. *See Nat'l Day Laborer*, 877 F. Supp. 2d at 100.

Separately, NSD persists in refusing to provide the Court with a list of search terms it used to identify potentially responsive documents. *See* Pls. Br. at 57. This failure is fatal to NSD's ability to establish the adequacy of its search. *See, e.g.*, *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003); *Nat'l Day Laborer*, 877 F. Supp. 2d at 110 ("Surely, the agencies have failed to establish the adequacy of the searches for which they have specified no search terms."). Plaintiffs respectfully request that, given NSD's underinclusive and inadequately described search, the Court order NSD to expand the scope of its search to additional record systems or individuals' files at NSD, and to provide a detailed description of how those searches were conducted.

## C.   The CIA Has Failed To Conduct a Proper Search.

The CIA failed to conduct an adequate search because it cannot or will not provide details regarding (1) which repositories it searched, and (2) which search terms it used and in what combinations. *See* Pls. Br. at 59-60.

In its reply, the government does not respond meaningfully to these two challenges, instead repeating assertions from its original submission that are not sufficient to meet its burden of proof. Gov. Opp. 47-49. Indeed, despite the fact that the CIA submitted a supplemental

declaration to address deficiencies in its original submissions, the supplemental declaration does not even attempt to further explain the adequacy of its FOIA search.

For instance, rather than provide even a basic description of its file repositories, the agency simply asserts that it has no legal obligation to do so. *See* Gov. Opp. 48-49. The government's reply brief cites not a single legal authority for this categorical position, because there is none to cite. As Plaintiffs have pointed out, case law is clear that agencies must describe their record systems with sufficient detail to allow a court to determine that the search was "reasonably calculated to uncover all relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007); *see* Pls. Br. 59 (citing *Weisberg*, 705 F.2d at 1348). Indeed, the CIA has been faulted by another court in this circuit on precisely the same issue. *See Rabin v. Dep't of State*, 980 F. Supp. 116, 121 (E.D.N.Y. 1997) (the CIA must "'describe at least generally the structure of the agency's file system' which renders any further search unlikely to disclose additional relevant information") (quoting *Church of Scientology v. IRS*, 792 F.2d 146, 151 (D.C. Cir. 1986)).

Similarly, the CIA dismisses the requirement that it describe the specific search terms it used as a mere "quibble," and it refuses to provide any meaningful details about how it searched the repositories that it did identify. *See* Gov. Opp. 48. As in its initial submission, the government states only that the agency used "broad search terms, including '12333'"; that it conducted unspecified "targeted" searches; and that it used other undisclosed "search terms and methods reasonably calculated to locate those documents." *Id.* (quoting CIA Decl. ¶¶ 10-11).

Far from a "quibble," it is well established that an agency must specify its search terms or equivalent details. *See, e.g.*, *Nat'l Day Laborer*, 877 F. Supp. 2d at 110; *Iturralde*, 315 F.3d at 313-14. Because the CIA has failed to describe its specific search terms—including, for example,

whether it used any of the other common permutations of the title of the executive order—it has failed to establish the adequacy of its search. *See Weisberg*, 627 F.2d at 371; *Nat'l Day Laborer*, 877 F. Supp. 2d at 96, 110; *Oglesby*, 920 F.2d at 68. This Court is left to guess as to which terms the agency relied upon, and whether those terms were reasonably calculated to produce all responsive records. Plaintiffs respectfully request that the Court order the CIA to conduct a proper search, or, at a minimum, to provide further affidavits with the detail that FOIA demands.

**D.      The State Department and Defense Intelligence Agency**

The State Department's supplemental declaration explains that it has just now located 35 boxes of archived records, covering the period of September 2001 to December 2008, that were not previously identified or searched. State Supp. Decl. ¶¶ 3-4 (ECF No. 81). Apparently, State did not investigate the seven-year gap in its search until after Plaintiffs' cross-motion identified a different inconsistency in the time-frame for the records searched. *See* Pls. Br. 56. Now, over 21 months after the original deadline for State to fulfill its obligation to search for, review, and produce responsive records, State suggests that it may be able to conduct an "initial review" for responsiveness by September 30, 2016, but refuses to indicate when it might produce any responsive records thereafter. This Court should not permit State to drag out this proceeding because of its negligence. At the very least, the Court should order State to complete its review for responsiveness by September 30, 2016, and it should require State to produce responsive records and to justify any withholdings in a Vaughn index by October 30, 2016.

Separately, the government has chosen to wait until the eleventh hour to inform this Court that the reason that DIA and State have turned up few or no responsive documents is because there is a mismatch between the language that was used in the Court-ordered stipulation specifying the scope of the search, and the nature of each agency's EO 12333 activities. Gov. Opp. 49, 55-56. Specifically, the government now informs Plaintiffs and the Court, for the first

time, that neither DIA nor State engage in "electronic surveillance" under EO 12333. DIA Supp. Decl. ¶¶ 13, 17 (ECF No. 77); Gov. Opp. 55-56. Because the Court-ordered search stipulation is largely framed in terms of electronic surveillance conducted *by each agency*, the government contends that both State and DIA are unlikely to have any (or many) responsive records. If this is the case, it is precisely the kind of information that the government should have provided to Plaintiffs more than two years ago, while they were engaged in extensive negotiations over the terms of the search stipulation. Indeed, two years ago, the government informed Plaintiffs that another agency—NSD—did not itself engage in electronic surveillance under EO 12333. *See* NSD Supp. Decl. ¶ 5. Plaintiffs then submitted a slightly revised FOIA request to NSD, so as to capture the documents that Plaintiffs intended to seek through their original request, and filed a Second Amended Complaint incorporating the revised NSD request. *See* ECF No. 47. The government should have provided the same notice with regard to State and DIA.

Plaintiffs withdraw their objection to the adequacy of State's and DIA's searches, except that they continue to press State to review and process the documents contained in the 35 newly discovered boxes, and they respectfully ask the Court to order a series of deadlines for that process, as outlined above.

## CONCLUSION

For these reasons, Plaintiffs' motion for partial summary judgment should be granted.

Respectfully submitted,

Jonathan Manes                              */s/ Ashley Gorski*
David Schulz                                Ashley Gorski
Russell Fink (law student intern)           Patrick Toomey
Media Freedom and Information Access Clinic,  American Civil Liberties Union
    Abrams Institute, Yale Law School[11]        Foundation

---

[11] This memorandum was prepared in part by the Media Freedom and Information Access Clinic, a program of the Abrams Institute for Freedom of Expression and the Information Society

45

P.O. Box 208215                        125 Broad Street, 18th Floor
New Haven, CT 06520                    New York, NY 10004
(212) 850-6103                         Phone: (212) 549-2500
jonathan.manes@yale.edu                Fax: (212) 549-2654
                                       agorski@aclu.org


Dated: July 1, 2016

Project at Yale Law School. The brief does not purport to express the school's institutional
views, if any.